UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
**Norfolk Division**

FILED

MAY 10 2016

CLERK. US DISTRICT COURT
NORFOLK, VA

ROXANNE ADAMS, ADMINISTRATOR OF
THE ESTATE OF JAMYCHEAL M. MITCHELL,
Deceased,

        Plaintiff,

v.

NAPHCARE, INC.,

      Serve:  RALS VA, LLC (Registered Agent)
              7288 Hanover Green Drive
              Mechanicsville, VA  23111

NSEKENENE  KOLONGO, MD,

      Serve  Hampton Roads Regional Jail
      at:     2690 Elmhurst Lane
             Portsmouth, VA  23701

RENEE EDWARDS, LCSW,

      Serve  218 Romanesque Street
      at:     Portsmouth, VA  23707-4200

JUSTIN RAY, NP-PSYCH,

      Serve  815 Satinwood Court
      at:     Chesapeake, VA  23322-5882

BENEDICT NGWA, NP,

      Serve  3512 Rochelle Ct.
      at:     Chesapeake, VA 23321-4436

PAM JOHNSON, RN,

      Serve  1331 Mt. Vernon Avenue
      at:     Portsmouth, VA  23707-3507

Case:  2:16 cv 229

**JURY TRIAL DEMANDED**

NATALYA THOMAS, RN, HSA,

> Serve 1918 Bridgestone Cir.
> at:     Conyers, GA 30012-3783

JALESSA RIVERS, LPN

> Serve 7 Wild Duck Ct.
> at:     Hampton, VA 23666-5577

HOPE NICHOLSON, MA

> Serve 1800 Winter Park Ct.
> at:     Virginia Beach, VA 23453-3732

DORIS MURPHY, MSW,

> Serve 3325 Daystone Arch
> at:     Chesapeake, VA 23323-1236

JOHN / JANE DOE NAPHCARE NURSES (1-11),

> Serve: NaphCare, Inc.
>          RALS VA, LLC (Registered Agent)
>          7288 Hanover Green Drive
>          Mechanicsville, VA  23111

LENNA JO DAVIS (Clerk, Portsmouth General District Court),

> Serve Office of the Clerk
> at:     Portsmouth General District Court
>          1345 Court Street, Suite 104
>          Portsmouth, VA 23705

KELLY N. BOYD,

> Serve Office of the Clerk
> at:     Portsmouth General District Court
>          1345 Court Street, Suite 104
>          Portsmouth, VA 23705

HAMPTON ROADS REGIONAL JAIL AUTHORITY,

> Serve: David L. Simons, Hampton Roads Regional Jail Authority
>          2690 Elmhurst Lane
>          Portsmouth, VA  23701

HAMPTON ROADS REGIONAL JAIL,

> <u>Serve:</u> David L. Simons, Hampton Roads Regional Jail
> 2690 Elmhurst Lane
> Portsmouth, VA  23701

DAVID L. SIMONS,

> <u>Serve</u>  Hampton Roads Regional Jail
> <u>at:</u>  2690 Elmhurst Lane
> Portsmouth, VA  23701

EUGENE TAYLOR, III,

> <u>Serve</u>  Hampton Roads Regional Jail
> <u>at:</u>  2690 Elmhurst Lane
> Portsmouth, VA  23701

BARNES, BLAKELY, BOURNE, BUTCHER, GIBBS, HILLIARD,
HOWARD, KEISTER, WHITAKER, POWELL (Correctional Officers
at the Hampton Roads Regional Jail),

SMITH, DIXON, JOHNSON (Master Jail Officers "MJOs" at Hampton
Roads Regional Jail),

DERRICK R. BROWN, STEPHEN T. PHILLIPS, WILLIAM A. EPPERSON,
STEVEN W. WHITEHEAD, TAMARA L. EVERETTE, (Sergeants at the
Hampton Roads Regional Jail),

RODERICK D. MADISON; REGINALD WHITEHEAD
(Lieutenants at the Hampton Roads Regional Jail),

FELICIA M. COWAN (Captain at the Hampton Roads Regional Jail),

> <u>Serve the aforementioned at</u>:
> Hampton Roads Regional Jail
> 2690 Elmhurst Lane
> Portsmouth, VA  23701

DEBRA K. FERGUSON (Licensed Clinical Psychologist), and

> <u>Serve:</u> 222 East Pearson Street, # 1406
> <u>at:</u>  Chicago, IL  60611

GAIL HART,

> <u>Serve</u>   1097 Old Denbigh Boulevard
> at:      Newport News, VA 23602-2038
>
> Defendants.

## **COMPLAINT**

COMES NOW Plaintiff Roxanne Adams, Administrator of the Estate of Jamycheal M.

Mitchell, Deceased, by counsel, and moves this Court for judgment against NaphCare, Inc.

("NaphCare"); Nsekenene Kolongo, MD; Renee Edwards, LCSW; Justin Ray, NP-Psych;

Benedict Ngwa, NP; Pam Johnson, RN; Natalya Thomas, RN, HSA; Jalessa Rivers, LPN; Hope

Nicholson, MA; Doris Murphy, MSW; John / Jane Doe NaphCare Nurses (1-11); Lenna Jo

Davis; Kelly N. Boyd; Hampton Roads Regional Jail Authority ("HRRJA"); Hampton Roads

Regional Jail ("HRRJ" or "the Jail"); David L. Simons; Eugene Taylor, III; Barnes, Blakely,

Bourne, Butcher, Gibbs, Hilliard, Howard, Keister, Powell, Whitaker (Correctional Officers at

HRRJ); Smith, Dixon, Johnson (Master Jail Officers "MJOs" at HRRJ); Derrick R. Brown,

Stephen T. Phillips, William A. Epperson, Steven W. Whitehead, Tamara L. Everette (Sergeants

at HRRJ); Roderick D. Madison, Reginald Whitehead (Lieutenants at HRRJ); Felicia M. Cowan

(Captain at HRRJ)[1]; Debra K. Ferguson, Licensed Clinical Psychologist; and Gail Hart; and, in

support of her Complaint, states as follows:

---

[1] Defendants Barnes; Blakely; Bourne; Butcher; Gibbs; Hilliard, Howard; Keister; Powell; Whitaker; Smith; Dixon; Johnson; D. Brown; Phillips; Epperson; Sgt. Whitehead; Lt. Whitehead; Everette; Madison and Cowan are collectively referred to herein as the "Correctional Officer Defendants."

I.    **INTRODUCTION**

1.    On August 19, 2015, 24-year-old Jamycheal M. Mitchell ("Mitchell") was pronounced dead by EMS after being found not breathing and without a pulse while a detainee at the HRRJ.

2.    Approximately four months earlier, in April 2015, Mitchell was arrested for allegedly stealing $5 in snacks from a 7-Eleven. When he was in or about the fourth grade, Mitchell was diagnosed as mildly intellectually disabled (upon information and belief, Mitchell was characterized in school records as mildly "mentally retarded"). Mitchell had also long suffered from bipolar disorder and schizophrenia. A mental health screening ordered by the Portsmouth General District Court in 2015 noted that "Mr. Mitchell's thought processes were so confused that only snippets of his sentences could be understood, the rest were mumbled statements that made no rational sense." At the urging of a mental health expert, the General District Court ordered that Mitchell be treated at Eastern State Hospital, a state mental hospital, to "restore his competency." However, according to Eastern State Hospital and to a state investigation conducted after Mitchell's death, Defendant Lenna Jo Davis, the Portsmouth General District Court Clerk, and, implicated by circumstances, her employee, Defendant Kelly N. Boyd, did not forward the restoration order to Eastern State Hospital *until more than two months after it was issued.* When Eastern State Hospital finally received it, the order was never acted upon because Defendant Gail Hart, an Eastern State Hospital admissions employee, simply *shoved the order in a drawer; she never entered Mitchell's name into the log used to manage incoming patients to Eastern State Hospital.* An investigative report by the Virginia Department of Behavioral Health & Development Services ("DBHDS") found that Hart's drawer contained a "significant number of [competency restoration orders] that had not been entered." By statute, it

was the specific duty of Defendant Debra K. Ferguson, the Commissioner of DBHDS, to comply with the General District Court's restoration of competency order regarding Mitchell.  During the relevant period, Defendant Ferguson regularly disregarded competency restoration orders issued by judges throughout the Commonwealth of Virginia.

3.      While housed at the HRRJ, Mitchell was repeatedly mistreated and/or purposefully ignored by Jail personnel.  The Correctional Officer Defendants sealed Mitchell in his cell by regularly locking shut the "chuck hole" to Mitchell's cell door.  During the last months of his confinement, Mitchell was confined in a two-inmate cell that he occupied by himself.  The cell door had a Plexiglas window.  When the cell door and the chuck hole were closed, the cell was completely sealed, excepting a small gap between the cell door and the door jam.  Mitchell and other inmates spoke to each other through the small gaps.  Other detainees and inmates were permitted at times to stand in, or pass through, the central pod area in front of Mitchell's cell.  However, Mitchell was almost never permitted to leave his cell.

4.      Further, the Correctional Officer Defendants regularly denied Mitchell food.  One inmate estimates that Mitchell would sometimes receive only one meal a day or one meal over several days.  Mitchell would suffer dramatic, significant weight loss that was never adequately addressed by Defendants HRRJ/HRRJA or their employees, or by HRRJ/HRRJA's medical contractor, Defendant NaphCare/its employees.  Despite inconsistencies and incompleteness across medical records and public statements made by Jail officials as to Mitchell's weight, it appears Mitchell lost approximately 40 pounds, and may have lost closer to 50 pounds.  What is clear is that his weight ultimately fell to 144 lbs on his 6' 1" plus frame.  At a court hearing held approximately three weeks before his death, his family was shocked to see how gaunt Mitchell had become.  Mitchell's aunt, Roxanne Adams, Administrator of Mitchell's Estate and Plaintiff

in this action, made well over 40 calls to Jail officials seeking help for her nephew.  HRRJ officials told Adams that Mitchell's weight loss was due to *his* failure to eat; however, Jail detainees/inmates have stated that Mitchell ate ravenously *when* he was provided food.  Jail officials told Adams that they would follow up on her concerns, but they never did.

5.      The Correctional Officer Defendants also turned off the water in Mitchell's cell.  As a consequence of no toilet water and a sealed door, Mitchell was encapsulated in a cell that reeked from the stench of unflushed urine and feces.  Indicative of the depths of his mental illness, and/or out of an effort by him to simply be noticed and helped, Mitchell smeared feces on the Plexiglas window to his cell.

6.      In the air-conditioned Jail that inmates regularly describe as "cold," for months, the Correctional Officer Defendants denied Mitchell clothing, a mattress, a sheet, and blankets (he reportedly received a bare mattress only days before his death).  Mitchell's "bed" was a metal sheet.  Day after day, he stood cold and naked at the doorway of his cell.  He did not have any shoes to insulate his feet from the frigid cement floor.  During a period of lucidity, he explained to another detainee that he stood at the doorway because he felt that there was some warmth provided by the overhead light.

7.      Although psychotropic medications (medications capable of affecting the mind, emotions, and behavior) were prescribed for Mitchell and important for the maintenance of his mental competency, Mitchell reportedly received virtually no psychotropic medication at the Jail, and, about a month before his death, his medication was discontinued altogether.  Mitchell also was prescribed medication to treat his severe edema, but also did not receive it as ordered.  Jail personnel have contended in the press that Mitchell "refused" to take his medications and also refused other treatments, but those statements suggest an informed and conscious decision,

which Mitchell was incapable of making. Further, other inmates refute the contentions of Jail

personnel that Mitchell was offered medication. The inmates assert that at "pill pass" NaphCare

nurses regularly walked past Mitchell's cell without offering any medications. The Correctional

Officer Defendants oftentimes encouraged NaphCare nurses to bypass Mitchell, asserting to "not

bother with" Mitchell as "he was crazy," or words to that effect. Despite knowing that Mitchell

was, among other things, significantly mentally impaired, not receiving his medications or other

medical treatments, losing significant amounts of weight, physically deteriorating, and

"smearing" feces/urine – thereby creating a highly infectious environment – Defendants

NaphCare; Edwards, LCSW; Kolongo, MD; Ngwa, NP; Ray, NP-Psych; Thomas, RN, HSA;

Rivers, LPN; Nicholson, MA; Doris Murphy, MSW; and Pam Johnson, RN; did not adequately

monitor, treat, and/or attempt to treat, Mitchell, did not have adequate systems in place to allow

Mitchell proper medical/mental health care, and did not follow up with DBHDS regarding the

failure to transfer Mitchell to Eastern State Hospital per court order.

8.      Mitchell was also physically and verbally abused by the Correctional Officer

Defendants. At times, Mitchell was forced to the ground, dragged, sprayed with mace, stood

upon, punched and kicked by Correctional Officer Defendants. Inmates state that the

Correctional Officer Defendants regularly mocked and laughed at Mitchell. In the words of one

inmate, certain Correctional Officer Defendants "treated [Mitchell] like a circus animal." Many

times following the abuse, Mitchell could be heard crying from his cell.

9.      Other detainees were deeply disturbed by Mitchell's horrid circumstances and the

mistreatment he received, and sought to intervene on his behalf. For instance, one detainee told

Correctional Officer Defendants, among other things, "this man shouldn't be here. He needs

help." However, the pleas of Mitchell's fellow inmates went unheeded; Correctional Officer

Defendants were deliberately indifferent to Mitchell's circumstances, saying, among other things, "as long as he does not die on my watch," they did not care about his circumstances.

10.   In the later part of his detention, Mitchell's feet and legs became very swollen. One detainee said that one of Mitchell's feet and legs was so swollen that it looked as it if he was wearing a large cast. After a considerable period of inadequate attention in-house, Defendant NaphCare finally sent Mitchell to Bon Secours Maryview Medical Center ("Maryview Hospital") for treatment. During his brief ED stay, Mitchell's condition was assessed – lab tests were performed and he was diagnosed as suffering from "Bilateral lower extremity edema," "hypoalbuminemia," and "elevated transaminase level" – but the cause of his conditions was not ascertained nor was he provided any treatment. Mitchell was given a consultation to see a GI doctor. However, Jail medical records reveal that upon Mitchell's return to the Jail, Defendants NaphCare; Kolongo, MD; Ngwa, NP; Pam Johnson, RN; and other NaphCare employees and/or agents, provided no follow up care, including no GI consult, for the remaining 19 days of Mitchell's confinement before his death, nor did they provide proper care or refer Mitchell to an ED again when his medical condition considerably worsened.

11.   Defendants NaphCare; Kolongo, MD; Edwards, LCSW; Ray, NP-Psych; Ngwa, NP; Thomas, RN, HSA; Rivers, LPN; Nicholson, MA; Doris Murphy, MSW; and Pam Johnson, RN; and, upon information and belief, Defendants HRRJA/HRRJ, Simons, and Eugene Taylor, among other HRRJ and NaphCare employees, were well aware that Mitchell was mentally decompensating and physically deteriorating, but did not adequately address such. Indeed, an evaluation for a temporary detention order (TDO) was requested by Defendant Edwards, LCSW, on July 31, 2015. A TDO was not necessary, and likely was contrary to Virginia law in this circumstance, where a CRO had been issued by the Court; in any event, the TDO evaluation was

not completed.  However, despite her awareness of Mitchell's mental and physical decline, and

her acknowledgement with the TDO evaluation request that Mitchell was imminently in danger

at HRRJ and needed to be removed, Defendant Edwards, LCSW, failed to follow up when no

TDO evaluation had been conducted as of August 3, 2015 and Mitchell otherwise had not been

removed from HRRJ (and no other NaphCare or HRRJ/HRRJA employees followed up either).

Mitchell thus remained largely abandoned in his cell at HRRJ until his death on August 19, 2015.

      12.    Prior to his death, Mitchell, who inmates report was always whistling and making

other noises between the crack between his door and door jam, became quiet.  For as many as

four days before his death, Mitchell uncharacteristically laid slumped on the rack in his cell.

When other detainees/inmates asked him what was wrong he moaned that he was feeling very

bad and needed medical help.  The detainees/inmates relayed that information to Correctional

Officer Defendants and implored them to help Mitchell, but the "COs" ignored the requests, or

otherwise did not obtain medical help for Mitchell.  At one point, inmate witnesses report that

Mitchell's cell door was opened and Mitchell stepped out of his cell and asked for medical care,

but Correctional Officer Defendants returned Mitchell to his cell and no medical care was

provided to Mitchell.

      13.    On August 19, 2015, fellow Jail detainees discovered Mitchell unresponsive in his

Jail cell.  Upon information and belief, a correctional officer employee then attempted to clean

Mitchell's cell.  Upon information and belief, in response, inmates yelled that the correctional

officer was "tampering with a crime scene."  Responding NaphCare providers recorded that,

upon their arrival, Mitchell was not breathing and had no pulse.  Upon information and belief,

when these providers attempted to use the defibrillator, it was not working.  EMS was called to

the scene and pronounced Mitchell dead.  In the Death Scene Investigation Report, despite, upon

information and belief, the above attempted cleaning efforts, investigators from the Office of the Chief Medical Examiner described Mitchell's cell as having the stench of a "foul odor."  The toilet in the cell was full of urine and feces.  Investigators found puddles of urine on the floor of Mitchell's cell.

14.     An autopsy performed by the Office of the Chief Medical Examiner listed the cause of Mitchell's death as "Probable cardiac arrhythmia accompanying wasting syndrome of unknown etiology."  Assistant Chief Medical Examiner Wendy M. Gunther, M.D., described Mitchell as "nearly cachectic," meaning the loss of body mass that cannot be reversed nutritionally.

15.     Upon viewing his body, Mitchell's family was stunned.  Their beloved Jamycheal, despite his struggles with mental illness, had been a vibrant young man who loved music and always made people laugh.  In his place was a withered figure the family could hardly recognize.

16.     Multiple investigations by a variety of governmental agencies have been initiated to examine the circumstances of Mitchell's death and his detention at the Jail.   Critical findings made in the two reports released to date are included herein.

## II.    JURISDICTION

17.     Jurisdiction exists in this case pursuant to the Fourteenth Amendment of the U.S. Constitution, 42 U.S.C. §§ 1983 and 1988, and 28 U.S.C. § 1331, 1343.  Additionally, jurisdiction exists pursuant to 28 U.S.C. § 1332, as the matter in controversy: a) exceeds the sum or value of $75,000, exclusive of interest and costs, and b) is between citizens of different States, as the Plaintiff is a citizen of the Commonwealth of Virginia and Defendant NaphCare is a citizen of Alabama; additionally, upon information and belief, Defendant Ferguson is now a citizen of Illinois and Defendant Thomas is now a citizen of Georgia.  Further, this Court has

supplemental jurisdiction, pursuant to 28 U.S.C. § 1367 (a), over the state law claims, including claims alleged pursuant to Virginia Code § 8.01-50 *et seq.* (wrongful-death statute), or, alternatively, pursuant to Virginia Code § 8.01-25 *et seq.* (survival statute).  All relief available under the foregoing statutes is sought herein by Plaintiff.

### III.   VENUE

18.   Venue is proper pursuant to 28 U.S.C. § 1391(b), because a substantial part of the acts and omissions giving rise to Plaintiff's claims occurred in this district.

19.   Assignment to the Norfolk Division of the Eastern District of Virginia is proper pursuant to Eastern District of Virginia Local Rules 3(B)(4) and 3(C), because a substantial part of the acts and omissions giving rise to Plaintiff's claims occurred in this division.

### IV.   PARTIES

20.   Plaintiff Roxanne Adams is the aunt of the Decedent, Jamycheal M. Mitchell. Plaintiff is, and was at all relevant times, a resident of the Commonwealth of Virginia.  On October 19, 2015, Plaintiff duly qualified as Administrator of the Estate of Jamycheal M. Mitchell, Deceased, in the Circuit Court of City of Portsmouth, under the provisions of Virginia Code § 64.2-454.  A copy of the Certificate/Letter of Qualification is attached hereto, marked as **Exhibit A.**  Plaintiff brings this action in her capacity as Administrator of the Estate of Jamycheal M. Mitchell, Deceased, pursuant to, among other statutes, Virginia Code § 8.01-50 *et seq.* (wrongful death statute), or, alternatively, pursuant to Virginia Code § 8.01-25 *et seq.* (survival statute).  All relief available under these statutes is sought herein by Plaintiff.

21.   Defendant NaphCare, Inc., is an Alabama corporation with operations in Virginia, and, previously, in the City of Portsmouth.  Information obtained from the Virginia State Corporation Commission indicates that its principal office is located in Birmingham, Alabama.

At all times relevant hereto, Defendant NaphCare had a contract with HRRJA and/or the HRRJ. By contract, Defendant NaphCare assumed responsibility for the provision of on-site medical services to all inmates/detainees of the Jail, including Mitchell, and also for supervising, directing, and controlling health care personnel at the Jail. Defendant NaphCare was paid in excess of $9 million per year to provide healthcare services at the Jail. Based upon the foregoing, upon information and belief, Defendant NaphCare and its employees/agents (Defendants herein), at all relevant times, provided services to the Jail as an independent contractor. At all relevant times, Defendant NaphCare and its employees/agents acted under color of state law. On August 21, 2015, *just two days after Mitchell's August 19, 2015 death*, HRRJ/HRRJA issued a Request for Proposals *for another healthcare contractor to replace NaphCare*; the company Correct Care Solutions, LLC ("CCS") was hired thereafter.

22.     Defendant Nsekenene Kolongo, MD, is a physician licensed in the Commonwealth of Virginia. At all times relevant hereto, Defendant Kolongo, MD, was a NaphCare employee and/or agent acting within the scope of his employment and/or agency, and under color of state law. By serving as "Medical Director," Defendant Kolongo, MD assumed responsibility for the provision of on-site medical services to all HRRJ detainees/inmates, including Mitchell, and also for the supervision, direction, and control of health care personnel at the Jail. Additionally, upon information and belief, as medical director of HRRJ, Defendant Kolongo, MD, was responsible for implementing medical protocols, as well as for the training, duties, and actions of the medical services staff at the Jail. Defendant Kolongo, MD, is sued in his individual capacity.

23.     Defendant Renee Edwards, LCSW, was, at all relevant times, a Licensed Clinical Social Worker, and the Mental Health Director at HRRJ. At all relevant times, Defendant

Edwards was an employee and/or agent of NaphCare acting within the scope of her employment and/or agency with Defendant NaphCare, and under color of state law. Defendant Edwards, LCSW is sued in her individual capacity.

24.     Defendant Justin Ray, NP-Psych, was, at all relevant times, a licensed Nurse Practitioner with a specialization in mental health working at HRRJ. At all relevant times, Defendant Ray was an employee and/or agent of NaphCare acting within the scope of his employment and/or agency with Defendant NaphCare, and under color of state law. Defendant Ray, NP-Psych, is sued in his individual capacity.

25.     Defendant Benedict Ngwa, NP, was, at all relevant times, a licensed Nurse Practitioner working at HRRJ. At all relevant times, Defendant Ngwa, NP, was an employee and/or agent of NaphCare acting within the scope of his employment and/or agency with Defendant NaphCare, and under color of state law.   Defendant Ngwa, NP, is sued in his individual capacity.

26.     Defendant Pam Johnson, RN, was, at all relevant times, a licensed registered nurse and the Director of Nursing ("DON") at HRRJ. At all relevant times, Defendant Pam Johnson, RN, was an employee and/or agent of NaphCare acting within the scope of her employment and/or agency with Defendant NaphCare, and under color of state law. Defendant Pam Johnson, RN, is sued in her individual capacity.

27.     Defendant Natalya Thomas, RN, HSA, was, at all relevant times, a licensed registered nurse and the Health Services Administrator at HRRJ. At all relevant times, Defendant Thomas, RN, HSA, was an employee and/or agent of Defendant NaphCare acting within the scope of her employment and/or agency with Defendant NaphCare, and under color of state law. Defendant Thomas, RN, HSA, is sued in her individual capacity.

28.     Defendant Jalessa Rivers, LPN, was, at all relevant times, a Licensed Practical Nurse working at HRRJ.  At all relevant times, Defendant Rivers, LPN, was an employee and/or agent of NaphCare acting within the scope of her employment and/or agency with Defendant NaphCare, and under color of state law.  Defendant Rivers, LPN, is sued in her individual capacity.

29.     Defendant Hope Nicholson, MA, was, at all relevant times, a medical assistant working at HRRJ.  Upon information and belief, Nicholson would have been working under the license of a licensed medical provider in connection with her work at the Jail; that provider may have been Defendant Kolongo, MD, Medical Director of the Jail.  At all relevant times, Defendant Nicholson was an employee and/or agent of NaphCare acting within the scope of her employment and/or agency with Defendant NaphCare, and under color of state law.  Defendant Nicholson, MA, is sued in her individual capacity.

30.     Defendant Doris Murphy, MSW, was, at all relevant times, a mental health professional working at HRRJ.  Upon information and belief, Murphy would have been working under the license of a licensed mental health provider in connection with her work at the Jail; that provider may have been Defendant Edwards, a LCSW, and the Mental Health Director.  At all relevant times, Defendant Murphy, MSW, was an employee and/or agent of NaphCare acting within the scope of her employment and/or agency with Defendant NaphCare, and under color of state law.  Defendant Murphy, MSW, is sued in her individual capacity.

31.     Defendants John / Jane Doe NaphCare Nurses (1-11), and each of them, were, at all relevant times, health care providers at HRRJ.  At all relevant times, Defendants John / Jane Doe NaphCare Nurses (1-11) were employees and/or agents of NaphCare acting within the scope of their employment and/or agency with Defendant NaphCare, and under color of state law.

Defendants John / Jane Doe NaphCare Nurses (1-11) are sued in their individual capacities.

32.     Defendants NaphCare; Kolongo, MD; Edwards, LCSW; Ray, NP-Psych; Ngwa, NP; Thomas, RN, HSA; Rivers, LPN; Nicholson, MA; Doris Murphy, MSW; Pam Johnson, RN, and Defendants John / Jane Doe NaphCare Nurses (1-11), are collectively referred to herein as the "NaphCare Defendants." The NaphCare Defendants had specific responsibilities and duties to provide medical, nursing, psychological, and/or psychiatric care to Jail inmates/detainees, including Mitchell. Upon information and belief, the NaphCare Defendants were charged with carrying out the protocols and orders of Defendant Kolongo, MD, the Jail's chief medical officer.

33.     Defendant Lenna Jo Davis was, at all relevant times, the Clerk of the Portsmouth General District Court. At all relevant times, Defendant Davis was acting within the scope of her employment and under color of state law. Defendant Davis is sued in her individual capacity.

34.     Defendant Kelly N. Boyd was, at all relevant times, employed by Portsmouth General District Court and/or by the Clerk of Portsmouth General District Court, and was acting within the scope of her employment and under color of state law. Defendant Boyd is sued in her individual capacity.

35.     Defendant Hampton Roads Regional Jail Authority ("HRRJA") is a regional jail authority created by the cities of Chesapeake, Hampton, Portsmouth, Newport News and Norfolk, Virginia pursuant to Va. Code §§ 53.1-95.2 *et seq.* to manage the Jail. At the regional jail's website, it is stated that the HRRJ "facility is operated under the direction of the Hampton Roads Regional Jail Authority which is comprised of the sheriffs, city managers and city counsel members representing their perspective [sic] jurisdictions."

     a.     The HRRJA is not an arm or agency of the Commonwealth of Virginia, nor was it an arm or agency of the Commonwealth of Virginia at any relevant time hereto. Jail Policies and Procedures characterize the HRRJA as "an autonomous regional governmental organization."

     b.     The actual creation of the HRRJA required local activation by one or more municipalities.

     c.     The HRRJA is not a political subdivision of the Commonwealth of Virginia, nor was it a political subdivision of the Commonwealth of Virginia at any relevant time hereto.

     d.     The HRRJA is not a municipal corporation, nor was it a municipal corporation at any relevant time hereto.

     e.     Presently, and at all relevant times hereto, the HRRJA lacked the power of eminent domain.

     f.     Presently, and at all relevant times hereto, the HRRJA was authorized and empowered to sue and be sued in its own name, plead and be impleaded, by virtue of Va. Code § 53.1-95.7.

     g.     Va. Code § 53.1-95.7 (3) vests in the HRRJA the power "[t]o appoint, select, and employ officers, agents, and employees therefor, … and to fix their respective compensations[.]" Accordingly, HRRJA was the employer of Defendants Simons and Eugene Taylor and the Correctional Officer Defendants.

36.     Defendant Hampton Roads Regional Jail ("HRRJ") is a regional jail located in Portsmouth, Virginia. Defendant HRRJ serves the cities of Chesapeake, Hampton, Portsmouth, Newport News and Norfolk, Virginia. Despite Virginia statutes vesting Defendant HRRJA with the authority to manage the Jail and appoint and employ correctional officers and other

employees and agents (discussed above), there is some question as to whether certain Jail

management functions were, during the relevant period, carried out through HRRJ, as opposed to

HRRJA. For example, the contract for Defendant NaphCare to provide medical services at the

Jail at times references "the Hampton Roads Regional Jail," as the contracting party – not

HRRJA. Additionally, the Medical Services policies and procedures obtained from Defendant

Simons refer to the HRRJ as the contracting party in the medical contract. It is not known which

entity, during the relevant period, actually signed the checks issued to correctional officers and

other Jail staff.

37.     At all relevant times, Defendant David L. Simons was the Superintendent of the

HRRJ. According to an August 21, 2015 Request for Proposals to provide medical care at HRRJ

(issued shortly after Mitchell's death), "[t]ypically, inmates with medical and mental health

needs are transferred to HRRJ and, therefore, HRRJ essentially serves as a medical and mental

health facility for the five member city jails"; HRRJ's previous Request for Proposals dated

February 1, 2012, from which Defendant NaphCare was hired as the Jail's medical contractor,

had made the same material claims (excepting that there were then four member cities).  Upon

information and belief, as many as a third of HRRJ's population may suffer from some degree of

mental illness. Thus, the broad mental and medical healthcare needs of the Jail's detainee and

inmate population were, and are, readily apparent (especially to Defendants Superintendent

Simons and Assistant Superintendent Eugene Taylor, and the NaphCare Defendants).

a.     At all relevant times, Defendant Simons operated and managed the Jail

and directed and supervised its personnel. In addition, at all relevant times hereto, Defendant

Simons was an employee, agent, and/or servant of Defendant HRRJA, and was acting within the

course and scope of his employment and/or agency with Defendant HRRJA, and under color of state law. Defendant Simons is sued in his individual capacity.

b. According to the Policies and Procedures of the HRRJ, Defendant Simons "[p]erforms the duties of chief executive officer of the [HRRJA]." Defendant Simons "[p]lans the agenda for the meetings of the Board of Directors of the [HRRJA], recommends policies for adoption by the Board, and implements the decisions of the Board."

c. The Policies and Procedures further dictate that Defendant Simons "[p]lans, directs, coordinates, and manages all activities of the [HRRJ]. Ensures effective management and operation of the facility. ... Ensures training, supervision, and performance evaluation of staff are provided."

d. Upon information and belief, at all relevant times, the HRRJA established minimum standards for the administration and operation of the Jail, but delegated the final policymaking authority and management of the Jail to the Superintendent, Defendant Simons.

e. As noted above, two days after Mitchell's death, the HRRJA/HRRJ issued a Request for Proposals for another healthcare contractor to replace NaphCare, then the Jail's healthcare provider. Additionally, on August 20, 2015, *the very day after Mitchell's August 19, 2015 death,* Defendant Simons signed an updated "Mental Health Services" chapter under the "Health Care Services" Section of the Jail's *Policies and Procedures.*

f. On May 1, 2016, the *Richmond Times-Dispatch* reported that Defendant Simons had failed to preserve videotape of Mitchell's confinement, even after Simons had received a written request to preserve all videotape and other relevant evidence concerning Mitchell. (Kleiner, Sarah, "Portsmouth: Jail discarded video footage in death case," *Richmond Times-Dispatch*, May 1, 2016).

38.     At all relevant times, Defendant Eugene Taylor, III was the Assistant
Superintendent of the HRRJ.  At all relevant times hereto, Defendant Eugene Taylor was an
employee, agent, and/or servant of Defendant HRRJA, and was acting within the course and
scope of his employment and/or agency with Defendant HRRJA, and under color of state law.
Along with Defendant Simons, Defendant Eugene Taylor, at all relevant times, operated and
managed the Jail and directed and supervised its personnel.  The Policies and Procedures of the
Jail state that the Assistant Superintendent "support[s] the Superintendent in planning, directing,
and coordinating the overall operations of the [Jail]."  Like Defendant Simons, Defendant
Eugene Taylor was tasked with "Ensur[ing] effective management and operation of the facility.
… Ensures training, supervision, and performance evaluation of staff are provided." Defendant
Eugene Taylor is sued in his individual capacity.

39.     Defendants HRRJA/HRRJ, Simons and Eugene Taylor are collectively referred to
herein as the "Jail Authority Defendants."

40.     Defendants Barnes, Blakely, Bourne, Butcher, Gibbs, Hilliard, Howard, Keister,
Powell, Whitaker (all Correctional Officers at HRRJ); Smith, Dixon, Johnson ("MJOs" at
HRRJ); D. Brown, Phillips, Epperson, Sgt. Whitehead, and Everette (all Sergeants at HRRJ);
Madison, Lt. Whitehead (Lieutenants at HRRJ); and Cowan (a Captain at HRRJ) (the foregoing
are collectively referred to herein as the "Correctional Officer Defendants"), were, at all relevant
times hereto, correctional officers, MJOs, sergeants, lieutenants and/or captains, and employees,
agents, and/or servants of Defendant HRRJA and/or HRRJ,[2] and were acting within the course
and scope of their employment and/or agency with the foregoing, and under color of state law.

---

[2] In the alternative, the Correctional Officer Defendants, were, at all relevant times hereto,
correctional officers, MJOs, sergeants, lieutenants and/or captains, and employees, agents, and/or
servants of Defendant Simons, and were acting within the course and scope of their employment
and/or agency and under color of state law.

At all relevant times, the Correctional Officer Defendants worked as correctional officers at the Jail, and were responsible for maintaining the custody and care of Mitchell, and other Jail detainees and inmates. The Correctional Officer Defendants are sued in their individual capacities.

41.     Defendant Debra K. Ferguson is a Licensed Clinical Psychologist, and was formerly Commissioner of the Virginia Department of Behavioral Health & Developmental Services ("DBHDS"), a department administered by the Commonwealth of Virginia. DBHDS's Office of Forensic Services' programs serve individuals with disabilities who are involved in the Commonwealth's legal system.  Services include mental health evaluations and screenings, treatment of individuals with mental illness in jail, case management and restoration of competency to stand trial.  After little more than a year on the job, Ferguson resigned from her position, effective October 20, 2015.  During the relevant time period and pursuant to Virginia Code § 37.2-304, Defendant Ferguson was DBHDS's chief executive officer and was responsible for supervising and managing DBHDS and its mental hospitals and other facilities. Pursuant to Virginia Code § 19.2-169.2, Defendant Ferguson also had a legal duty to transfer Mitchell and other incompetent individuals to appropriate hospitals and to provide them restorative inpatient health care at such hospitals.  In addition, at all relevant times hereto, Defendant Ferguson was an employee, agent, and/or servant of DBHDS, and was acting within the course and scope of her employment and/or agency with DBHDS, and under color of state law.  Defendant Ferguson is sued in her individual capacity.

42.     Defendant Gail Hart was, at all relevant times, an employee of DBHDS and/or Eastern State Hospital, acting within the course and scope of her employment and/or agency with DBHDS, and under color of state law.  Defendant Hart is sued in her individual capacity.

V.   **APPLICABLE STATUTES**

43.     Among other statutory requirements, the Defendants employed at the HRRJ were required to comply with Virginia Code § 53.1-126, which states that, with regard to detainees/inmates, "...medical treatment shall not be withheld for any ... serious medical needs, or life threatening conditions."

44.     Virginia Code §19.2-169.1, *Raising question of competency to stand trial or plead; evaluation and determination of competency,* establishes procedures for raising the question of a pretrial detainee's legal competence, for obtaining an expert psychiatrist's or clinical psychologist's evaluation and report of the individual's condition, and for a final determination of competency or incompetency by the Virginia court presiding over the case.

45.     Virginia Code Section § 19.2-169.2 *Disposition when defendant found incompetent,* mandates the procedures that a Virginia court is required to follow when it finds that a pretrial detainee is incompetent pursuant to the procedures set out at Virginia Code § 19.2-169.1. In pertinent part, § 19.2-169.2 provides that:

> "A. Upon a finding pursuant to Subsection E of § 19.2-169.1 that the defendant, including a juvenile transferred pursuant to § 16.1-269.1 is incompetent, the court shall order that the defendant receive treatment to restore his competency on an outpatient basis, or if the court specifically finds that the defendant requires inpatient hospital treatment, at a hospital designated by the Commissioner of Behavioral Health and Developmental Services as appropriate for treatment of persons under criminal charge...."

46.     Pursuant to Virginia Code § 37.2-304, the Commissioner of Department of Behavioral Health and Developmental Services has a duty "to supervise and manage the Department and its state facilities." This includes functions of the Commissioner, Department, and state facilities defined elsewhere in the law, including in Virginia Code § 19.2-169. When a hospitalization and inpatient treatment order is entered pursuant to § 19.2-169, it is the

Commissioner's duty to transfer the individual to an appropriate hospital to be admitted and provided with restorative mental health treatment.

47.     Pretrial detainees held under § 19.2-169.2 orders are entitled to transfer to an appropriate hospital to begin their restorative treatment *immediately* after the order is entered. Virginia Code § 19.2-178 permits, in certain circumstances, jails to retain custody of mentally ill inmates who are court ordered to be transferred to a hospital until there is a vacancy at the "proper" hospital. ***However, specifically excluded from the delineated lists of circumstances in which there may be a delay are inmates awaiting transfer pursuant to §19.2-169.2 (detainees found incompetent to stand trial).***

48.     Virginia Code § 19.2-169.6, *Inpatient psychiatric hospital admission from a local correctional facility,* promulgates a process for the issuance of a temporary detention order (TDO), but specifically excluded from § 19.2-169.6 is an inmate "subject to the provisions of § 19.2-169.2." Thus, a TDO is not a statutorily prescribed process for an inmate subject to a CRO. Put another way, Virginia Code does not provide for the entry of a § 19.2-169.6 order in the context of an inmate subject to a § 19.2-169.2 order.

## VI.    FACTS

### A.    Mitchell was mildly intellectually disabled and was diagnosed with bipolar disorder and schizophrenia

49.     When he was in or about the fourth grade, Mitchell was diagnosed as mildly intellectually disabled (upon information and belief, Mitchell was characterized in school records as mildly "mentally retarded"). As early as the following year, Mitchell was also diagnosed with bipolar disorder and schizophrenia.

50.     In or about the 10th grade, Mitchell stopped attending school. At the time, Mitchell had fallen well behind in curriculum requirements and was significantly older than his

classmates.  From the time when he left school until he reached the age of 18, Mitchell resided in a behavioral health group home in Williamsburg, Virginia.

51.    Mitchell was prescribed certain psychotropic medications.  Mitchell received the medications every two weeks, by injection.  A Portsmouth Department of Behavioral Healthcare Services ("PDBHS")[3] employee would take Mitchell to a clinic, where he would receive the medication.

52.    The severity of Mitchell's mental health diagnoses had caused him to be hospitalized at various times at, among other places, Eastern State Hospital and Maryview Hospital, and to have been evaluated by PDBHS.  Upon information and belief, given these periodic hospitalizations and his medication regimen, Mitchell was well-known to the local mental health community.

**B.      Mitchell was arrested for allegedly stealing $5 worth of soda and snacks**

53.    In April 2015, Mitchell began to act in an increasingly erratic manner.

54.    On April 22, 2015, Mitchell was arrested for allegedly stealing a Mountain Dew, Snickers bar, and Zebra Cake totaling $5.05 from a 7-Eleven.  He was also charged with trespassing.  Mitchell had sometimes incorrectly asserted that his father owned the 7-Eleven and that the items in the store were his.  Mitchell's weight was listed as 180 pounds on the April 22, 2015 arrest warrant.

55.    According to Portsmouth General District Court records, bail was originally "set at $3,000 Secured Bond" for Mitchell, but, soon thereafter, his status was changed to detained without bail.  Mitchell was initially detained at Portsmouth City Jail ("PCJ").

---

[3]  PDBHS is a "community services board" established pursuant to Virginia Code § 37.2-500. PDBHS, and other CSBs, provide, among other services, mental health services to persons with mental illness and intellectual disabilities.

56.     During his receiving medical screening at PCJ, Mitchell, who had struggled with schizophrenia and bipolar disorder for over a decade, was noted to have a history of recent psychiatric inpatient hospitalizations at Maryview Hospital.  It was also noted that Mitchell's "thought process does not make sense."  Mitchell was given a referral for mental health. Thereafter, records indicate that Mitchell was placed on suicide watch at PCJ due to "suggesting that he would harm himself."  It was recorded on or about April 24, 2015, among other things, that Mitchell was "distractible and [had] poor concentration, agitated behavior, elevated and irritable mood," had "delusions," and that Mitchell's "thought processes [were] disorganized with loose associations."  Mitchell was described further: "He does not respond directly to questions regarding suicidal ideations but rambles from subject to subject; he talks about having plenty of bread, getting anything he wants from Maryview which is where he needs to be now and where Bill Gates and Steve Jobs are."  On or about April 28, 2015, Mitchell was described in records as "very psychotic – delusional."

57.     On April 29, 2015, Portsmouth General District Court Judge Morton V. Whitlow issued an Order to have Mitchell psychologically evaluated.  Judge Whitlow's Order indicated that Mitchell was to be evaluated for "Competency" and "Sanity at the time of the offense."  On the same day, Judge Whitlow also issued an Order to have Mitchell assessed for eligibility for participation in a jail diversion program.

58.     On April 30, 2015, provider Ronald Scott, BS, Case Manager at PDBHS's Jail Diversion Program, evaluated Mitchell in connection with the Court's jail diversion order.  In his written report to the Court (apparently filed with the Court about a month later on May 27, 2015), Case Manager Scott concluded that Mitchell was an appropriate candidate for the Jail Diversion Program, but that the impaired Mitchell "refuse[d] to accept services."

59.     Records from PCJ medical providers also dated April 30, 2015 characterize Mitchell with the descriptions "Inmate continues to be psychotic," "inmates thoughts are very disorganized."

60.     PCJ medical records dated from early May 2015 continue to describe Mitchell's mental health, stating, among other things: "disoriented, inappropriate affect, elated mood, loud speech, disheveled appearance, unable to sit still, thought process does not make sense," "mental health problems requiring routine follow up," "Psychotic/delusional," "bizarre appearance, pressured speech, irritable mood, hostile and labile affect, thought process – tangential, flight of ideas, loose association, thought content is delusional ...poor insight, poor judgment, agitated behavior," "hallucinations, delusions, self-neglected appearance," "Inmate continues to present as acutely psychotic – Deputies report that he goes for hours just yelling."

**C.      On or about May 11, 2015, Mitchell was transferred to HRRJ**

61.     On or about May 11, 2015, Mitchell was transferred to HRRJ.  The Medical Information Transfer Form from PCJ, dated May 8, 2015, stated, among other things, that Mitchell needed "medical treatment, psychotropic medication maintenance, high risk medical treatment, suicide risk/precautions."  His weight was listed as 182 pounds.[4]  Upon information and belief, Mitchell's PCJ medical records were also transferred to HRRJ.

62.     On May 20, 2015, Evan S. Nelson, Ph.D., ABPP, CSOTP examined Mitchell at HRRJ in accordance with Portsmouth General District Court Judge Whitlow's Order for

---

[4] HRRJ officials have conversely reported to the press that Mitchell weighed 190 pounds when he arrived at HRRJ.  NaphCare initial screening records from May 11, 2015 record Mitchell's weight as 178 pounds.  As noted herein, these are among many discrepancies and inconsistencies and much incompleteness in records that Plaintiff's counsel was provided pre-litigation by the HRRJ, which declined to produce anything other than medical records and certain contract and policy documents.  It is clear, however, that by the time Mitchell died on August 19, he weighed just 144 pounds, dressed, and, therefore, had suffered profound, unaddressed weight loss of approximately 40 pounds (and possibly closer to 50 pounds) at HRRJ.

Psychological Evaluation.  In his report to the Court dated May 21, 2015, Nelson found Mitchell to be both manic and psychotic.  Nelson wrote, "Mitchell's thought processes were so confused that only snippets of his sentences could be understood, the rest were mumbled statements that made no rational sense."  Further describing Mitchell, Nelson referred to Mitchell's "psychotic and grandiose" ideas, and "rapid" speech.  Nelson commented that Mitchell was "hyperactive," and noted that Mitchell dropped his pants and spat on the floor during the exam.  Mitchell was reportedly, "too mentally and behaviorally disorganized to discuss his case or his background."  Nelson further explained that at one point, he "gave up" and took a break from examining Mitchell to evaluate someone else.  He describes that during that time, "for the entire half hour, Mitchell could be heard relentlessly banking [sic] on the walls, singing, and yelling incomprehensibly.  Only a manic patient could keep up such a high level of energy for so long."  In making his findings, Nelson wrote, "Only a competency report is being submitted as Mitchell was not mentally capable of participating in a sanity evaluation."  Nelson stated, "...it is the **opinion of the undersigned that the defendant LACKED the capacity to assist counsel in preparing a defense; he probably could not be rational about court but that was difficult to assess at present."** (Emphasis in original).  Nelson further communicated, **"[t]he court is urged to commit Mitchell to the Department of Behavioral Health for inpatient treatment to restore his competency under VA 19.2-169.2."** (Emphasis in original).

### D.   On May 21, 2015, the General District Court issued a CRO for Mitchell

63.   On May 21, 2015, Judge Whitlow issued an Order for Treatment of Incompetent Defendant for Mitchell (also known as a competency restoration order ("CRO")).  The CRO ordered Mitchell to be treated at Eastern State Hospital "in an effort to restore him to competency."  An Order for Continued Custody for Mitchell dated May 29, 2015 indicated,

"DEFENDANT WAITING ON A BED AT EASTERN STATE HOSPITAL." A hearing was scheduled for July 31, 2015.

64.     However, despite the Court's Orders, Mitchell continued to be detained at HRRJ, and would *never* be transferred to Eastern State Hospital or an equivalent facility. Instead, a series of failures on the part of the multiple Defendants caused Mitchell to remain languishing at HRRJ.

### E.     "No record" that the General District Court Clerk forwarded the CRO for over two months

65.     An investigative report completed after Mitchell's death by DBHDS's Office of Internal Audit ("DBHDS Investigation") revealed, among other things, that serious lapses in communication and protocol contributed to Mitchell being overlooked for the care he needed and was ordered. Although responsible for sending Judge Whitlow's CRO to Eastern State, the DBHDS Investigation revealed *no evidence* that Defendant Davis, the General District Court Clerk, did so in May 2015 (although a "Timeline" note added after-the-fact to Mitchell's General District Court Clerk's file and signed by employee Defendant Boyd asserts that a copy of the Order was mailed to Eastern State on May 27, 2015, six days after its issuance, there is *no contemporaneous proof* of such mailing in the Clerk's file, and the DBHDS Investigation found "no record" that Eastern State received the CRO in May 2015). Instead, the only proof of the General District Court Clerk forwarding the CRO to Eastern State Hospital is dated July 31, 2015 – when it was faxed to Eastern State by Defendant Boyd – *more than two months* after the order was issued.

### F.     At HRRJ, Mitchell was mistreated and intentionally disregarded

66.     Meanwhile, instead of pursuing their duties toward Mitchell, and despite HRRJ officials' apparently discussing with the press that Mitchell "needed to be in a mental hospital,

not in jail" and making statements seeming to concede knowledge of their inability to provide proper care to Mitchell ("There's a limit to what we can do, and that's our dilemma"; "Certain treatments... are going to be available at Eastern State Hospital that aren't going to be available at a jail. That's why they are court-ordered to a treatment facility" (Harki, Gary, "Help was ordered, but time ran out for Jamycheal Mitchell, found dead in jail cell," *The Virginian-Pilot*, November 1, 2015)), Defendants working at HRRJ allowed Mitchell to languish terribly at the Jail. Reported deplorable conditions and indications of mental and physical deterioration were allowed to continue unchecked by the Jail Authority Defendants, the Correctional Officer Defendants, and Defendant Naphcare and its Defendant employees. The NaphCare Defendants failed, among other things, to carry out basic procedures and provide proper care, and Defendants Kolongo, MD; Edwards, LCSW; Pam Johnson, RN; and Thomas, RN, HSA, failed to have systems in place to effectively check the performance and quality of medical and mental health care at the Jail.

67. According to multiple inmate accounts, including those published by various news sources, Mitchell's condition deteriorated obviously and significantly on the Correctional Officer Defendants' watch. Former Inmate Justin Dillon told *The Washington Post* that he regularly saw Mitchell naked and muttering to himself in his cell, where Mitchell had smeared his feces on the wall. Dillon described Mitchell, whose weight, upon information and belief, dropped approximately 40 pounds (and possibly closer to 50 pounds) by the time of his death, as "...all skin and bones. He looked like a stick." According to Dillon, the Correctional Officer Defendants sometimes withheld food from Mitchell because he would not give his Styrofoam meal trays back to the Correctional Officer Defendants. Dillon commented that the mentally ill Mitchell lost his clothing and bedding because Correctional Officer Defendants took it away

after he was observed trying to flush them in his toilet.  One of Mitchell's legs, Dillon said, was swollen and "elephant like." (Jouvenal, Justin, "Man accused of stealing $5 in snacks died in jail as he waited for space at mental hospital," *The Washington Post*, September 29, 2015).  Dillon further informed *The Virginian-Pilot* that he never saw Mitchell with clothes at the jail.  He described that Mitchell "just didn't belong in HRRJ" and "didn't know what he was doing or what he was saying."  Dillon added that Mitchell "got mistreated"; he said that Mitchell was never allowed to take a shower and that he personally saw jail personnel squirt a water bottle in Mitchell's face and kick him (Harki, *The Virginian-Pilot*).

68.     Like Dillon, another inmate, Dominique Vaughan, also has stated that food was regularly withheld from Mitchell.

69.     When denying Mitchell food, the Correctional Officer Defendants oftentimes cruelly placed Mitchell's food tray outside his cell so that Mitchell could see what he was being denied.

70.     Inmate Steven Gray wrote to Mitchell's family after his death, "I watched a physically healthy young man grow into a physically broken old man in a matter of months." Gray further stated in his letter, "The lack of attention didn't just start in housing unit 3/1 A-Side where he passed but months before in 1/3 D-Side."  He also described, "…the aggressive manhandling of a cuffed Mitchell" and indicated that if "…Mitchell didn't comply at that exact moment, he wouldn't get fed for days at a time.  I've watched Mitchell cuffed naked and sat out in the pod on the cold cement (display) while officers laughed and talked…"

71.     Former inmate Reginald Morst informed the press that "Everyone in the jail knew of [Mitchell].  He was always in his cell screaming."  Morst commented that Mitchell was not allowed a mattress or clothes.  He described Mitchell as spending considerable time standing

naked in front of the window of his cell. Morst remarked, "When you opened his slot, you smelled this horrific smell. It was like walking in the forest after something had died." He described that feces lined Mitchell's walls, and that Mitchell's cell floor was covered in urine. Morst described that it was not until about a week before Mitchell died that correctional officers apparently decided to clean his cell. Morst was charged with doing the cleaning and stated that he nearly retched upon entering the cell. At that time, Morst was also able to get Mitchell a mattress. He described his efforts, remarking, "Nobody really wanted to deal with [Mitchell]" (Harki, *The Virginian-Pilot*).

72.     Roxanne Adams, Mitchell's aunt and the Administrator of his estate, estimates that she called HRRJ over 40 times trying to get assistance for Mitchell. Ms. Adams and Mitchell's mother Sonia Adams were not able to visit Mitchell at the Jail, as they were told they were not on his visitor list; they believe Mitchell was too impaired to add them.

73.     Further regarding food, although inmates report that Mitchell was often denied food by the Correctional Officer Defendants, former inmate Justin Dillon stated that *when actually provided food*, Mitchell ate, often in a voracious manner. Inmate Dominique Vaughan noted that Mitchell regularly requested extra food, but the requests were ignored.

74.     In addition to oftentimes being denied food, Mitchell was almost never provided anything to drink. This was especially cruel considering that the Correctional Officer Defendants had turned off the water in Mitchell's cell. The reason that Correctional Officer Defendants provided to other inmates for their not giving Mitchell anything to drink was that they had no Styrofoam cups to provide to him. However, this stated reason appears to be false, as, according to inmate Vaughan, the Correctional Officer Defendants *themselves* drank out of Styrofoam cups all the time. The failure to give Mitchell beverages, upon information and

belief, was simply another deliberate expression of unwarranted cruelty by the Correctional

Officer Defendants.

G.     **Mitchell's medical records document his mental and physical decline**

75.     Jail records document the decline in Mitchell's mental health.  Medical notes in

June 2015 state that Mitchell, among other things, "Refused restricted round"; "Pt did not receive

0800 medications due to being very agitated and spitting at the officer and nurse"; and "Patient

refused seg visit." A "Psychiatric Progress Note" from June 11, 2015 states, among other things,

that Mitchell, "[g]ot very close to this provider and asked him to touch his eyes and give him a

kiss…States not knowing what year or month it was and that this provider was the President

…Became fixated on this providers [sic] beverage (Mountain Dew) asking for it. …Patient

appears to remain psychotic, not taking his medications."  In mid-July, Jail medical personnel

describe attempting to assess Mitchell, noting, "Pt is aggressive uncooperative and refusing to

take prescribed med.  Pt alert to name only.  Pt has a history of not taking mental health meds."

It is also characterized that Mitchell "refused clinic visit for labs 7/15/15" and also "refused am

meds" that day.

76.     On July 26, 2015, another "Psychiatric Progress Note" was created, stating,

"Patient entered the room and started cussing the provider refusing to sit down. Did not

participate in evaluation and left."  A mental status exam was not completed.  The record

indicates that Mitchell's medication was discontinued because he was "Not taking meds."

77.     Despite their duties to Mitchell and obvious signs that Mitchell was declining, *no*

*Defendant working at HRRJ* (including the Correctional Officer Defendants, the NaphCare

Defendants, and the Jail Authority Defendants) contacted the Court or Eastern State Hospital

concerning the facts that Mitchell had a CRO but had not been transferred to Eastern State, that

the Court's CRO was not being followed, or otherwise to communicate that the HRRJ was incapable of providing adequate care for Mitchell, or to seek alternative remedies for Mitchell.

78.     Additionally, upon information and belief, *no Defendant working at HRRJ* (including the Correctional Officer Defendants, the NaphCare Defendants, and the Jail Authority Defendants) communicated to Eastern State or to the Court that Mitchell was allegedly "refusing"/otherwise not receiving psychotropic medication, that Mitchell was allegedly "refusing"/otherwise not receiving other medical care, or that the NaphCare Defendants were choosing to discontinue Mitchell's medication.

### H.     The OSIG Report blasts the NaphCare Defendants' care of Mitchell

79.     In its report released in April 2016, the Office of the State Inspector General condemned the care provided to Mitchell by Defendant NaphCare and its employees, noting that a "review of NaphCare records raised significant concerns regarding the quality of assessment, care, follow-up, and documentation." The Report further indicates that Jail medical personnel failed to respond to Mitchell's dramatic weight loss. Documentation for certain sick call visits was noted to be scanty, incomplete and inconsistent. There was no mention, according to the Report, in the treatment planning notes provided of psychosis, inability to care for oneself, meal refusal, or weight loss. The report states that NaphCare *relied on the impaired Mitchell to proactively report health problems and suicidal ideology himself,* and that, "as the individual was thought to lack capacity to assist an attorney in his own defense, expectations that the individual would have the ability to seek out medical treatment independently while acutely symptomatic seems unreasonable and likely to fail." The Report states that Jail personnel took no effective action despite noting that Mitchell was suffering from a "4+ pitting edema in the lower extremities." Stating that the "HRRJ has a direct responsibility to provide quality medical

and mental health care for those in their custody," the report found that although NaphCare is no longer the HRRJ's healthcare contractor, "a change in provider offers limited promise of improvement in care or documentation in the absence of a change in oversight practices."

80.     Further, the NaphCare Defendants, the Correctional Officer Defendants, and, upon information and belief, the Jail Authority Defendants, knew of the infectious environment in which Mitchell was being housed at HRRJ, and the extent of his mental and physical deterioration there.  Additionally, these Defendants, including, upon information and belief, the Jail Authority Defendants, knew of Mitchell's failure to receive prescribed medications and treatments.  Upon information and belief, the NaphCare Defendants, Correctional Officer Defendants and Jail Authority Defendants knew of other abuses and failures detailed herein, but also did not act to effectively change them.  Among other things, Defendant Simons, the Superintendent of HRRJ, or Defendants HRRJA/HRRJ, could have informed the Court concerning Eastern State Hospital's failure to accept Mitchell; Mitchell's purported "refusal" to accept treatment/medication while adjudged by the Court to be incompetent, and the danger to him absent court-ordered treatment; and/or Mitchell's overall deterioration in their facility – and any concerns they had regarding HRRJ's ability to keep him safe/healthy – but, upon information and belief, they did not.  Defendants Simons, Eugene Taylor and/or HRRJA/HRRJ also could have properly audited and intervened concerning the care provided by HRRJ/HRRJA contractor NaphCare, but, they did not.  Among other things, the NaphCare Defendants could have been on the phone with Eastern State every day explaining Mitchell's dire condition, need for transfer, and any concerns Jail Authority Defendants/the NaphCare Defendants had concerning being able to properly treat Mitchell at HRRJ– but, the circumstances indicate that they were not and did not.  In addition to the duties of all NaphCare Defendants to treat Mitchell

adequately, which they did not do, Defendants Kolongo, MD, Medical Director; Edwards, LCSW, Mental Health Director; Pam Johnson, RN, DON; and Thomas, RN, HSA, Health Services Administrator, also all had duties to have systems in place to allow for the proper care and monitoring of, among others, Mitchell, and to properly audit such, but they did not.

### I.      The NaphCare Defendants provide no follow up care to Mitchell following his return from Maryview Hospital

81.     On or about July 30, 2015, NaphCare personnel finally sent Mitchell to a hospital, Maryview Hospital in Portsmouth, to address his feet, which, as noted above, were, by this time, showing significant swelling.  Records indicate that, initially, the impaired Mitchell was characterized as uncooperative with hospital providers, but did eventually allow blood to be drawn from his right arm.  Mitchell's condition was assessed– lab tests were performed and he was diagnosed as suffering from "Bilateral lower extremity edema," "hypoalbuminemia," and "elevated transaminase level" – but the cause of his conditions was not ascertained nor was he provided any treatment.  Mitchell was given a consultation to see a GI doctor and then discharged.

82.     The Maryview medical records indicate that as of July 30, 2015, Mitchell weighed 145 pounds (Mitchell stood approximately 6 foot, 1 inch tall.).

83.     The NaphCare Defendants  received records showing that no real treatment had occurred at Maryview Hospital, but that the lab tests indicated hypoalbuminemia (low levels of the blood protein albumin, signifying possible protein malnutrition), and that recorded vitals measured what was already visually apparent, but not medically explained- that Mitchell had lost considerable weight.  However, beyond the filling out of an "ER Discharge" sheet acknowledging that Mitchell was transferred back to HRRJ and reflecting the hospital's diagnosis, the NaphCare Defendants provided no follow up care.  Mitchell was not provided

access to a GI consult.  For the remaining 19 days of Mitchell's confinement before his death, the NaphCare Defendants failed to provide Mitchell with proper care or monitoring, and continued to ignore his horrific conditions of confinement.  They failed to elevate Mitchell to an ED again as his condition considerably worsened.  Indeed, Mitchell would not be seen by a doctor or nurse practitioner again after July 30, and his Jail records reflect few recorded contacts with nurses during this vital period, either.

### J.    Mitchell's CRO, as well as countless others, were regularly disregarded by DBHDS

84.    As stated above, Court records indicate that, *more than two months after it was ordered*, the General District Court Clerk's Office finally faxed the May 21, 2015 CRO Order to Eastern State Hospital on July 31, 2015.  However, according to the DBHDS Investigation, the faxed CRO Order *was never processed* by Eastern State because Defendant Hart, Admissions Coordinator at Eastern State Hospital, *put the fax in her desk drawer and took no further action.* The court order for Mitchell was never entered into Eastern State's Forensic Log, the index of individuals waiting for beds at Eastern State.  Eastern State Hospital, operated by DBHDS, therefore not only never admitted Mitchell, despite being court ordered to do so, but also utterly failed to even process the court order at all.  Notably, had Defendant Hart processed the CRO for Mitchell, she and/or other Eastern State officials would have discovered that they had considerable records and information about Mitchell and his condition, as Mitchell had been court-ordered to be hospitalized at Eastern State in 2012 (and actually *was* treated at Eastern State at that time; Mitchell was also being held at HRRJ in 2012 when he was transferred to Eastern State on court order).  The DBHDS Investigation indicates that state investigators learned that when Mitchell's CRO was discovered on August 24, 2015, after his death, **approximately 10-12 other CROs were also found abandoned in Hart's desk drawer, also**

**having not been entered into the Forensic Log.**  Defendant Hart reportedly told state investigators that as of August 24, 2015, *she was still adding items to the Forensic Log from May 2015.*

85.     According to the *Richmond Times-Dispatch*, data from the DBHDS shows that around the time of Mitchell's death, 85 people in Virginia jails were on waiting lists to get into one of Virginia's state mental hospitals for court-ordered treatment, while, at the same time, *115 collective state mental hospital beds remained empty.*  At Eastern State alone, according to the *Times Dispatch*, there were reportedly 34 people on the waiting list shortly before Mitchell's death, **despite 16 of Eastern States' beds being unused, and nearly 100 others across the state also being unused** (Kleiner, Sarah, "More than 100 mental health beds were unused when Jamycheal Mitchell died in jail," *Richmond Times-Dispatch*, March 26, 2016).

86.     Further, according to the April 2016 investigation authored by the Office of the State Inspector General, between May 21, 2015, the date of Mitchell's court order for transfer to Eastern State Hospital, and his death on August 19, 2015, **there *was only one day – the very date of the order, May 21, 2015* – where Eastern State's average daily census was at full capacity for the male jail transfer unit.**  On July 31, 2015, when Mitchell's order finally was transferred from the Court to Eastern State, *the OSIG report indicates that there were several open beds.*

87.     Records obtained on FOIA request from the DBHDS indicate that, even without breaking down by factors specific to Mitchell such as that he would have been on a male jail transfer unit, Defendant Ferguson was woefully mismanaging the DBHDS's available beds.  The records indicate that every monthly reporting period from April through September 2015, the total number of people on a waiting list for any kind of bed at any of the state mental hospitals

never went above 45 (and was never "0"), and the total number of available beds never went below 176.  Clearly, many available beds went unused.

88.     The failure to properly use available state mental hospital beds and the failure to properly transfer inmates under court order to such facilities for restoration was persistent and widespread.

89.     Pursuant to Virginia Code § 37.2-304, the Commissioner of the DBHDS – Defendant Ferguson, during the relevant period – has a duty "to supervise and manage the Department and its state facilities."  This includes functions of the Commissioner, Department and state facilities defined elsewhere in the law, including Virginia Code § 19.2-169.  When a hospitalization and inpatient treatment order is entered pursuant to § 19.2-169, it is the Commissioner's duty to transfer the individual to an appropriate hospital to provide restorative mental health treatment to the individual.

90.     Pretrial detainees held under §19.2-169.2 orders are entitled to transfer to an appropriate hospital to begin their restorative treatment *immediately* after the order is entered.  Virginia Code §19.2-178 permits, in certain circumstances, jails to retain custody of mentally ill inmates who are court ordered to be transferred to a hospital until there is a vacancy at the "proper" hospital.  However, *specifically excluded* from the delineated lists of circumstances in which there may be a delay are inmates awaiting transfer pursuant to §19.2-169.2 (detainees found incompetent to stand trial).

91.     Clearly, Defendant Ferguson had both the duty and ability to admit Mitchell, but failed to do so, due to, among other things, the wrongful actions of Admissions Coordinator Defendant Hart.  Defendant Ferguson failed to carry out the Court's CRO, or failed to ensure that the Court's CRO was carried out, and failed to inform the Court that the order was not being

carried out.

**K.    Defendant Edwards demonstrated an understanding of NaphCare and HRRJ's inability to properly care for Mitchell, but failed to follow through**

92.     On July 31, 2015, the same day that the Judge's May 21, 2015 CRO was finally received at Eastern State Hospital, Defendant Edwards, a licensed clinical social worker and Mental Health Director at the Jail, called Portsmouth Department of Behavioral Healthcare Services ("PDBHS") at 9:33 AM to request an emergency evaluation for Mitchell to determine if he met criteria for involuntary hospitalization (a temporary detention order or "TDO"). Defendant Edwards's request was apparently with the view that the requested assessment could have led to Mitchell receiving expedited mental health care at Eastern State or another comparable facility.  As noted above, a TDO is not a necessary process for an inmate subject to a CRO.  Indeed, Virginia Code appears to not permit entry of a § 19.2-169.6 order regarding an inmate subject to a § 19.2-169.2 order.

93.     As detailed in the DBHDS Investigation and PDBHS records, PDBHS never completed a TDO evaluation for Mitchell.  According to the DBHDS Investigation and PDBHS records, on July 31, 2015, PDBHS employee Candace Mundy received a message concerning Defendant Edwards's 9:33 AM call, and called back and spoke directly with Defendant Edwards. Thereafter, Mundy reportedly went to HRRJ on July 31, 2015 to see Mitchell, but left after waiting 30-45 minutes when security officers informed her that Mitchell was in court. According to the DBHDS Investigation, Mundy asked the HRRJ correctional officers at the front desk to have Defendant Edwards call her back, and then left the Jail.  Mundy stated that she did not hear back from Defendant Edwards.  Records indicate, however, that Defendant Edwards called to speak with Mundy later in the day on July 31 at 3:42 PM, and left a message with another employee, and then called PDBHS again on August 3, 2015 at 11:00 AM, and again left

a message for Mundy with another employee. The DBHDS investigation revealed conflicting accounts of the information known by PDBHS's employees and actions taken by them, including that Mundy may have referred the case to another employee. What is clear is that PDBHS did not perform an evaluation of Mitchell for a temporary detention order (which, as noted above, was not necessary or likely legally valid, given the already existing CRO).

94.     However, Defendant Edwards's request for a TDO indicated a clear understanding and acknowledgement on her part that Mitchell's mental health and medical needs were not being met, and, indeed, that he was imminently in danger at HRRJ and needed to be removed immediately. According to PDBHS records, Edwards informed PDBHS on July 31 in connection with her evaluation request that Mitchell "has been psychotic since arrival to facility" and was "hostile, not med compliant," had "medical issues," and was "uncooperative." Despite making this determination, and despite the fact that Mitchell, all along, had had a CRO that was being ignored by all Defendants, Edwards did not do anything past August 3 with a view towards moving Mitchell out of the Jail.

95.     On July 31, 2015, while PDBHS and HRRJ officials were miscommunicating about the TDO evaluation, a hearing was held in Mitchell's case and Judge Whitlow reiterated his order to transfer Mitchell to Eastern State Hospital. An Order for Continued Custody issued that day stated "DEFENDANT WAITING ON A BED AT EASTERN STATE HOSPITAL." As noted above, the Court also finally sent the CRO to Eastern State more than two months late. Mitchell's family members who attended the court hearing were greatly disturbed by his appearance in the courtroom; he appeared very thin, and did not look like the man they knew and loved.

96.     On or about August 3, 2015, Ms. Adams, Mitchell's aunt and Administrator of his

Estate, Plaintiff in this action, called the HRRJ and told personnel that Mitchell needed

emergency medical care.  She was informed that HRRJ had already taken him for care on July

30.  As noted above, Defendant Edwards, LCSW, called and left a message for PDBHS

employee Mundy on August 3, 2015 at approximately 11 AM.  The DBHDS Investigation

includes a note that Defendant Edwards stated that "there were no further efforts made" to

contact PDBHS regarding Mitchell after August 3.

**L.     The Correctional Officer Defendants disregarded Mitchell's pleas for help**

97.     On or about August 16, 2015, Mitchell told inmate Justin Dillon that Mitchell was

sick.  Mitchell remained unmoving in his bed.  Dillon reported Mitchell's situation to certain

Correctional Officer Defendants, but they ignored Dillon's concerns.

98.     On or about August 18, 2015, HRRJ inmate Dominique Vaughan recalls that he

saw Mitchell slumped over the sink in his cell with his legs sticking out.  Mitchell told Vaughan,

"Get help, I can't move."  Vaughan appealed to certain Correctional Officer Defendants to call

for medical help, but they never did so.  According to Vaughan, Mitchell did not get out of his

bed thereafter, and Mitchell did not take his dinner tray or respond when Vaughan called out to

him (Jouvenal, *The Washington Post*).

**M.     Fellow Jail detainees discovered Mitchell unresponsive**

99.     At or about 0544 Hours (5:44 AM) on August 19, 2015, according to HRRJ

medical records, Mitchell was "found unresponsive by officers during morning meal

distribution" in a "supine position on bunk cuffed." Mitchell reportedly "had voided on himself."

**In actuality, fellow Jail detainees, not correctional officers, discovered Mitchell**

**unresponsive** in his Jail cell.  Upon information and belief, a correctional officer attempted to

clean Mitchell's cell, while inmates yelled that he was "tampering with a crime scene," and also attempted to turn on the water to Mitchell's cell.  Jail medical personnel were called to the scene. Mitchell was noted to have no pulse.  Upon information and belief, when Jail medical providers attempted to use the defibrillator, it was not working.

100.    EMS were called to the scene.  According to Jail medical records, EMS pronounced Mitchell dead at 5:59 AM.  In the Death Scene Investigation Report, despite, upon information and belief, the above attempted cleaning efforts, investigators from the Office of the Chief Medical Examiner described Mitchell's cell as having the stench of a "foul odor."  The toilet in the cell was full of urine and feces.  Investigators found puddles of urine on the floor of Mitchell's cell.  Investigators also noted the close proximity of Mitchell's cell to Jail correctional officers, stating the "CELL WAS LOCATED IN THE POD, DIRECTLY ACROSS THE COMMON AREA FROM THE OFFICER'S CENTRAL BOOTH."

### N.    The Medical Examiner describes Mitchell as "nearly cachectic"

101.    An autopsy performed by the Office of the Chief Medical Examiner listed the cause of Mitchell's death as "Probable cardiac arrhythmia accompanying wasting syndrome of unknown etiology."  During a post-death examination, Mitchell was found to weigh just 144 pounds, dressed; he had lost approximately 40 pounds (and possibly closer to 50 pounds, see Note 4) since his transfer to HRRJ.  Assistant Chief Medical Examiner Wendy M. Gunther, MD, described Mitchell as "nearly cachectic," meaning the loss of body mass that cannot be reversed nutritionally.

102.    This matter has generated statewide and national attention.  On or about March 31, 2016, Virginia Governor Terry McAuliffe publicly acknowledged the circumstances surrounding Mitchell's death and the multiple shortfalls by entities and individuals in the

handling of this case. Among other comments, McAuliffe stated, "This is a sad story beyond comprehension. Five dollars, I think it was a candy bar, it was a soda pop, and he'd been agitated in the store so they arrested the individual. He spent four months in a jail, and he died of starvation." "… I'm not even sure why he then was even sent to jail, I mean to get into the system, and then be there for four months and then to starve." The Governor critically asked, "Why did you not know for fourth months he was not eating his food?" He also noted the implications of certain Defendants' failures: "Jamycheal wasn't even on the waiting list. So he wouldn't even have the ability [to obtain a bed]. …" The Governor also addressed the reasonable expectations of the state professionals: "…Clearly, if you have an individual as who is as stressed as Jamycheal was, we gotta be able to move him immediately, I don't care what the bed situation is, you find a bed."

### O.   Specific facts concerning the five groups of Defendants

103.   In addition to those facts described above, facts, organized around the following five groups of Defendants, are asserted below:

(1)   **"NaphCare Defendants"** – Defendants NaphCare; Kolongo, MD; Edwards, LCSW; Ray, NP-Psych; Ngwa, NP; Thomas, RN, HSA; Rivers, LPN; Nicholson, MA; Murphy, MSW; Pam Johnson, RN; and the John/Jane Doe NaphCare Nurses 1-11.

(2)   **"Correctional Officer Defendants"** - Defendants Barnes, Blakely, Bourne, Butcher, Gibbs, Hilliard, Howard, Keister, Powell, Whitaker, Smith, Dixon, Johnson, D. Brown, Phillips, Epperson, Sgt. Whitehead, Lt. Whitehead, Everette, Madison and Cowan.

(3)   **"Jail Authority Defendants"** - Defendants HRRJA, HRRJ, Simons, and Eugene Taylor.

(4)     **"Clerk's Office Defendants"** – Defendants Davis and Boyd.

(5)     **"DBHDS Defendants"** – Defendants Ferguson and Hart.

---------

1.     **The NaphCare Defendants** (Defendants NaphCare; Kolongo, MD; Edwards, LCSW; Ray, NP-Psych; Pam Johnson, RN; Ngwa, NP; Thomas, RN, HSA; Rivers, LPN; Nicholson, MA; Murphy, MSW; John / Jane Doe NaphCare Nurses (1-11))

     a.     <u>The NaphCare Defendants failed to provide adequate medical care to Mitchell</u>

104.    The NaphCare Defendants deliberately neglected Mitchell despite his significant weight loss, mental and physical deterioration, and severely swollen feet and legs. Mitchell was *never* medically or psychologically cleared or stabilized at HRRJ. NaphCare medical and mental health care providers utterly failed to coordinate care amongst themselves. Despite, among other things, his obviously impaired condition, the Court order that he was incompetent, and reports of his somehow purportedly "refusing" psychotropic medication while incompetent, there are no records of Mitchell seeing a psychiatrist (although per its contract, NaphCare was required to have a psychiatrist working at the Jail at least 12 hours/week).

105.    As noted above, the report released in April 2016 by the Office of the State Inspector General rebuked the care provided to Mitchell by NaphCare, noting that a "review of NaphCare records raised significant concerns regarding the quality of assessment, care, follow-up, and documentation." The Report further indicates that NaphCare and its employees failed to respond to Mitchell's dramatic weight loss. Multiple inmates have reported that Mitchell's weight loss was readily apparent and disturbing. Documentation for certain sick call visits was noted to be scanty, incomplete and inconsistent. There was no mention, according to the Report, in the treatment planning notes provided of psychosis, inability to care for oneself, meal refusal,

or weight loss. The report states that NaphCare relied on the impaired Mitchell to proactively report health problems and suicidal ideology himself and that "as the individual was thought to lack capacity to assist an attorney in his own defense, expectations that the individual would have the ability to seek out medical treatment independently while acutely symptomatic seems unreasonable and likely to fail." The Report said that Jail personnel took no effective action despite noting that Mitchell was suffering from a "4+ pitting edema in the lower extremities." Multiple inmates have also reported that the intense swelling of Mitchell's foot and leg was readily apparent and disturbing.

106.    Defendants NaphCare; Kolongo, MD; Ray, NP-Psych; Pam Johnson, RN; and Ngwa, NP, and John / Jane Doe NaphCare Nurses 4-8 (referred to below) failed to provide medication to Mitchell as prescribed. NaphCare's scanty records indicate that these Defendants did not even attempt to provide Mitchell with his prescribed psychotropic medications for days, sometimes weeks at a time. **There simply are no records showing medication administration for many days when Mitchell was prescribed medicine.** When medication administration was documented, on almost all occasions, the mentally impaired Mitchell was said to have "refused" his medication, or otherwise to have not ingested it. However, in addition to Mitchell's inability to conscientiously refuse, and NaphCare Defendants' knowledge of such and of the danger to Mitchell in not receiving his medication, in all or nearly all such circumstances, there is no documented contemporaneous notification of a physician or nurse practitioner that Mitchell was not receiving his medication. Additionally, as noted below, inmates report that NaphCare nurses regularly bypassed Mitchell when distributing medications. In addition to psychotropic medication for his mental condition, Mitchell suffered from "4+ pitting edema in the lower extremities"; however, the foregoing Defendants also failed to provide medication as prescribed

to Mitchell for this condition, failed to report alleged "refusals," and/or otherwise failed to treat Mitchell adequately in connection with this condition.  Records show that Defendants Ray, NP-Psych; Ngwa, NP; and Kolongo, MD did eventually find out, despite failures in documentation, that Mitchell was not receiving his prescribed medication, but none of these providers did anything effective in response – indeed, Defendant Ray, NP-Psych, simply discontinued Mitchell's psychotropic medication without any referrals or other interventions. As noted herein, HRRJ/HRRJA updated its mental health policies and procedures *the day* after Mitchell's death, and issued a new Request for Proposals to replace NaphCare as its medical contractor *two days* after Mitchell's death.  The actions/inactions of individual NaphCare Defendants are addressed below:

### (1)     *Defendant Edwards, LCSW*

107.    According to medical records obtained pre-litigation from the HRRJ, Defendant Edwards, LCSW, was the Mental Health Director at HRRJ during the relevant time period.

108.    Records indicate that Defendant Edwards did multiple evaluations of Mitchell over the course of nearly one month in connection with the daily suicide watch program that NaphCare providers instituted for Mitchell.  From May 12, 2015 until June 3, 2015, Defendant Edwards created multiple handwritten and electronic reports showing her assessments of Mitchell, including on May 12, 13, 14, 15, 18, 19, 20, 21, 22, 26, 27, 28, and 29 and June 1, 2 and 3.  During her almost daily contact with Mitchell, Defendant Edwards would have been exposed to, among other conditions, Mitchell's dramatic weight loss and the condition of his cell, including the unflushed urine and feces and Mitchell's smeared feces on the Plexiglas window to his cell, and Mitchell's distress as described by inmates.  Further, Defendant Edwards noted the deteriorated mental condition of Mitchell, writing, among other things, about his

largely flat or inappropriate affect; wavering and generally compromised orientation to people, time, situation, and place; his often garbled and/or rambling speech; consistently impaired judgment; "nonsensible talking" and "not making sense"; "laughing inappropriately"; "hollering out door"; at times overactive behavior; at times intrusive behavior; at times, minimal participation; his at times "pressured" speech; his generally labile mood (marked fluctuation of mood, mood swings) and at times irritable mood; at times agitated behavior; his often one or two word answers concerning his well being ("Alright"; "Fine," "I'm ok"); his sometimes slow speech; at times resistant behavior; his apparent impaired memory (only short term memory intact); his nude appearance; his "rambling about food"; and his requests on a couple of occasions to "get out," "go home," and receive "the shot" (likely a reference to his receiving medication in the community through injection; the Jail ordered oral medications).

109.   Defendant Edwards later documented another encounter with Mitchell on June 19, 2015 at 4:04 PM.  Although the meeting is described in NaphCare electronic records under "Sick Calls" as a "mental health sick call-social worker," Defendant Edwards merely makes cryptic remarks about the mentally ill Mitchell's behavior, writing, "Inmate approached me with appropriatedly [sic] answering questions to points of talking garbe [sic].  When asked if he know [sic] what got him in segregation, he stated he did and wanted to apologize realizing his actions were not appropriate." Again, Defendant Edwards would have witnessed Mitchell's deterioration, including, but not limited to, his dramatic weight loss, edema, and the unsanitary and dangerous state of his cell, and should have further investigated Mitchell's apparent reaching out for assistance, especially in the context of his garbled speech and her overall knowledge of his mental illness and compromised abilities for self care.  Instead, it appears from records that

Defendant Edwards, the Mental Health Director, simply made this incomplete note and otherwise took no action with regard to Mitchell.

110.    Then, according to records from the PDBHS and the state DBHDS Office of Internal Audit investigation conducted after Mitchell's death, Defendant Edwards had additional interactions with Mitchell's case in late July and early August 2015.  Records and the investigation indicate that on July 31, 2015 at 9:33 AM, Defendant Edwards called the PDBHS requesting an emergency evaluation of Mitchell, or a TDO evaluation.  As noted above, a TDO is not a necessary process for an inmate already subject to a CRO.  Indeed, the Virginia Code appears to not permit entry of a § 19.2-169.6 order regarding an inmate subject to a § 19.2-169.2 order.  PDBHS records state that Defendant Edwards left a message for Mundy of PDBHS that Mitchell "had been psychotic since arrival to the facility (HRRJ), hostile, not receptive to taking medicine, has medical issues, and was uncooperative."  Records and the investigation indicate that Mundy thereafter called Defendant Edwards back, and Defendant Edwards said that an assessment was needed for Mitchell.  When interviewed by state investigators, Defendant Edwards reportedly said that she told PDBHS not to come right away because Mitchell was in Court, and "she wanted to see what happened in court to determine what was to be done next." It is unclear why Defendant Edwards would have said she was waiting on a court outcome, as the Court's CRO for Mitchell had already existed, yet been largely ignored by Defendant Edwards and the other Defendants since its issuance on May 21, and it is unclear why Defendant Edwards would have waited until July 31 to request an emergency evaluation for a patient who she described to PDBHS and in her own records as consistently impaired (i.e. "had been psychotic since arrival to the facility (HRRJ), hostile, not receptive to taking medicine, has medical issues, and was uncooperative").  However, Defendant Edwards's request indicates a clear

understanding and acknowledgement on her part that Mitchell's mental health and medical needs *were not* being met at the HRRJ, and, indeed, that he required emergency removal from HRRJ through a TDO.  However, despite this contemporaneous clear understanding and acknowledgement, as well as her acknowledgement to state investigators after Mitchell's death that she did call the PDBHS regarding a psychiatric evaluation, *there is no documentation in the HRRJ medical records for Mitchell of Defendant Edwards's call to PDBHS at 9:33 AM on July 31, 2015, nor of any of her other subsequent calls to PDBHS concerning Mitchell, described below.*  When questioned by state investigators, Defendant Edwards also admitted that at 3:42 PM on July 31, she called PDBHS back regarding Mitchell.  Defendant Edwards stated that she called at this time to "tell them that Mr. Mitchell had been ordered to go to the state hospital and that Mr. Mitchell had come back from court with this information"; again, Mitchell had already been court ordered to go to Eastern State since May 21, but the order had been largely ignored by Defendant Edwards and the other Defendants.  Defendant Edwards further admitted to state investigators having made another call to PDBHS on August 3, 2015; according to Defendant Edwards, she was calling back "to find out the name of the person that she talked to ...regarding Mr. Mitchell," and "was not sure what else was said."  PDBHS records for the August 3 call state that Defendant Edwards communicated that Mitchell was waiting on a bed at Eastern State Hospital; again, this had long been the case.  As noted above, although the TDO was unnecessary and likely contrary to the law, the PDBHDS never did complete a TDO evaluation for Mitchell anyway.  However, when asked by state investigators whether any further effort was made to contact the PDBHS after August 3, Defendant Edwards admitted that no such further efforts had been made.

111.    Despite her position as the Mental Health Director, a position that put her in a position of authority and of review of records, her training as a LCSW, and her several contacts with Mitchell and knowledge of his condition, Defendant Edwards was negligent, grossly negligent, wanton and willful in her actions, and acted with deliberate indifference to Mitchell's medical and mental health needs.  As Mental Health Director, Defendant Edwards should have implemented and had in place systems and procedures to ensure access of inmates/detainees to adequate mental health care and proper auditing of such systems, including, but not limited to, an effective mechanism to track the status of inmates ordered to receive mental health competency restoration; however, Edwards did not, and knew that she did not.  As Mental Health Director, Defendant Edwards had a responsibility to coordinate care, which she did not do.  Edwards should have ensured that there was communication and coordination of care between and among Mitchell's Jail mental health providers and medical providers; however, she did not and knew she did not.  Among other things, no meetings between mental health and medical providers and no coordinated treatment plans are in the record.  Knowing that Mitchell was not only acutely mentally impaired to the point of incompetence, but also physically deteriorating and not receiving medication, treatments, or adequate care at the Jail, Mental Health Director Edwards could and should have been calling Eastern State every day regarding Mitchell and the danger of keeping him at HRRJ.  The fact that Mitchell was never on Eastern State's list indicates that Defendant Edwards obviously did not contact Eastern State (and neither did anyone else at the Jail).  Knowing of Mitchell's condition and all of the above failures, Edwards acted with negligence, gross negligence, wanton and willfully, and/or deliberate indifference in not following up on the Court's CRO, in an effort to put Mitchell in an environment away from the Jail where he could access proper medical and mental health treatment.  Defendant Edwards, as

Mental Health Director, also should have ensured **that a psychiatrist was regularly consulted and made part of the chain of command of reporting on Mitchell, given his continued mental incompetency and physical deterioration, but did not, and knew that she did not**. Further, although the TDO evaluation that Edwards requested was unnecessary and likely incompatible with Virginia law, Edwards did not even see this process through, doing nothing after August 3 when Mitchell still remained at the Jail. *Edwards recognized that Mitchell was not receiving adequate care at the Jail, that he was in an emergency situation in which he was substantially likely, as a result of his mental illness, to, in the near future, cause serious physical harm to himself or others or suffer serious harm due to lack of capacity to protect himself and thus required immediate removal from the Jail to a hospital, but she was indifferent to changing his circumstances.* Defendant Edwards's failure to act effectively in her position as Mental Health Director and as a LCSW prevented Mitchell from receiving proper mental health and medical treatment.

### (2)    *Defendant Ray, NP-Psych*

112.    HRRJ medical records also reveal that Defendant Ray, NP-Psych, had several interactions with Mitchell, was responsible for his psychiatric medication management at HRRJ, had considerable knowledge of his impaired and deteriorating mental state, and witnessed his physical deterioration, including significant weight loss and edema, but, nonetheless, failed adequately to act on Mitchell's behalf.

113.    According to HRRJ medical records, Defendant Ray first encountered Mitchell's case on May 11, 2015, the date of Mitchell's transfer to HRRJ, when Defendant Ray gave orders for several psychiatric medications for Mitchell (Hydroxyzine HCl; Haloperidol; and Benztropine Mesylate), which were to be administered twice a day.  Defendant Ray later

discontinued these medications on May 14, 2015, and issued new orders for psychiatric

medications, including for Benztropine Mesylate; Hydroxyzine pamoate; and Haloperidol. The

medications prescribed on May 14, 2015 were also to be administered twice a day and were

originally prescribed to continue from May 14, 2015 through August 11, 2015.

114.    On May 17, 2015 at 12:41 PM, Defendant Ray entered a Psychiatric Progress

Note in the NaphCare electronic record for what appears to be his first examination of Mitchell.

It is noted that Mitchell was referred to Defendant Ray for a "med eval." Defendant Ray

describes Mitchell as "psychotic" and "significantly disorganized" with a "mildly unkempt"

appearance. Defendant Ray notes Mitchell's "preoccupied" demeanor and "expansive" affect.

He describes a person limited in his ability to communicate and stay in touch with reality,

conveying Mitchell's "tangential" thought process, his "rambling" speech, his "laughing

inappropriately," his status as a "poor historian," and his "making nonsensical out of context

statements about a variety of things." Defendant Ray states that when asked why he was in jail,

Mitchell replied irrationally, stating, "from an alien and I don't hear voices." When Defendant

Ray asked about Mitchell's social status outside of the Jail, Mitchell reportedly "rambled about

being on some avenue," and, when he asked if Mitchell had family in the area, Mitchell

reportedly made the confused claim that his mother was in his jail pod. Defendant Ray

comments that Mitchell, at the time, is compliant with medications and is under "close watch."

Ray states that he "will continue present meds for now" and will "continue to follow" Mitchell.

115.    Defendant Ray's next Psychiatric Progress Note for Mitchell, dated June 11,

2015, after the Court's CRO was ordered on May 21, indicates Mitchell's continued mental

deterioration. Defendant Ray describes that Mitchell "appears to remain psychotic." He depicts

Mitchell as having a "tangential" thought process, "disorganized" thought content, and a

"loosening of associations." He says that Mitchell has "poor" insight. Defendant Ray describes Mitchell's demeanor as "violating boundaries" and "uncooperative"; he narrates that Mitchell "[g]ot very close to this provider and asked him to touch his eyes and give him a kiss...States not knowing what year or month it was and that this provider was the President ...Became fixated on this providers [sic] beverage (Mountain Dew) asking for it. When re-directed got out of his chair and came around the table. When explaining to patient that it was the provides [sic] and not his he left the room and wouldn't continue to be evaluated." Defendant Ray's choice to have a soda for himself in front of Mitchell was improper and unprofessional, especially given Mitchell's psychosis and considerable weight loss; seemingly blaming a psychotic, physically deteriorating inmate for improperly handling the presence of Ray's soda and allowing the exam to end over the issue was further improper. Defendant Ray comments that the "record shows patient taking meds intermittently at best"; he elects to "continue meds without changes."[5]

116.    On July 26, 2015 at 1:59 PM, more than two months after the Court's CRO was ordered, Defendant Ray recorded another Psychiatric Progress Note in the NaphCare electronic record concerning a "med mgmt" appointment with Mitchell. The brief Note shows continued incapacitation on the part of Mitchell. Defendant Ray writes, "Patient entered the room and started cussing the provider refusing to sit down. Did not participate in evaluation and left. Not taking meds so will discontinue. Has displayed no unsafe behaviors."

117.    Defendant Ray's records indicate that he had knowledge of Mitchell's continued, unresolved psychotic state, and his apparently growing uncooperative behavior and inability to communicate as he languished at HRRJ without proper treatment. As a psychiatric nurse

---

[5] In the electronic record under "Sick Calls," Defendant Ray indicates that he completed a "med mgmt. appointment" with Mitchell on June 15, 2015 at 6:02 AM – it says "see note in chart." However, there is no note concerning this visit; it appears Defendant Ray is referring to the June 11, 2015 visit and perhaps only entered it under "Sick Calls" on June 15, 2015.

practitioner prescribing medication to Mitchell, examining Mitchell on several occasions, and having access to Mitchell's chart, Defendant Ray would have known that there was a CRO order for Mitchell that was not being carried out.  From the foregoing, and especially his examinations of Mitchell, Defendant Ray, a nurse practitioner, also knew that Mitchell was physically deteriorating, suffering from, among other things, dramatic weight loss and pitting edema that were not being adequately treated.  Psychiatric nurse practitioner Ray also would have known that Mitchell was living in unsanitary, unsafe conditions, and was expressing distress.  Defendant Ray (although he did not document much in the way of his actual review of medication administration records or any effort to identify why Mitchell was not taking his medications or intervene) did make mention in his records of Mitchell's purportedly "not taking" his psychotropic medications; Ray knew that failing to receive these medications made Mitchell more uncooperative, vulnerable, and less able to advocate for himself, including concerning medical needs.  Defendant Ray knew Mitchell was not receiving adequate mental health or medical care at HRRJ.  However, Defendant Ray's records do not indicate that he, a nurse practitioner with a mental health concentration, ever adequately addressed Mitchell's mental condition.  They do not indicate that Ray ever called Eastern State Hospital about the CRO, or that he ever ordered or undertook any interventions, such as more regular visits with himself or another nurse practitioner or physician, that would allow him to monitor Mitchell given his apparent non-receipt of medication and continued deterioration.  Indeed, Ray saw Mitchell only three times, and did not see him at all after July 26, when he abruptly stopped Mitchell's psychotropic medicine.  Records indicate that, in the face of Mitchell's continued mental deterioration, Defendant Ray never sought consultation with a psychiatrist.  Records further indicate that Defendant Ray did not intervene in the face of Mitchell's physical deterioration,

such as referring him to the medical nurse practitioner (Defendant Ngwa) or physician

(Defendant Kolongo) to address his significant weight loss, have his edema properly treated, or

otherwise ensuring that he received access to proper medical care for his physical conditions.

Defendant Ray's records further do not indicate that he spoke with Defendant Ngwa, NP,

Defendant Kolongo, MD, Defendant Pam Johnson, RN, (the Director of Nursing overseeing the

nurses who were charged with administering medication he prescribed and Mitchell reportedly

was not taking), Mental Health Director Defendant Edwards, or anyone else providing Mitchell

with medical care or psychological care in an attempt to coordinate care.  Defendant Ray's

records also do not indicate that he investigated or addressed appropriately Mitchell's non-

receipt of medications.  Instead, Defendant Ray decided to categorically and summarily stop the

medications of a known psychotic who was mentally decompensating and physically

deteriorating, and then not to see Mitchell again before his death.

(3)   <u><i>NaphCare Nursing Staff - Segregation Rounds</i></u>

118.   According to the NaphCare electronic medical records produced pre-litigation by

HRRJ, on May 17, 2015 at 12:16 AM, Defendant Kolongo, MD, gave an order for Mitchell for

"SEG ROUNDS" to occur "once a day QD [everyday]"; the order was to start May 17, 2015 and

end May 15, 2016.  The electronic order summary does not specifically indicate what was to

occur during the "SEG ROUNDS"; however, the "Segregation Note" electronic record filled out

at certain times in the record includes prompts to be filled out, including whether the patient

refused the segregation round; vital signs; "Any contradictions to placement in Segregation

Housing?" (yes or no); Appearance; Room Condition; Behavior; Mood; Suicidal Ideation;

Assessed Inmate Need for: Medical, Dental, Mental Health (check); "Any additional healthcare

needed?" (yes or no); and "Summary of Findings / Actions Taken:" (to be typed in).  However,

the record indicates that the segregation rounds: 1) were not executed every day as ordered; 2) were often marked as being purportedly "refused" without a documented notification to Defendant Kolongo, MD, or another physician or nurse practitioner; and, 3) when they were purportedly accomplished, appear not to have been completed in their entirety and/or to contain conflicting information.  For example, it appears that "seg rounds" (or "restricted round," as they appear to also be called in the record) were conducted or attempted on the following dates only, as reflected in a "Segregation Note" and/or "Progress Note" (it is unclear why a consistent format was not always used) and contain the indicated incompleteness[6]:

| Date | Provider | Record | Contents |
|------|----------|--------|----------|
| 5/17/15 12:18 AM | Norma Piovane, RN | Segregation Note-electronic record | Marks that there are no contraindications for segregation but leaves much other information blank: nothing marked in appearance, room condition, behavior, mood – nothing checked under "assessed inmate need for: medical, dental, or mental health" and |

[6] Additionally, the July 30, 2015 "Release Summary" for Mitchell's referral to Maryview Hospital ED states that Mitchell's "Most Current Medications and Treatments Administered" was a once a day SEG Rounds treatment on July 29, 2015 at 1:23 PM and the Release Summary dated August 19, 2015 at 8:35 AM (after Mitchell's death) indicates that Mitchell's "Most Current Medications and Treatments Administered" was a "SEG ROUNDS" treatment on August 17, 2015 at 8:47 AM; *however, there are no underlying records of these segregation rounds having occurred.*
    Further, a paper document entitled "Daily Confinement Record" was produced for the period from June 15-21, 2015 only.  This document includes, among other things, spaces to mark a "Medical Visit" and medication administration.  It is unclear whether the "Medical Visit" described herein constitutes a "SEG ROUND"; however, with the exception of June 18, 2015, there are no "Segregation Notes" or "Progress Notes" concerning Mitchell in the electronic record for these dates, and the "Daily Confinement Record" does not contain places to note the information requested in a "SEG ROUND" as per the "Segregation Note" electronic form.
    In any event, even if June 15-17, June 19-21, July 29 and August 17 were added to the list of days when NaphCare providers supposedly performed the SEG ROUNDS, they still would have performed these rounds on a fraction of the ordered days, and much documentation concerning what was observed/found is missing.

|  |  |  | summary of findings/actions taken blank |
|---|---|---|---|
| **5/27/15** 10:59 PM | Nicia Smith MA | Progress Notes-electronic record | "REFUSED RESTRICTED ROUND" (no Segregation Note created, no notification to MD/NP) |
| **6/7/15** 8:53 PM | Nicia Smith, MA | Progress Notes-electronic record | "REFUSED RESTRICTED ROUND" (no Segregation Note created, no notification to MD/NP) |
| **6/18/15** 8:36 PM | Nicia Smith, MA | Progress Notes-electronic record | "REFUSED RESTRICTED ROUND" (no Segregation Note created, no notification to MD/NP) |
| **6/30/15** 9:34 PM | Crystal Tyndal MA | Progress Notes-electronic record - and Segregation Note-electronic record | Progress Notes states "Patient refused seg visit" No comments on Appearance, room condition, behavior, or mood; nothing checked under "assessed inmate for: medical, dental or mental health"; appears to be missing second page<br><br>No notification to MD /NP |
| **7/15/15** 11:21 PM | Debra Jentons, RN | Segregation Note-electronic record | No vitals noted and states "REFUSED RESTRICTED ROUND"<br><br>No notification to MD/NP |
| **7/20/15** 10:03 PM | Hope Nicholson, MA | Segregation Note-electronic record | REFUSED RESTRICTED ROUND<br><br>(mostly blank, no vitals recorded, No comments on Appearance, room condition, behavior, or mood; nothing checked under "assessed inmate for: medical, dental or mental health"<br><br>No notification to MD/NP |
| **7/31/15** 9:12 PM | Nicia Smith, MA | Segregation Note-electronic record | No vitals recorded; Appearance, Room Condition, Behavior, Mood, |

| | | | all blank |
|---|---|---|---|
| | | | Assessed inmate need for- Medical, Dental, Mental Health (supposed to check)- all blank |
| | | | Any additional healthcare needed marked "no" |
| | | | Summary of findings/actions taken: |
| | | | "REFUSED TO HAVE VITALS CHECKED" |
| | | | No notification to MD/NP |
| **8/12/15** 10:46 PM | Hope Nicholson MA | Segregation Note- electronic record | Contains conflicting information: |
| | | | Summary of findings/ actions taken: "REFUSED RESTRICTED ROUNDS" |
| | | | and Vital signs section is blank |
| | | | However, marks the following, as if she did do the assessment- |
| | | | Appearance: clean/ appropriate |
| | | | Room condition: clean |
| | | | Behavior: cooperative |
| | | | Mood: normal |
| | | | Section asking- Assessed inmate need for: Medical, Dental, Mental Health (supposed to check)- is blank |
| | | | Any additional healthcare |

| | | | needed is checked "No" |
| | | | No notification of MD/NP |

Therefore, of the approximately 94 times that segregation rounds should have been performed

(from May 17, 2015 until Mitchell's death on August 19, 2015), NaphCare providers appear to

have performed only a handful.  When the segregation rounds were supposedly performed, the

records are incomplete and/or conflicting, and there is no indication that a doctor or nurse

practitioner was contacted when Mitchell supposedly refused segregation rounds.  Notations on

August 12 that Mitchell appeared "clean/appropriate," that his room was "clean" and that he was

"cooperative" are suspect given the multitude of other sources of information pointing to

Mitchell's obvious and deliberately ignored distress (and the conflicting mention that Mitchell

supposedly "refused" this round).  Assuming that the last treatment given to Mitchell was a

"SEG ROUNDS" treatment on August 17, 2015 at 8:47 AM as purported by the "Release

Summary" created after Mitchell's death (despite the lack of an underlying record of it), then

NaphCare providers performed only 2 of 19 required segregation rounds during the last couple

weeks of Mitchell's life in August 2015, and did not perform a segregation round for almost 48

hours immediately prior to his death.  As noted above, in the days leading to his death, Mitchell

was uncharacteristically slumped on his metal bed and asking for medical help.  It should also be

noted that, despite the paltry segregation records and other records concerning Mitchell,

including medication administration records, Defendant Pam Johnson, RN, DON, reportedly told

state investigators that her nurses observed Mitchell daily.  Although the documentation does not

support this, if NaphCare nurses *did* assess Mitchell everyday, then Defendant NaphCare's

negligence, gross negligence and deliberate indifference is still flagrant, as, in that case, instead

of largely and deliberately ignoring Mitchell, NaphCare nurses would have seen Mitchell's acute

medical needs not just sporadically, but *every day* and still failed to address them.

(4)   <u>Defendant Kolongo, MD</u>

119.   Although the record indicates that NaphCare nurses did not properly notify

Defendant Kolongo, MD, contemporaneously about Mitchell's purported "refusals" of

segregation rounds or their own failure to perform the segregation rounds as ordered, NaphCare

records indicate that eventually Defendant Kolongo, MD, was given relevant information, but

failed to enforce his own order and otherwise failed to provide adequate care for Mitchell.  In his

electronic notes for July 30, 2015, Defendant Benedict Ngwa, NP noted that he was referring

Mitchell to a "doctor," stating:

> "Patient was brought down to the clinic for increased swelling to bilat lower ext.  Patient
> has been refusing treatment lately, lab work and medication.  Patient with pitting bilateral
> lower ext edema +4, extending to back of knees, faint popliteal and dorsals pedis pulses,
> right lower ext more edematous.  Patient disheveled, psychotic and very uncooperative.
> Will attempt treatment with Diuresis and order stat lab work, **doctor to see patient**"
> (emphasis added).

Defendant Ngwa, NP further wrote on July 30 that a "doctor" had seen Mitchell and

recommended sending Mitchell out to the emergency room:

> "Patient very uncooperative, refuses treatment, meds, lab or full assessment at this time,
> very uncooperative, burst, verbally abusive and using profanity and derogatory language,
> lesions noted to bilateral distal upper arm to various healing stages, no drainage noted,
> limited assessment RT patient being uncooperative, **doctor saw patient** and recommends
> referral to the ED.  Patient sent out to the ED" (emphasis added).

120.   Upon information and belief, the "doctor" who would have seen Mitchell is

Defendant Kolongo, MD, the head of HRRJ's Medical Department.  Although there are no notes

produced from a doctor's exam of Mitchell, if Defendant Kolongo, MD spoke with Defendant

Ngwa and examined Mitchell on July 30, 2015, he would have known that Mitchell had not been

treated, was not receiving medication, and had no lab work.   He would have known that his

order regarding segregation rounds was largely being disregarded by NaphCare nurses. Kolongo would have further observed, in addition to his edema, Mitchell's "psychotic," "uncooperative" state and "disheveled" appearance, including extreme weight loss. As the physician in charge of the Jail's Medical Department who examined Mitchell on July 30, had given a previous order regarding segregation rounds that he knew (at least by July 30) had been largely disregarded, and had access to Mitchell's chart and other Jail providers who worked under Kolongo, Kolongo knew that Mitchell was physically deteriorating, suffering from, among other things, dramatic weight loss and pitting edema, and he knew that Mitchell was living in unsanitary, unsafe conditions, and was expressing distress.[7] Defendant Kolongo, as Medical Director, further would have known that there was a CRO order for Mitchell that was not being carried out, and knew, *at least* by July 30, if not earlier, that Mitchell was not receiving adequate medical or mental health care at HRRJ. However, there is nothing in the NaphCare records received pre-litigation indicating that Defendant Kolongo, MD ever intervened in the face of Mitchell's physical deterioration, such as properly addressing his weight loss, properly treating his edema, assessing him for medical conditions, or otherwise providing him with proper medical care. There is nothing in the records indicating that Defendant Kolongo, MD, ever made any additional interventions, such as regular visits for Mitchell to see himself or a nurse practitioner, given Mitchell's condition and non-receipt of treatment and medications. As Medical Director, Defendant Kolongo, MD, had a responsibility to have systems in place that would allow for inmate/detainee access to adequate medical care, and to properly audit such systems, but he did

---

[7] As noted above, as medical director of HRRJ, Defendant Kolongo, MD, was responsible for implementing medical protocols, as well as for the training, duties, and actions of the medical services staff at the Jail. The failures of the type abundantly shown in Mitchell's Jail medical records indicate a disregard by Defendant Kolongo, MD, of his duties as medical director of the Jail.

not and knew that he did not.  As Medical Director, Defendant Kolongo, MD, had a

responsibility to coordinate care, including ensuring that he and other medical providers

communicated among themselves and also with mental health care providers and had a

coordinated treatment plan concerning Mitchell.  However, there is nothing in the records

received pre-litigation indicating that Kolongo ever followed up with nursing staff to make sure

that his segregation order was enforced and properly documented; nothing indicating that he

addressed Mitchell's supposed "refusal" or non-receipt of medications and treatments; nothing

indicating that Kolongo ever followed up with Defendant Ray, NP-Psych, or another mental

health care provider; and nothing indicating that Kolongo ever followed up with Defendant

Ngwa, NP, after Mitchell was brought back to the Jail from Maryview Hospital after a very short

visit. Additionally, despite his authority and duties as Medical Director, there is nothing

indicating that Defendant Kolongo, MD, ever called Eastern State Hospital about the CRO, or

took any other actions, which would have afforded Mitchell access to proper medical and mental

health treatment.  Instead, Defendant Kolongo, MD, despite learning of Mitchell's state, and

serving as the Medical Director, did not do anything for Mitchell after approving of his being

sent to the ED on July 30.

### (5)    *NaphCare Nursing Staff – Medication*

121.    Defendant NaphCare's nursing staff failed to properly administer medication and

failed to properly document such.  The record indicates that Mitchell was prescribed medication

by both Defendants Ray, NP-Psych (psychotropic medication for his mental illness) and Ngwa,

NP (medication apparently for his edema).  Ray's various orders originally covered the period

from May 11, 2015 through August 11, 2015, with twice a day administrations, but he

wrongfully discontinued the medications on July 26, 2015.  Defendant Ngwa's combined orders

for medication covered the period from July 14, 2015 through July 19, 2015, and then from July 30, 2015 through August 1, 2015, with once a day administrations (although the edema was never resolved, there are no orders by Ngwa for after August 1). Thus, Defendant NaphCare nurses should have made at least twice daily medication administrations from May 11, 2015 through July 26, 2015, and once daily administrations from July 30, 2015 through August 1, 2015. However, of the approximately 160 plus times over 80 days when NaphCare nursing staff should have administered or attempted to administer medication to Mitchell, they document the purported attempt[8] to administer the medication on only approximately 27 occasions over 20 days:

| Date | Provider | Type of Record | Outcome of Medication Admin. Attempt | Follow up if "Refused?" |
|------|----------|----------------|--------------------------------------|-------------------------|
| **5/12/15** 6:19 AM | Shannon Pifer, RN | Drug Administration History under Non-formulary Request, electronic record | Administered | |
| **5/12/15** 6:47 PM | Olga Matheson, RN | Drug Administration History under Non-formulary Request, electronic record | Administration Canceled / Cancelation Note: refused | No referral to doctor or nurse practitioner |
| **5/12/15** 9:26 PM | Olga Matheson, RN | Drug Administration History under Non-formulary Request, electronic record | Administration Canceled / Cancelation Note: refused | No referral to doctor or nurse practitioner |
| **5/12/15** 9:34 PM | Olga Matheson, RN | Drug Administration History under Non-formulary Request, | Refused | No referral to doctor or nurse practitioner |

---

[8] As detailed herein, inmates have contested Naphcare's supposedly administering medication.

| | | electronic record | | |
|---|---|---|---|---|
| **5/13/15** 6:20 AM | Shannon Pifer, RN | Drug Administration History under Non-formulary Request, electronic record | Refused | No referral to doctor or nurse practitioner |
| **5/13/15** 5:07 PM | Shaun Heafner, RN | Drug Administration History under Non-formulary Request, electronic record | Refused | No referral to doctor or nurse practitioner |
| **5/14/15** 6:26 AM | Shannon Pifer RN | Progress Notes- electronic record  (also recorded under Drug Administration History under Non-formulary Request, electronic record with reference to the progress note) | "Pt given floated medication. Pt proceeded to drink off the water and stick his finger into the bottom of the cup with the wet medication and sniffed it up his nose. "That's good coke." Pt did not actual [sic] ingest the medication and handed the cup back." | No referral to doctor or nurse practitioner noted |
| **5/17/15** 5:06 AM | Shannon Pifer RN | Progress Notes – electronic record | "Pt was observed for pill pass. Medication was crushed and floated. He drank the majority of water out of the cup then proceeded to stick his nose in the cup and inhale sharply through his nose. Encouraged pt to drink his medication. He | No referral to doctor or nurse practitioner noted |

| | | | then stuck his finger in the crushed pills and stick them in his nose and snort. Pt handed the cup back with some of the crushed medication still in the cup.  Pt. proceeded to yell profanities and racial slurs." | |
|---|---|---|---|---|
| 5/30/15 2:56 PM | Pamela Trimble, LPN | Progress Note – electronic record | "REFUSED 0800 MEDICATION" | No referral to doctor or nurse practitioner noted |
| 6/9/15 12:50 PM | Jacqueline Wilson, LPN | Progress Note – electronic record | "Pt did not receive 0800 medications due to being very agitated and spitting at the officer and nurse" | No referral to doctor or nurse practitioner noted |
| 6/15/15 11:15 22:06 | 11:15: "SBB" 2206: "DH" | Daily Confinement Record (paper) | No information noted beyond initials under "Medical Visit" and times under "Medication 1st" ("N/A" written in "Medication: 2nd and 3rd") Unclear | |
| 6/16/15 11:35 21:35 | 11:35: "TM" [?] 2135: DH | Daily Confinement Record (paper) | No information noted beyond initials under "Medical Visit" and times under "Medication 1st" ("N/A" written in "Medication: 2nd and 3rd") Unclear | |
| 6/17/15 | 2122: JZZ | Daily | No information | |

| | | | | |
|---|---|---|---|---|
| 21:22<br>20:09 | 2009: OK or JK | Confinement Record (paper) | noted beyond initials under "Medical Visit" and times under "Medication 1st" ("N/A" written in "Medication: 2nd and 3rd") Unclear | |
| **6/18/15**<br>13:49<br>21:30 | 1349: _S [?]<br>2130: DH | Daily Confinement Record (paper) | No information noted beyond initials under "Medical Visit" and times under "Medication 1st" ("N/A" written in "Medication: 2nd and 3rd") Unclear | |
| **6/19/15**<br>11:45<br>21:32 | 11:45: _S [?]<br>2132: DH | Daily Confinement Record (paper) | No information noted beyond initials under "Medical Visit" and times under "Medication 1st" ("N/A" written in "Medication: 2nd and 3rd") Unclear | |
| **6/20/15**<br>12:18<br>21:49 | 1218: JPOT [?]<br>2149: DH | Daily Confinement Record (paper) | No information noted beyond initials under "Medical Visit" and times under "Medication 1st" ("N/A" written in "Medication: 2nd and 3rd") Unclear | |
| **6/21/15**<br>12:10<br>[illegible- 20:__<br>[?]] | 12:10 JPOT [?]<br>[illegible- 20:__<br>[?]]: Illegible | Daily Confinement Record (paper) | No information noted beyond initials under "Medical Visit" and times under "Medication 1st" ("N/A" written in "Medication: 2nd and 3rd") Unclear | |
| **7/14/15**<br>3:43 PM | Teycia Bynum, RN, BSN | Progress Notes-electronic record | Correction from previous SOAP | |

| | | | note made during her exam of Mitchell.<br><br>Indicates, among other things, that is giving "Lasix 20 mg po x's 1 now" per Ngwa, NP order | |
|---|---|---|---|---|
| **7/15/15**<br>**3:32 PM** | Mary Day, LPN | Progress Notes-electronic record | Inmate refused am meds | No referral to doctor/ nurse practitioner |
| **7/31/15**<br>**3:17 PM** | Jacqueline Wilson, LPN | Progress Notes-electronic record | Pt administered 0800 medications | No referral to doctor/ nurse practitioner |

NaphCare nurses did not use a standard Medication Administration Record ("MAR") with regard to Mitchell's medication administration; such a form would list every medication that Mitchell was on, and how long, how often, in what dosage, and in what manner each medication was to be administered – and there would be places to indicate that and when each individual medication dose was / was not administered and if not, why (i.e. "refusal," etc). Because of Defendant NaphCare's disorganized records, even on the few occasions when medication was supposedly administered, **there is no record as to exactly which medications were administered/ in which doses – a stunning failure by the NaphCare Defendants.** Also, as noted above, the incomplete medication administration records contain some entries indicating that Mitchell "refused" his medications.[9] However, in addition to the fact that NaphCare employees knew that Mitchell was incompetent and incapable of making an informed "refusal," and that his not getting medication put him in danger, *there is no documented follow up* with a doctor or nurse practitioner of Mitchell's purported "refusal" to take his medications. There is also no

---

[9]   As noted below, inmates held in the same pod(s) as Mitchell largely rebut the assertion. Indeed, Mitchell himself denied the assertion.

documented follow up to a nurse practitioner or physician in instances wherein Mitchell reportedly did not receive his medication or all of his medication because, in his impaired state, he purportedly attempted to take it in an incorrect manner (i.e. snorting). Inmates have reported that they were told that Mitchell had stopped receiving medications from Medical because, among other things, of his behavior (i.e. because he was agitated, etc.).

122.    Finally, indicative of the shoddy and indifferent medication administration practices of NaphCare nursing staff, inmates Morst, Gray, and Vaughan state that when nurses were on the pod, they would just walk by Mitchell's cell without stopping to provide medication or other medical care.

### (6)    *Defendant Benedict Ngwa, NP*

123.    According to the progress note dated July 14, 2015 at 3:38 PM by nurse Teycia Bynum, RN BSN, Defendant Benedict Ngwa, NP, was "made aware" of Bynum's exam of Mitchell, and also examined Mitchell at that time. Among the information of which Defendant Ngwa was "made aware" in Bynum's note, was: "Pt to medical for BLE edema. +4 pitting edema noted. Pt is aggressive uncooperative and refusing to take prescribed med. Pt. alert to name only. Pt has a history of not taking mental health meds." Defendant Ngwa, NP gave orders for the medications Lasix and Furosemide; the following day, on July 15, Ngwa issued a new Furosemide order (discontinuing the old one), and ordered that Mitchell should be "reassess[ed] x 5 days and treatment as needed." On July 15, 2015 at 4:24 PM, Defendant Ngwa also ordered that vital signs be taken for Mitchell two times/ week – to start July 15, 2015 and stop July 21, 2015; at 4:27 PM, he also ordered that vital signs be taken "NOW." However, no vital signs were recorded during the period from July 15- July 21, 2015, and there is no indication that Mitchell was "reassess[ed]" by Ngwa within 5 days of July 15. Instead,

Defendant Ngwa, NP, did not see Mitchell again until July 30, when, according to Defendant

Ngwa's 11:50 AM Progress Note (the record indicates that Ngwa made his electronic notes well

after his actual exam of Mitchell because Mitchell was already at the Maryview ER by 10:20

AM), Mitchell "was brought down to the clinic for increased swelling to bilat lower ext."

Defendant Ngwa further noted that:

> Patient has been refusing treatment lately, lab work and medication.  Patient with pitting
> bilateral lower ext edema +4, extending to back of knees, faint popliteal and dorsals pedis
> pulses, right lower ext more edematous.  Patient disheveled, psychotic and very
> uncooperative.  Will attempt treatment with Diuresis and order stat lab work, doctor to
> see patient

124.    Defendant Ngwa, NP, also wrote (in an 11:58 AM progress note, again, recorded

after the fact):

> Patient very uncooperative, refuses treatment, meds, lab or full assessment at this time,
> very uncooperative, burst, verbally abusive and using profanity and derogatory language,
> lesions noted to bilateral distal upper arm to various healing stages, no drainage noted,
> limited assessment RT patient being uncooperative, doctor saw patient and recommends
> referral to the ED.  Patient sent out to the ED.

125.    Defendant Ngwa, NP, therefore knew about Mitchell's pitting edema at least by

July 14, but did not effectively treat it or follow it or determine its cause.  He knew, at least by

July 14, that Mitchell was "uncooperative" and that he was not receiving his medication.  Ngwa

also noted on July 30, among other things, that Mitchell was purportedly "refusing" treatment,

lab work and medication (he must have known that the vital signs he ordered were not taken),

was "disheveled," "psychotic" and "very uncooperative," and that Mitchell also had arm lesions

in addition to the unresolved edema.  Having examined Mitchell on July 14 and July 30,

Defendant Ngwa also knew about Mitchell's physical deterioration, including his considerable

weight loss.[10]  Further, although Ngwa apparently thought Mitchell's condition warranted being sent to the ER on July 30, after Mitchell was sent back from the ER a few hours later with no treatment and no medical stabilization, there is no record that Defendant Ngwa examined Mitchell again at any point prior to his death in order to follow up on his unresolved conditions and his physical deterioration, or medication management.  As a nurse practitioner obviously aware of Mitchell's psychotic condition, Defendant Ngwa also had to have known that the Court's CRO order had not been carried out, and that the Jail was not providing Mitchell with adequate care, but there is no record that Ngwa ever called Eastern State Hospital about the CRO.  There is also no record indicating that Ngwa followed up with Defendant Ray, NP-Psych, or another mental health care provider concerning coordination of care.  Instead, it appears that Defendant Ngwa, NP, simply did nothing after sending Mitchell to the ER on July 30.

### (7)     *NaphCare Nursing Staff- Care Plans*

126.    The NaphCare records produced pre-litigation do not include care/treatment plans for *any issue other than suicide watch.*

### (8)     *Defendant Pam Johnson, RN*

127.    As Director of Nursing ("DON") of HRRJ, Defendant Pam Johnson, RN, would have known that her nursing staff was not properly administering medication, was not properly performing segregation rounds, had not properly developed treatment plans, was not properly taking vital signs, and was not properly documenting in Mitchell's chart.  As DON, Defendant

---

[10] In addition to Ngwa's exam, vital signs including weight were finally taken at HRRJ on July 30 immediately prior to Mitchell's being sent to the Maryview ED; although Mitchell's weight curiously was listed at 158 pounds - it was listed as 145 pounds shortly thereafter at Maryview- as a nurse practitioner prescribing medication to Mitchell, Defendant Ngwa would have known that Mitchell's weight had changed considerably from his intake weight.  Maryview records were also provided to the Jail and Ngwa, upon information and belief, could have reviewed them upon Mitchell's discharge and seen the weight discrepancy.

Pam Johnson, RN, would have known that her nursing staff was not properly communicating to nurse practitioners/doctors material conditions such as Mitchell's alleged "refusal" of medication, treatments, and labs, his continued mental deterioration, weight loss, and the unsanitary conditions of his cell, as well as his distress. As DON, Defendant Pam Johnson, RN, would have known that Mitchell was issued a CRO order by the Court, but that it was not being carried out. As DON and an RN, Defendant Pam Johnson, RN, would have known that Mitchell's not receiving medication made him more vulnerable and progressively less likely to be able to communicate his needs effectively to staff. As DON, Defendant Pam Johnson, RN, would have known that there was inadequate follow up after Mitchell's ER visit on July 30. As DON, Defendant Pam Johnson, RN, would have known of Mitchell's physical deterioration and distress. As DON, Defendant Pam Johnson, RN, would have known that HRRJ medical personnel were not providing adequate care for Mitchell. As DON, Defendant Pam Johnson, RN, knew that there was not effective coordination of care between or among medical providers and mental health care providers at HRRJ. However, these conditions were allowed to continue unchecked. Despite her duties as Director of Nursing to have systems in place to provide for effective, proper nursing care and effective auditing of such, there is no record that Defendant Pam Johnson, RN, did anything directly to intervene in Mitchell's case, such as conferring with nurse practitioners or doctors, meeting with nurses charged with providing care to Mitchell, contacting Eastern State, or otherwise improving Mitchell's circumstances of confinement or medical care. As noted herein, Defendant Pam Johnson, RN, told state investigators that her nurses observed Mitchell daily; although the records indicate otherwise, if this were the case, then Defendants NaphCare and Pam Johnson, RN, were still flagrantly negligent, grossly negligent, acted willfully and wantonly, and were deliberately indifferent because, instead of

largely and deliberately ignoring Mitchell, NaphCare nurses would have seen Mitchell's acute medical needs not sporadically but *every day* and still failed to address them.

(9)     *Defendant Natalya Thomas, RN, HSA*

128.    As a Health Services Administrator, Defendant Thomas was charged with planning, directing, and coordinating medical and health services at HRRJ.   Defendant Thomas would have known that there was not effective coordination of care among providers at HRRJ, including among and between medical and mental health providers.  Defendant Thomas would have known that nursing staff was not properly communicating to nurse practitioners/ doctors conditions such as non-receipt or "refusal" of medication/otherwise failure to ingest medication; non-receipt or "refusal" of other treatments; mental deterioration; extreme weight loss and physical deterioration; unsanitary conditions; and distress.  Defendant Thomas would have known that nurse practitioners, doctors, social workers, and others were not communicating effectively amongst each other.  As HSA, Defendant Thomas would have known in general that nursing staff was not properly administering medication, was not properly performing segregation rounds, was not properly developing treatment plans, was not properly taking vital signs, and was not properly documenting, and would have known that mental health staff also were not properly assessing and treating Mitchell's mental health condition.  Thomas also would have been aware of widespread documentation failures in Mitchell's chart.  As HSA, Defendant Thomas would have known that Mitchell was issued a CRO order by the Court, but that it was not being carried out.  As HSA, Defendant Thomas should have had a system in place to effectively track CROs / whether they had been implemented, but did not.  As HSA, Defendant Thomas would have known of failures of medical and mental health providers to medically and psychologically stabilize mentally ill inmates.  Thomas also would have known about the

unsanitary conditions that mental health inmates were being forced to endure in segregation. As HSA, Defendant Thomas likely knew about Mitchell's particular circumstances, including physical and mental deterioration, unsanitary living conditions, and distress. As an RN, Thomas would have known of the danger to Mitchell that those conditions presented. However, Thomas, in addition to apparently failing to do anything directly to improve Mitchell's situation, failed to facilitate coordination of care and communication among and between mental health and medical providers, failed to audit records and nursing practices, failed to have systems in place to track CROs, failed to have systems in place to effectively monitor segregation inmates, failed to have systems in place to ensure that there was documented showing of medical and mental health stabilization, and otherwise failed to provide for a correctional health care system that would allow access to adequate medical and mental health treatment and monitoring to Mitchell and inmates like him.

### (10)   *Misc. NaphCare Employees*

#### (a)   Defendant Jalessa Rivers, LPN

129.   According to inmate Vaughan, one day when Defendant Rivers was on the unit passing out medications to others, Mitchell asked her "where are my meds?" or words to that effect. Rivers replied that Mitchell had been taken off his medications because he refused them. Mitchell, confused, told Rivers that he had not refused his medications, but was not offered them.

130.   Further, according to a NaphCare electronic Progress Note for August 9, 2015, Defendant Jalessa Rivers, LPN, encountered Mitchell on that day, but did not provide him with adequate care. Defendant Rivers, LPN, writes in her note:

> Pt seen in pod during pill pass. I observed the patient in his cell naked and sitting on the toilet. I observed swelling to BLE. I was unable to understand pt when I asked if he was okay. I told pt to go lay down and put his feet up, but he continued to sit on the toilet.

Observing Mitchell on August 9, shortly before his death, Defendant Rivers, LPN, would have observed the unsanitary conditions of his room, his extreme weight loss, his physical deterioration, his distress, and his erratic behavior. Additionally, Defendant Rivers admittedly saw Mitchell's unresolved edema, problems communicating, and unresponsiveness. She further writes that although she was apparently compelled upon observing to ask Mitchell "if he was ok," she "was unable to understand" his answer. Yet, Defendant Rivers did nothing; there is no record that she alerted a physician/ nurse practitioner, asked guards to remove Mitchell from his cell for an examination or to take his vital signs, or otherwise engaged in any actions to assist Mitchell.

### (b)   Defendant Hope Nicholson, MA

131. According to a NaphCare electronic Segregation Note, Nicholson performed a Segregation round for Mitchell on August 12, 2015 at 10:46 PM. However, the record is inconsistent: the "Summary of findings/ actions taken" states that Mitchell "REFUSED RESTRICTED ROUNDS," and certain sections, including the vital signs, are blank, but "Appearance" is noted as "clean/appropriate," "room condition" as "clean," "behavior" as "cooperative," and "mood" as "normal," which contradicts the record that Mitchell refused the segregation round, and contradicts considerable other evidence, as discussed herein, of Mitchell's unsanitary living conditions, distress, and physical deterioration. Further, observing Mitchell on August 12, shortly before his death, Nicholson would have observed, among other things, the unsanitary conditions of Mitchell's room, his extreme weight loss, his distress, his physical deterioration, and his erratic behavior. However, records do not indicate that Nicholson

did anything to aid Mitchell, such as alerting a physician/ nurse practitioner, or asking

correctional officers to remove Mitchell from his cell for an examination or to take his vital

signs.

(c)    <u>Defendant Doris Murphy, MSW</u>

132.    According to inmate Vaughan, an inmate in Mitchell's cell block, he spoke with

Defendant Doris Murphy, MSW, a social worker at the Jail, in August 2015 and expressed his

concern for Mitchell.  Murphy told Vaughan that she would tell Correctional Officer Defendant

Captain Cowan everything that Vaughan reported to her.  Murphy reportedly had "tears in her

eyes" as she told Vaughan that she had not been aware of how much weight Mitchell had lost.

Murphy also promised Vaughan that she would come and see Mitchell and his condition;

medical records do not reflect that Murphy did so.  Hearing of Mitchell's grave condition in

August 2015, Murphy should have caused a physician or nurse practitioner to see Mitchell or

otherwise sought emergency care for him, but, despite apparently becoming emotional upon

hearing of Mitchell's condition, the record does not show that she did so.  Additionally, there is

no record in Mitchell's medical records that Murphy alerted Defendant Cowan of Mitchell's

reported condition; however, inmate Vaughan states that Cowan was well aware of Mitchell's

condition.

(d)    <u>Defendants John/ Jane Doe NaphCare Nurses No.<br>1-2 who refused to see Mitchell shortly before his<br>death</u>

133.    Approximately a few days before Mitchell's death, per former inmate Justin

Dillon, correctional officer Almond said that he told Medical about Mitchell's needing medical

attention.  Almond noted that he would be willing to take Mitchell to Medical; however, he said

that ***Medical refused to receive Mitchell***.  Any failure by NaphCare employee healthcare

providers to see and examine Mitchell, especially upon request by a correctional officer,

wrongfully blocked Mitchell's access to adequate medical care.  It is reasonable to assert that

Almond would have likely informed HRRJ sergeants, lieutenants, captains and other supervisory

personnel of NaphCare's refusal to see Mitchell.

(e)    <u>Defendant John / Jane Doe NaphCare Nurse No. 3<br>who performed 8/17/15 8:47 AM Seg Round</u>

134.    If a segregation round was performed on August 17, 2015 at 8:47 AM (the

NaphCare Release Summary for Mitchell, created after Mitchell's death, states that this was the

last assessment/treatment performed for Mitchell; however, there is no underlying record of it

being performed/what happened), then the NaphCare nurse/employee who performed this check

ignored Mitchell's distress, the unsanitary conditions of Mitchell's room, his physical

deterioration, his extreme weight loss, and his erratic behavior, and did not provide Mitchell with

adequate care.  Such nurse failed, among other things, to examine Mitchell and to contact a

physician/ nurse practitioner or otherwise obtain emergency care for Mitchell.

(f)    <u>Defendants John/Jane Doe NaphCare Nurses No. 4-<br>8 who did not administer medication to Mitchell,<br>did not conduct segregation rounds, and/or did not<br>develop treatment plans for Mitchell</u>

135.    As noted in the sections above entitled *"(3) NaphCare Nursing Staff -*

*Segregation Rounds"*; *"(5) NaphCare Nursing Staff – Medication"* and *"(7) NaphCare Nursing*

*Staff- Care Plans,"* in addition to improper care, the records indicate that some NaphCare

nursing staff (including nurses and other non-nurse, non-physician healthcare assistant positions)

simply did not administer, or, attempt to administer, medication or do segregation rounds at all.

Additionally, the records indicate that some nursing staff responsible for developing treatment

plans did not do so, as the records do not reflect care/treatment plans for Mitchell for any issue

other than suicide watch.

> (g)  Defendants John/Jane Doe NaphCare Nurses  No.
> 9-11, who failed to intervene when, in the days
> leading to his death, Mitchell was
> uncharacteristically slumped on his metal bed and
> asking for medical help (and other inmates were
> asking for it on his behalf)

136.   Upon information and belief, additional NaphCare employees besides John / Jane

Doe NaphCare Nurse No. 3 would have seen Mitchell and his desperate conditions in the days

leading up to his death, but deliberately ignored them.

> **2.   Correctional Officer Defendants (Defendants Barnes, Blakely,
> Bourne, Butcher, Gibbs, Hilliard, Howard, Keister, Whitaker, Powell,
> Smith, Dixon, Johnson, D. Brown, Phillips, Epperson, Sgt. Whitehead,
> Lt. Whitehead, Everette, Madison and Cowan)**

137.   The Correctional Officer Defendants intentionally denied Mitchell food,

physically and verbally abused him, ignored his horrific living conditions, and disregarded his

pleas and pleas on his behalf for medical help[11]. These failures and breaches caused Mitchell

pain, exacerbated his deteriorating health, and caused his eventual death.

---

[11] Defendant Superintendent Simons refused to provide to Plaintiff's counsel pre-litigation any
records in the Jail's possession other than Mitchell's medical records and certain contract and
policy documents, despite having the discretion to do so if he so chose.  The Superintendent
noted that he was withholding other records under Virginia Code §§ 2.2-3706(A)(2)(d) and 2.2-
3705.1; although documents under these Sections are not subject to mandatory disclosure, they
may be produced *at the custodian's discretion*, as long as not otherwise prohibited by law.  As a
result, and because the Jail is a closed institution, Plaintiff did not have access to many
documents often produced pre-litigation in cases involving jails that would help to identify
individual correctional officer actions/inactions, such as staffing schedules, incident reports,
investigative reports, statements, officer logs, and internal memos.  However, in connection with
this matter, Plaintiff's counsel interviewed several inmates incarcerated at the HRRJ at the same
time as Mitchell who have knowledge of Mitchell's condition and the actions/inactions of Jail
personnel; certain of these inmates also wrote to Mitchell's family and/or Plaintiff's counsel,
and/or gave statements to media outlets, as mentioned herein.  The individual correctional

a. The Correctional Officer Defendants purposefully denied Mitchell food.

138. The Correctional Officer Defendants purposefully denied Mitchell food. Inmate Gray identified Defendants Blakely, Butcher, Bourne, Gibbs, Hilliard, and Barnes as correctional officers who refused to feed Mitchell. Gray also observed that if Mitchell did not "comply at that exact moment [in response to an instruction by a correctional officer], he wouldn't get fed for days at a time." Former inmate Kenneth Williams identified Defendant Brown as having denied Mitchell food. Inmate Jade Johnson identified Epperson, Blakely, and Gibbs as denying Mitchell food. In addition to Bourne and Barnes, former inmate Dillon identified Defendants Powell and Butcher as correctional officers who withheld food from Mitchell. According to Dillon, these correctional officers were frustrated when the mentally ill Mitchell would fail to return his Styrofoam meal tray from a previous meal, and, would refuse to provide him with food as a result. Dillon said that Mitchell was oftentimes denied food. Sometimes, the Correctional Officer Defendants would place Mitchell's food tray outside his cell, in Mitchell's view, but beyond his reach, in an obvious and cruel effort to underscore Mitchell's deprivation. Dillon, who – under the supervision and direction of the Correctional Officer Defendants – was one of the inmates who carried out the distribution of meals, noted that, at mealtime, Mitchell would always be by the door to his cell, without fail, and when correctional officers *did* allow him to be fed, Mitchell would grab the food and eat ravenously. Inmate Vaughan further stated that when Mitchell *was* fed, he would have to eat his food with feces on his hands. Mitchell further was almost never provided anything to drink, a circumstance that was especially cruel when coupled with the fact that the water in Mitchell's cell was turned off. The reason that Correctional

officers cited herein and their actions/inactions cited herein are therefore supported by inmates. Discovery in this matter should yield significantly more information.

Officer Defendants provided to other inmates for their not giving Mitchell anything to drink was that they had no Styrofoam cups to provide to him. (Former inmate Dillon stated that approximately a week before Mitchell died, another inmate snuck a cup for Mitchell.) However, this stated reason appears to be false, as, according to inmate Vaughan, the Correctional Officer Defendants *themselves drank out of Styrofoam cups all the time*. The failure to give Mitchell beverages, upon information and belief, was simply another deliberate expression of unwarranted cruelty by the Correctional Officer Defendants.

    b.  <u>The Correctional Officer Defendants physically abused Mitchell</u>

  139. The Correctional Officer Defendants physically abused Mitchell. At times, Mitchell was forced to the ground, dragged, sprayed with mace, and stood upon and beaten by Correctional Officer Defendants. Inmate Vaughan reported that Mitchell's sharp screams could be heard throughout the Jail pod while he was being abused by the Correctional Officer Defendants. Additionally, the Correctional Officer Defendants regularly mocked and laughed at Mitchell.

  140. Defendant Dixon, according to inmate Hurst, kicked the legs out from under Mitchell while Mitchell was handcuffed. Hurst also said that Defendant Dixon sprayed Mitchell in the face with soapy water from a bottle. Inmate Gray identified Defendant Dixon (and Defendant Sgt. Whitehead) as having dragged Mitchell, naked, out of his cell, placed him on the floor, and having put him on display, remarking that they "treated [Mitchell] like a circus animal."

  141. Defendant Whitaker kicked Mitchell while he was handcuffed, according to former inmate Dillon.

142.     Defendant Lieutenant Whitehead, according to inmate Hurst, sprayed Mitchell in the face with mace and punched him.  Hurst also said that Lt. Whitehead kicked Mitchell in the shoulders and head while telling Mitchell to "stop resisting."

143.     As noted above, inmate Gray identified Defendant Sgt. Whitehead (and Defendant Dixon) as having dragged Mitchell, naked, out of his cell, placed him on the floor, and having put him on display "…like a circus animal."  Former inmate Ra-Sheem Saunders stated that Sgt. Whitehead kicked Mitchell while Mitchell was on the ground, and also put his foot on Mitchell's back.

144.     Defendant Butcher, per inmate Vaughan, threw Mitchell to the ground and punched him.  During those occasions when the chuck hole to Mitchell's cell was open (and not sealed by the Correctional Officer Defendants), per inmate Gray, Defendant Butcher would twist Mitchell's arm whenever Mitchell placed his arms in the chuck hole.

145.     Defendant Brown, per former inmate Williams, would also twist Mitchell's arm whenever Mitchell had access to the chuck hole and placed his arms in the chuck hole.

146.     Defendant Bourne, per former inmate Dillon, would also repeatedly punch Mitchell in the arm when Mitchell put his arm in the chuck hole.

147.     Defendant Barnes, according to inmate Vaughan, would shut Mitchell's arm in the tray slot, would twist Mitchell's arm and would further punch Mitchell's arm repeatedly when Mitchell put his arm in the chuck hole.

148.     As to Defendant Epperson, according to inmate Vaughan, on or about August 14, 2015, Defendant Barnes inadvertently opened Mitchell's door or Mitchell's cell door otherwise was opened, and Mitchell limped out of his cell, said that he was experiencing great pain in his leg, and stated that he needed to go to Medical.  According to inmate Vaughan, Defendant

Epperson "tricked" Mitchell by indicating that the Correctional Officer Defendants would take him to Medical, and also give him "canteen," so that he would be cooperative. However, instead, Defendant Epperson and another officer proceeded to physically drag Mitchell back into his cell. Mitchell cried out about how much pain his legs were in and asked to be taken to Medical. Once back inside Mitchell's cell, Mitchell loudly cried out in pain while Defendant Epperson told Mitchell, among other things, "give me your f___ing arm," and told another correctional officer to put his weight on Mitchell. Former inmate Dillon also recalls Epperson dragging Mitchell; Dillon describes that Mitchell was crying, and Epperson said, "oh, don't start that sh__," grabbed Mitchell, and Mitchell fell due to his injured foot, and Epperson dragged Mitchell all the way from the front of the pod to his cell.

149.    Inmate Steven Gray also identified Defendant Epperson as having "ruffed (sic) Mr. Mitchell up while in cuffs." Inmate Gray recalls hearing banging on the cinderblock walls and metal bunks of Mitchell's cell while Epperson was inside; he recalls that, afterward, Epperson emerged from Mitchell's cell breathing heavily, and Mitchell could be heard crying.

150.    As to Defendant Epperson and also Defendant Blakely, inmate Jade Johnson identified them as having abused Mitchell; he stated that, among other abuse suffered by Mitchell at the hands of Epperson and Blakely, was that they would kick Mitchell and throw him to the ground while he was handcuffed and too weak to defend himself, and would use restraints as a form of discipline (e.g. cuffing Mitchell very hard to punish Mitchell). Inmate Johnson also recalls that Epperson and Blakely would drag Mitchell to spaces removed from the unit's cameras when abusing Mitchell. (Inmate Gray informed that the camera "blind spots" on the unit were identified with red tape).

c.   The Correctional Officer Defendants ignored Mitchell's horrific
living conditions and dramatic weight loss

151.   All of the Correctional Officer Defendants also consistently ignored Mitchell's

horrific conditions of confinement.  As described herein, Mitchell was abandoned, without

clothing or bedding, in a cell reeking from unflushed urine and feces, wherein his main contact

with the outside world, his chuck hole, was locked, and his water line turned off, sealing him off

in an environment of filth, cold and pestilence.  Indeed, in its Death Scene Investigation Report,

investigators from the Office of the Chief Medical Examiner described Mitchell's cell as having

the stench of a "foul odor," remarked that the toilet was full of urine and feces, and noted

puddles of urine on the floor.  Investigators also noted the close proximity of Mitchell's cell to

Jail correctional officers, stating: "CELL WAS LOCATED IN THE POD, DIRECTLY

ACROSS THE COMMON AREA FROM THE OFFICER'S CENTRAL BOOTH."

Additionally, as noted herein, inmates have reported that Mitchell's dramatic weight loss was

readily apparent.  Indeed, former inmate Dillon reports that during a conversation with a

correctional officer around mid-July 2015, the correctional officer remarked that Mitchell had

lost a significant amount of weight since he first arrived at the Jail.  However, Mitchell's

deteriorating condition remained unaddressed.

152.   Along with the other Correctional Officer Defendants named herein who, in

addition to ignoring Mitchell's circumstances, had other wrongful conduct associated with

Mitchell (failure to feed, abuse, failure to respond to pleas for help, etc.), Defendants Keister,

Johnson, Phillips and Everette also saw, yet were deliberately indifferent to, Mitchell's horrific

living conditions and dramatic weight loss.  Among other things, Defendant Keister, according to

former inmate Dillon, was a "floater" who often worked on 3-1, 3-3, and 3-2, had contacts with

Mitchell, including on occasions when he witnessed others abusing Mitchell (when he was

sprayed in the face and kicked), and was well aware of Mitchell and his conditions; and

Defendant Johnson regularly worked on 3-1 and also was aware of Mitchell's conditions.

Defendants Sergeants Phillips and Everette also had knowledge of Mitchell's circumstances;

they are discussed in more detail below under section "e. Sergeants, Lieutenants and Captain

Defendants Were Especially Indifferent, Given their Positions."

153.    The Correctional Officer Defendants clearly knew about Mitchell's desperate

conditions, and contributed to them, but deliberately chose to perpetuate them.

> d.    The Correctional Officer Defendants ignored
> Mitchell's pleas for help and pleas for help made on his behalf

154.    The Correctional Officer Defendants failed to respond to Mitchell's pleas for

medical help and pleas made for him by other inmates.

155.    For example, former inmate Dillon reports that he told Defendants Barnes, Smith,

and Dixon throughout June and July 2015 that Mitchell needed help, but that his pleas went

unheeded.

156.    According to inmate Hurst, Defendant Madison stated that Mitchell was denied

medical attention because "he doesn't act right" and conveyed that he would not receive medical

attention until he did "act right."

157.    Inmate Hurst also described that Mitchell asked for medical help, that his foot

and leg were in pain, but that he received abuse instead.

158.    According to former inmate Saunders, Barnes made a statement, "as long as he

doesn't die on my shift…" indicating that he was indifferent to Mitchell's needs.

159.    Inmate Vaughan spoke with Defendant Doris Murphy, MSW, a social worker at

the Jail, in August 2015 and expressed his concern for Mitchell.  Murphy told Vaughan that she

would tell Correctional Officer Defendant Captain Cowan everything that Vaughan reported to

her. Murphy reportedly had "tears in her eyes" as she told Vaughan that she had not been aware of how much weight Mitchell had lost. Although Plaintiff found no medical record indicating that Murphy spoke with Cowan about Mitchell, inmate Vaughan states that, whether Murphy did or not, Defendant Cowan was well aware of Mitchell's condition.

160.    On or about August 14, 2015, when Defendant Barnes inadvertently opened Mitchell's cell door or Mitchell's cell door otherwise was opened, Mitchell limped out of his cell, stated that he was experiencing pain in his leg and asked to go to Medical. However, as noted above, Mitchell's request went unheeded and he was instead dragged and battered.

161.    On or about August 16, according to former inmate Dillon, Mitchell was uncharacteristically lying on his bed and not standing by his door, nor grabbing his tray. Dillon said Mitchell told Dillon that he was sick. But, when Dillon informed Defendant Bourne that Mitchell was sick and needed attention, Defendant Bourne declined to do anything, stating, "he'll be ok; keep serving food," or words to that effect.

162.    According to inmate Vaughan, on or about August 18, 2015, very early in the morning at approximately 2 AM, he checked on Mitchell and saw him hunched over with his legs extended. Mitchell said, "get help; I can't move." Vaughan asked why Mitchell could not move. Mitchell replied that his legs and body hurt from the way that the Correctional Officer Defendants had dragged him into his cell. Vaughan also noted that there was blood in Mitchell's toilet. Vaughan alerted Defendant Bourne; Bourne originally told Vaughan that he had called Medical, but later, when Medical had not come and Vaughan approached Bourne again, Bourne acknowledged that he had ignored the request. Vaughan also noted that Mitchell was screaming out "help" during the early morning. Inmate Gray also corroborates this account, stating that

days before  Mitchell's death, Defendant Bourne, who was doing rounds, was told about

Mitchell's reports that he was hurting, but ignored the pleas.

163.   During the afternoon of August 18, 2015, per inmate Vaughan, Defendant Blakely

was seen tapping on Mitchell's door and calling over the walkie-talkie requesting for Mitchell's

door to be opened to see if Mitchell would respond.  Mitchell did not get out of bed at all during

the afternoon.  Mitchell did not get up to accept his dinner tray.  Vaughan states that another

inmate, a trustee, who saw Mitchell told Blakely that Mitchell appeared to be dead.  Defendant

Blakely ignored the inmate and carried on with what he was doing.  Blakely then came back after

tray passing to look in Mitchell's room, and, when inmate Vaughan asked what was going on,

Defendant Blakely replied that Mitchell was "not going to die on my shift, especially when I'm

about to get off."  On the next shift, per inmate Vaughan, when he implored Defendants Bourne

and Howard to check on Mitchell, the officers replied that Mitchell was sleeping; they declined

to try to wake Mitchell up, even when Vaughan said that he might be dead and not asleep.

164.   It was not until the next morning, August 19, 2015, during breakfast, that, in

response to more inmate alerts that Mitchell was dead, Jail correctional officers finally

summoned NaphCare providers.  According to former inmate Dillon, he and other inmate

trustees were passing out breakfast trays under the direction of Defendants Bourne and Powell.

Even then, when Dillon and the other inmates told Bourne that he needed to call the code to open

Mitchell's door because Mitchell had passed, Defendant Bourne resisted, stating, "naw, naw,

let's go" or words to that effect.  It was only after Dillon insisted and 5-10 minutes had passed

that Defendant Bourne finally called Sergeant Jones, who then called the code to open Mitchell's

door, and NaphCare nurses arrived.  EMS was called and pronounced Mitchell deceased shortly

thereafter.

e.   Sergeants, Lieutenants and Captain Defendants Were Especially
Indifferent, Given their Positions

165.   Former inmate Dillon describes that Sergeant D. Brown regularly was the day

sergeant for Unit 3 (the unit Mitchell was on when he died) and Sergeant Phillips regularly was

the night sergeant for Unit 3; unless they were off, Defendants D. Brown and Phillips were

immediately "in charge" of the unit daily and/or nightly.  When Defendants Sgt. D. Brown and

Sgt. Phillips were off, another sergeant such as Defendant Sergeants S. Whitehead, Epperson or

Everette would be scheduled.  Dillon further describes that sergeants would be notified, via a log,

of inmate "refusals" to eat and/or receive medication.  Additionally, Dillon understood that the

correctional officers on Unit 3 were supposed to make rounds every 15 minutes, but did not do

so, a circumstance that the commanding sergeants would have known about.  Defendants

Madison and R. Whitehead, as Lieutenants, outranked the sergeant defendants, but, as noted

above, still failed to provide Mitchell with access to medical care and abused Mitchell,

respectively.  Finally, Defendant Cowan, as a Captain, outranked even the lieutenant and

sergeant defendants, and, as such, had considerable authority to intervene on Mitchell's behalf,

but, as noted above, also was indifferent.  Despite being in positions of authority *and having

specific knowledge of Mitchell's dire circumstances*, Defendants Sergeants D. Brown, Phillips,

Epperson, S. Whitehead, and Everette, Defendants Lieutenants Madison and R. Whitehead, and

Defendant Captain Cowan were deliberately indifferent to Mitchell's dire conditions.

3.   **The Jail Authority Defendants** (HRRJA/HRRJ, Simons, and Eugene
Taylor)

166.   At all times while Mitchell was confined at the HRRJ, Defendants HRRJA/HRRJ,

Simons, and Eugene Taylor had the duty to maintain the custody and care of Mitchell.  Among

other statutory requirements, Defendants HRRJA/HRRJ, Simons, and Eugene Taylor were

required to comply with Section 53.1-126 of the Code of Virginia, which states that, with regard to detainees/inmates, "…medical treatment shall not be withheld for any … serious medical needs, or life threatening conditions."

167.   The OSIG Report, which criticized the care provided to Mitchell by NaphCare, underscored the duty of the "HRRJ" – more accurately, Defendants HRRJA/HRRJ, Simons, and Eugene Taylor – to provide medical and mental health services to Mitchell and other detainees and inmates.  Specifically, the OSIG Report observed that "HRRJ has a direct responsibility to provide quality medical and mental health care for those in their custody[.]"  Indeed, that Report noted that although NaphCare is no longer the HRRJ's healthcare contractor, "a change in provider offers limited promise of improvement in care or documentation in the absence of a change in **oversight practices.**"  (Emphasis added.)

168.   Defendants HRRJA/HRRJ, Simons, and Eugene Taylor also had a duty to ensure that Mitchell's conditions of confinement met constitutional standards, including properly supervising their employees and sufficiently evaluating the performance of their contractors to conclude that Jail inmates/detainees were receiving constitutionally adequate care and appropriate conditions of confinement.  However, in addition to the failures of the NaphCare Defendants, as described above, on Defendants HRRJA/HRRJ, Simons, and Eugene Taylor's watch, the Correctional Officer Defendants purposefully denied Mitchell food, physically abused Mitchell, ignored his horrific living conditions, and ignored his and others' pleas for help.

169.   As noted herein, upon information and belief, the Jail Authority Defendants knew of the infectious environment in which Mitchell was being housed at HRRJ, the extent of his mental and physical deterioration there, his failure to receive prescribed medications and treatments, and other abuses detailed herein, but did not act to effectively change them.  Despite

being well aware that pretrial detainees held under § 19.2-169.2 orders are entitled to transfer to an appropriate hospital to begin their restorative treatment *immediately* after the order is entered, the Jail Authority Defendants, among other things, did not inform the Court concerning Eastern State Hospital's failure to accept Mitchell; Mitchell's non-receipt of treatment/medication while Court-determined to be incompetent, and the danger to him absent court-ordered treatment; Mitchell's overall deterioration in their facility; and/or any concerns they had regarding HRRJ's ability to keep Mitchell safe/healthy.

170. Among other things, Defendant NaphCare's March 2012 proposal in response to the bid to provide medical and mental health services at HRRJ (which proposal, or a version thereof, was later incorporated into NaphCare's contract to provide such), states, among other things:

- "NaphCare will generate and **provide the Regional Jail Administration a monthly report on all inmates who have not received medication as ordered.**" (Emphasis added.)

- "NaphCare will maintain a log within *TechCare* [their electronic medical records system, or "EMR"] that will be available to the Regional Jail administration on all non-emergency medical requests received."

- "Through *TechCare*, [NaphCare] give[s] all jail commanders a daily report via email that details the services provided in the last 24 hours."

- "NaphCare has provided a plan for a quality assurance program to the Regional Jail Superintendent and the Chief of Operations or other designated individual for approval. ...NaphCare will actively seek out opportunities for improvement for

any and all problems identified by the Chief of Operations or Regional Jail Superintendent..."

- "NaphCare will participate in monthly medical advisory committee (MAC) meetings with designated Regional Jail personnel to review and discuss monthly medical utilization statistics, quality monitoring activity results, and any other administrative or medical service problems identified. ..."

- "Our on-site continuous quality improvement program monitors, evaluates, and improves efficiency, cost-effectiveness, quality, and appropriateness of care provided to the inmate population. ...The Institution CQI [Continuous Quality Improvement] Committee will include the following members...

    o Institution Administrator/Designee;

    o Institution Security Representative;

    o Medical Director;

    o Health Services Administrator;

    o Director of Nursing;

      ...

To enhance communication, we share results through monthly committee meetings and monthly reports to Jail administration.  An annual summary is also prepared as part of the annual report.  Our CQI program includes all on-site disciplines and also includes the jail administrator and contract monitor."

- "NaphCare submits statistical daily reports pertaining to medical services rendered, and a monthly contract compliance report to the Contract Monitor, administrators, and/or their designees..."

171. The foregoing indicates that the Jail Authority Defendants undoubtedly had actual knowledge that Mitchell had remained at HRRJ *for months* despite being subject to a § 19.2-169.2 order that required Mitchell to be ***immediately*** transferred to Eastern State Hospital to begin restorative treatment. The Jail Authority Defendants would have also known that Mitchell had not been receiving his medications as ordered. Also, the horrific nature of Mitchell's cell and condition likely would have been communicated to the Jail Authority Defendants. Accordingly, there is sufficient evidence to indicate that the Jail Authority Defendants were deliberately indifferent to Mitchell's circumstances and acute medical needs. Additionally, as in the case of the other Defendants, there is an affirmative causal link between the Jail Authority Defendants' inaction and the particular constitutional injury suffered by Mitchell – great suffering and his eventual death.

### 4. The Clerk's Office Defendants (Davis and Boyd)

172. Defendant Davis, the Clerk of the Portsmouth General District Court, and her employee/deputy, Defendant Boyd, were responsible for sending Judge Whitlow's CRO for Mitchell to Eastern State in a timely manner. This duty was a ministerial function; neither Defendant Davis nor Boyd had discretion over whether or not to send the Order, nor over whether to send it timely from the date of its entry by the Judge. However, there is *no contemporaneous proof* that these Defendants forwarded the CRO to Eastern State until July 31, 2015 –*more than two months* after the order was issued. Defendants Davis and Boyd therefore breached their duties to Mitchell by failing to carry out their simple ministerial tasks – and thus effectively improperly negating a judge's order – for over two months.

### 5. The DBHDS Defendants (Ferguson and Hart)

173. Defendant Ferguson, as the then chief executive officer of DBHDS, and Defendant Hart, as a DBHDS /Eastern State Hospital employee, had duties, once they received Portsmouth General District Court Judge Whitlow's CRO, to properly act on the CRO's directives to admit Mitchell to Eastern State for the restoration of competency. Defendants Ferguson and Hart did not have discretion in the performance of these ministerial duties. Defendants Ferguson and Hart did not have discretion to fail to admit Mitchell, or to engage in practices that would improperly prohibit Mitchell from being admitted (i.e., Hart clearly *did not* have discretion *to improperly discard a judge's order in her drawer*, failing to perform a basic ministerial task of entering the CRO into Eastern State's processing system; the state investigation revealed that she did this in connection with *multiple* CROs, not just Mitchell's). Additionally, Defendant Ferguson also had statutory duties to Mitchell. As the then chief executive officer of DBHDS responsible for supervising and managing DBHDS and its mental hospitals and other facilities pursuant to Virginia Code § 37.2-304, Ferguson had a statutory duty under Virginia Code § 19.2-169.2 to transfer Mitchell and other incompetent individuals to appropriate hospitals and to provide them restorative inpatient health care. Defendant Ferguson's statutory duty also required the *immediate* transfer of Mitchell (as soon as her agency received the order), as pretrial detainees held under § 19.2-169.2 orders are entitled to transfer to an appropriate hospital to begin their restorative treatment *immediately* after the order is entered. Although, as noted herein, a state investigation indicates that there actually *were* available beds at Eastern State for Mitchell, Ferguson also did not have any discretion to delay Mitchell's admittance. Jails are permitted, *in certain circumstances*, to retain custody of mentally ill inmates who are court ordered to be transferred to a hospital until there is a vacancy at the

"proper" hospital (Virginia Code §19.2-178). However, *inmates like Mitchell awaiting transfer pursuant to §19.2-169.2 are specifically excluded from the delineated lists of circumstances in which there may be a delay.* Defendants Hart and Ferguson therefore breached ministerial and statutory duties owed to Mitchell. Indeed, it appears that Defendant Ferguson, Eastern State Hospital administrators and staff persons *routinely* intentionally disregarded court orders regarding the restoration of competency. The findings of multiple investigations, and documents produced pursuant to a FOIA request made by Plaintiff, demonstrate that during the relevant period of time, numerous CROs (and others on the relevant hospital waiting lists) were ignored by Defendant Hart, even though records indicate that Eastern State and other state mental hospitals had available beds.

### B. Defendants Owed Mitchell Duties

174. At all times while Mitchell was detained[12] at HRRJ until August 19, 2015, when he was declared dead in his HRRJ cell, Mitchell was in the custody and under the care of the Jail Authority Defendants, the NaphCare Defendants, and the Correctional Officer Defendants, and other employees/agents of the foregoing.[13] Additionally, during that period of time, the Clerk's Office Defendants and the DBHDS Defendants owed duties to Mitchell.

175. As discussed herein, the Defendants owed duties to Mitchell. Among these duties, Defendants, and each of them, had statutory and common law duties of care to Mitchell, including affirmative duties to provide adequate and safe, secure, and humane conditions of detention, including adequate medical care or access to adequate medical care.

---

[12] As noted above, Mitchell was being held at the HRRJ as a detainee; no adjudication was ever made of any criminal conduct by Mitchell stemming from his April 2015 charges.
[13] As noted herein, on July 30, 2015, Mitchell was also briefly under the care of the Maryview Hospital physicians and staff.

176.    At all relevant times herein, Defendants, and each of them, had duties to Mitchell, a pretrial detainee, pursuant to the Fourteenth Amendment of the U.S. Constitution.

177.    At all times while Mitchell was a detainee at the Jail, he was in the custody and under the care of Defendants HRRJA/HRRJ, Simons, Eugene Taylor, and their employees and agents.

178.    Pursuant to state statute, Defendant Simons was responsible for the day-to-day operations and maintenance at the Jail, and had the duty of care and custody for Mitchell while he was detained at the Jail.  Va. Code § 53.1-95.8, incorporating by reference Va. Code §§ 53.1-116 et seq. and 15.2-1609.

179.    At all relevant times herein, the final policymaking decision maker for the HRRJA/HRRJ in the daily operation of the Jail was Defendant Simons, and, possibly, by delegation of certain duties, Defendant Eugene Taylor.

180.    Defendants HRRJA/HRRJ, Simons, and Eugene Taylor, by and through their agents and employees, had specific statutory duties to provide, or provide access to, medical treatment to Mitchell under Va. Code § 53.1-126.  Under that statute, the foregoing Defendants had a specific responsibility to inmates/detainees, in that "medical treatment shall not be withheld for any communicable diseases, serious medical needs, or life threatening conditions." *Id.*

181.    Moreover, Virginia legislative authority also enabled various regulations, including, but not limited to, those requiring that 24-hour emergency medical care be made available to inmates.  Va. Code §§ 53.1-68, 53.1-95.2; 6 VAC 15-40-360.

182.    In connection with Plaintiff's state law claims, Defendants HRRJA/HRRJ, NaphCare, and, possibly, Simons, Eugene Taylor, and Davis, and each of them, are accountable,

under the doctrine of *respondeat superior* liability, for the actions and inactions of their employees and agents.

183.    The NaphCare Defendants owed duties to Mitchell to treat him in accordance with recognized and acceptable standards of medical, mental health, and nursing care and treatment.

184.    All Defendants owed duties to Mitchell to exercise reasonable care in providing medical, mental health and nursing care, and/or professional, and/or correctional services, to Mitchell during the time period of his incarceration at the Jail.

185.    Defendants NaphCare; Kolongo, MD; Edwards, LCSW; Ray, NP-Psych; Ngwa, NP; Johnson, RN; Thomas, RN, HSA; Rivers, LPN; Nicholson, MA; Murphy, MSW; Ferguson, Licensed Clinical Psychologist; and the John/Jane Doe NaphCare Nurses 1-11 had duties to render that degree of knowledge, skill, diligence and care to Mitchell that is rendered by a reasonably prudent health care provider or similar professional in the Commonwealth.

186.    As to Defendants NaphCare (in the context of certain employees) and Ferguson, it is asserted, in the alternative, that, in the context of the facts of this case, they were not health care providers under Virginia Code § 8.01-581.15, and the provisions of Virginia Code § 8.01-581.15 do not apply to their conduct.

187.    All of the duties of all of the Defendants, and each of them, as described herein, were shared by the Defendants, individually and collectively.

### C.    Defendants breached duties owed to Mitchell; Defendants' conduct and omissions violated clearly established statutory and Constitutional rights of which Defendants knew

188.    Notwithstanding the duties described above, the Defendants, individually, and/or through their agents and employees, and each of them, breached the duties they owed to

Mitchell, and were negligent, grossly negligent, and deliberately indifferent to Mitchell's care and needs, and/or committed intentional acts of harm in their care and treatment of him.

189.   In disregard of the many requests by Mitchell, his aunt, Plaintiff Adams, and fellow Jail detainees/inmates, and the duties and responsibilities of the Defendants; and in bold defiance of Mitchell's constitutionally protected rights; Mitchell was regularly denied access to adequate medical care.

190.   Rather than responding immediately to Mitchell's deteriorating condition and pleas for help, Defendants deliberately disregarded him, causing his worsening condition and death.

191.   Because of, among other things, the duration of time that Mitchell was held at the Jail, examinations/observations of Mitchell, and documentation that Mitchell was not receiving his ordered medications/treatments, all of the NaphCare Defendants would have been aware of Mitchell's serious condition, and the worsening nature of his condition.

192.   The NaphCare Defendants were deliberately indifferent to Mitchell's medical condition.  The NaphCare Defendants failed to conduct proper examinations, failed to make an accurate diagnosis, failed to keep proper records, failed to coordinate care, failed to report up the chain of command effectively, failed to form and carry out an effective treatment plan with regard to Mitchell, and failed to devise an effective method for the administration of Mitchell's medications.  Records indicate that Mitchell was not permitted access to a physician when his condition worsened.  Upon information and belief, Defendant Kolongo, MD, made multiple decisions *not* to see Mitchell.  Defendants Ray, NP-Psych, and Ngwa, NP, also failed to see Mitchell after July 26 and July 30, respectively.

193. The Jail Authority Defendants and the Correctional Officer Defendants deliberately ignored Mitchell when he sought, and when his family and other inmates/detainees sought on his behalf, medical help. The Correctional Officer Defendants failed to respond, or responded with deliberate indifference or abuse, to Mitchell's deteriorating medical situation.

194. Through their deliberate indifference, Defendants Davis and Boyd prevented Mitchell's competency order from being sent to Eastern State in a timely manner, thus impeding Mitchell's access to adequate medical care.

195. Defendants Ferguson and Hart deliberately failed to comply with Judge Whitlow's CRO concerning Mitchell, thus impeding Mitchell's access to adequate medical care.

196. Defendants breached their express duties as set forth in the statutes, rules, policies, and procedures applicable to the Defendants. Among other provisions, Defendants failed to comply with Section 53.1-126 of the Code of Virginia, which states that, with regard to detainees/inmates, "...medical treatment shall not be withheld for any ... serious medical needs, or life threatening conditions."

197. Thus, the Defendants violated: an express directive by the Virginia General Assembly to provide medical treatment for all serious medical needs or life threatening conditions; the U.S. Constitution; as well as their individual expressed duties and responsibilities, in failing to provide Mitchell with adequate medical care, and/or access to adequate medical care.

198. Indeed, the joint and several conduct of each of the Defendants, and/or of their agents and/or employees, alone or in combination, as aforesaid, was so wanton or dispatched with such negligence as to evince a conscious disregard for the rights, health, and well being of Mitchell.

199.   Defendants' actions and omissions, in denying obvious and necessary care and attention to Mitchell, rose to the level of deliberate indifference to serious medical needs. Additionally, the several acts of negligence, when combined, had a cumulative effect showing a reckless or total disregard of Mitchell.

### D.   Defendants' wrongful conduct and omissions caused Mitchell's worsening condition and death

200.   As a direct and proximate cause of the negligent, grossly negligent, willful and wanton, deliberately indifferent, and/or intentional actions and omissions of the Defendants, Mitchell's condition worsened, he suffered great physical pain and mental anguish, and he died. Mitchell's worsening condition, great physical pain and mental anguish, and death constitute constitutional injuries.

201.   As a direct and proximate cause of the negligent, grossly negligent, willful and wanton, deliberately indifferent, and/or intentional actions and omissions of the Defendants, the surviving beneficiaries of Mitchell have suffered, and will continue to suffer, sorrow, mental anguish, and the loss of decedent's society, companionship, comfort, guidance, kindly offices, and advice of their loved one, as well as economic losses, and have incurred hospital, doctors', and related bills, as well as funeral expenses.

(The following counts are asserted cumulatively, or in the alternative, individually.)

## COUNT 1

**State Law Claims – Negligence, Gross Negligence, and Willful and Wanton Negligence**

**(Against All Defendants, except that the Willful and Wanton Negligence claim is not asserted as to Defendants Davis and Boyd)**

202.   Plaintiff incorporates the foregoing paragraphs of the Complaint as if fully set forth herein.

203.     Defendants NaphCare; Kolongo, MD; Edwards, LCSW; Ray, NP-Psych; Ngwa, NP; Pam Johnson, RN; Thomas, RN, HSA; Rivers, LPN; Nicholson, MA; Murphy, MSW; John / Jane Doe NaphCare Nurses 1-11; Davis; Boyd; HRRJA; HRRJ; Simons; Taylor, III; Barnes; Blakely; Bourne; Butcher; Gibbs; Hilliard; Howard; Keister; Whitaker; Powell; Smith; Dixon; Johnson; Brown; Phillips; Epperson; Steven W. Whitehead; Everette; Madison; Reginald Whitehead; Cowan; Ferguson, Licensed Clinical Psychologist; and Hart (collectively referred to *in this Count* as "the Foregoing Defendants"), had, among other duties, duties to exercise reasonable care with regard to Mitchell.

204.     The NaphCare Defendants (NaphCare; Kolongo, MD; Edwards, LCSW; Ray, NP-Psych; Ngwa, NP; Pam Johnson, RN; Thomas, RN, HSA; Rivers, LPN; Nicholson, MA; Murphy, MSW; John / Jane Doe NaphCare Nurses 1-11) owed duties to Mitchell to treat him in accordance with recognized and acceptable standards of medical care, health care, mental health care, and/or nursing care and treatment.

205.     The Foregoing Defendants' conduct, as described throughout this Complaint, constituted negligence.

206.     The Foregoing Defendants were grossly negligent in that their actions and inactions, described throughout this Complaint, showed such a level of indifference to Mitchell so as to constitute an utter disregard of prudence, amounting to a complete neglect for Mitchell's safety. Additionally, the several acts of negligence of each of the Foregoing Defendants, when combined, had the cumulative effect of showing a reckless or total disregard for Mitchell.

207.     Defendants NaphCare; Kolongo, MD; Edwards, LCSW; Ray, NP-Psych; Ngwa, NP; Pam Johnson, RN; Thomas, RN, HSA; Rivers, LPN; Nicholson, MA; Murphy, MSW; John / Jane Doe NaphCare Nurses 1-11; HRRJA; HRRJ; Simons; Taylor, III; Barnes; Blakely;

Bourne; Butcher; Gibbs; Hilliard; Howard; Keister; Whitaker; Powell; Smith; Dixon; Johnson; Brown; Phillips; Epperson; Steven W. Whitehead; Everette; Madison; Reginald Whitehead; Cowan; Ferguson, Licensed Clinical Psychologist; and Hart (all Defendants excepting Davis and Boyd) were willfully and wantonly negligent in that they acted, or failed to act, in the manner described throughout this Complaint, consciously in disregard to Mitchell's rights.  In addition, all Defendants excepting Davis and Boyd acted, or failed to act, in the manner described throughout this Complaint, with a reckless indifference to the consequences to Mitchell when they were aware of their conduct and also aware, from their knowledge of existing circumstances and conditions, that their conduct would result in injury to Mitchell.

208.    As a direct and proximate result of the negligence, gross negligence, and/or willful and wanton negligence of the Foregoing Defendants, Mitchell died.

209.    As a direct and proximate cause of the negligence, gross negligence and/or willful and wanton negligence of the Foregoing Defendants, which contributed to and were the proximate cause of the death herein complained of, Mitchell suffered great physical pain, and mental anguish.

210.    As a direct and proximate cause of the negligence, gross negligence and/or willful and wanton negligence of the Foregoing Defendants, which contributed to and were the proximate cause of the injuries and death herein complained of, Mitchell's surviving beneficiaries have suffered, and will continue to suffer, sorrow, mental anguish, and the loss of the decedent's society, companionship, comfort, guidance, kindly offices and advice, as well as economic losses, and have incurred hospital, doctors', and related bills, and have incurred funeral costs and expenses.

211.    WHEREFORE, Plaintiff respectfully requests that the Court enter judgment in her favor and against each of the Foregoing Defendants, jointly and severally, in the amount of $ 50 million ($50,000,000.00), or in such greater amount to be determined at trial, costs, prejudgment interest, and punitive damages (except as to Defendants Davis and Boyd) in the amount of $10 million ($10,000,000.00) or in such greater amount to be determined at trial, and grant such other and further relief that the Court may deem appropriate.

## COUNT 2

### Deprivation of Civil Rights – 42 U.S.C. § 1983

### (Denial, Delay, and Withholding of Medical Care)

**(Defendants Kolongo, MD; Edwards, LCSW; Ray, NP-Psych; Ngwa, NP; Pam Johnson, RN; Thomas, RN, HSA; Rivers, LPN; Nicholson, MA; Murphy, MSW; John / Jane Doe NaphCare Nurses 1-11; Simons; Taylor, III; Barnes; Blakely; Bourne; Butcher; Gibbs; Hilliard; Howard; Keister; Whitaker; Powell; Smith; Dixon; Johnson; Brown; Phillips; Epperson; Steven W. Whitehead; Everette; Madison; Reginald Whitehead; Cowan; Ferguson, and Hart)**

212.    Plaintiff incorporates the foregoing paragraphs of the Complaint as if fully set forth herein.

213.    At all times relevant to the allegations in this Complaint, Defendants Kolongo, MD; Edwards, LCSW; Ray, NP-Psych; Ngwa, NP; Pam Johnson, RN; Thomas, RN, HSA; Rivers, LPN; Nicholson, MA; Murphy, MSW; John / Jane Doe NaphCare Nurses 1-11; Simons; Taylor, III; Barnes; Blakely; Bourne; Butcher; Gibbs; Hilliard; Howard; Keister; Whitaker; Powell; Smith; Dixon; Johnson; Brown; Phillips; Epperson; Steven W. Whitehead; Everette; Madison; Reginald Whitehead; Cowan, Ferguson, and Hart (collectively referred to *in this Count* as the "Foregoing Defendants") acted or failed to act under color of state law.

214.    The Fourteenth Amendment to the U.S. Constitution provides to pretrial detainees the right to receive treatment for serious medical needs.

215.    As described in the Complaint, the Foregoing Defendants failed to provide necessary medical care, and/or access to medical care, to include prescribed medications, medical treatment, and appropriate mental health care.

216.    The Foregoing Defendants engaged in this injurious conduct with deliberate indifference to Mitchell's health and safety, especially in light of his extensive and detailed record of mental health diagnoses, thereby placing Mitchell in substantial risk of serious harm.

217.    At numerous times throughout the course of his detention, the Foregoing Defendants were informed by Mitchell's family, Mitchell himself, and other inmates that serious medical needs were not being met; accordingly, the Foregoing Defendants also had actual or constructive knowledge that Mitchell's constitutional rights were being violated.

218.    The acts or omissions of the Foregoing Defendants were conducted within the scope of their official duties and employment.

219.    As a direct and proximate result of the Foregoing Defendants' conduct, Mitchell was injured in various respects, including, without limitation, suffering physical injuries and severe mental anguish due to the egregious nature of the Foregoing Defendants' actions, all attributable to the deprivation of his constitutional rights guaranteed by the Fourteenth Amendment of the U.S. Constitution and protected under 42 U.S.C. §1983.

220.    As a direct and proximate result of the Foregoing Defendants' conduct, Mitchell died. Mitchell's death constitutes a deprivation of his constitutional rights guaranteed by the Fourteenth Amendment of the U.S. Constitution and protected under 42 U.S.C. §1983.

221.    The Foregoing Defendants' aforesaid actions and omissions constitute a willful, wanton, reckless, and conscious disregard of Mitchell's rights, by reason of which Plaintiff is entitled to recover punitive damages.

222.    The Foregoing Defendants' violations of the Fourteenth Amendment to the U.S. Constitution establish a cause of action, pursuant to 42 U.S.C. § 1983, for monetary relief consisting of compensatory damages and punitive damages, attorney's fees and costs to the Estate.

223.    WHEREFORE, Plaintiff respectfully requests that the Court enter judgment in her favor and against the Foregoing Defendants, jointly and severally, in the amount of $50 million dollars ($50,000,000.00), or in such greater amount to be determined at trial, costs, pre-judgment interest, attorney's fees, punitive damages in the amount of $10 million dollars ($10,000,000.00) or in such greater amount to be determined at trial, and grant such other and further relief that the Court may deem appropriate.

## COUNT 3

### Deprivation of Civil Rights – 42 U.S.C. § 1983

### (Conditions of Detention)

**(Defendants Kolongo, MD; Edwards, LCSW; Ray, NP-Psych; Ngwa, NP; Pam Johnson, RN; Thomas, RN, HSA; Rivers, LPN; Nicholson, MA; Murphy, MSW; John / Jane Doe NaphCare Nurses 1-11; Simons; Taylor, III; Barnes; Blakely; Bourne; Butcher; Gibbs; Hilliard; Howard; Keister; Whitaker; Powell; Smith; Dixon; Johnson; Brown; Phillips; Epperson; Steven W. Whitehead; Everette; Madison; Reginald Whitehead; Cowan)**

224.    Plaintiff incorporates the foregoing paragraphs of the Complaint as if fully set forth herein.

225.    At all times relevant to the allegations in this Complaint, Defendants Kolongo, MD; Edwards, LCSW; Ray, NP-Psych; Ngwa, NP; Pam Johnson, RN; Thomas, RN, HSA; Rivers, LPN; Nicholson, MA; Murphy, MSW; John / Jane Doe NaphCare Nurses 1-11; Simons; Taylor, III; Barnes; Blakely; Bourne; Butcher; Gibbs; Hilliard; Howard; Keister; Whitaker; Powell; Smith; Dixon; Johnson; Brown; Phillips; Epperson; Steven W. Whitehead; Everette;

Madison; Reginald Whitehead; Cowan (collectively referred to *in this Count* as the "Foregoing Defendants") acted or failed to act under color of state law.

226.    The Fourteenth Amendment to the U.S. Constitution provides to pretrial detainees at least the right afforded under the Eighth Amendment to be free from cruel and unusual punishment. Indeed, a pretrial detainee may not be punished.

227.    The Fourteenth Amendment includes the right to be free from extreme deprivations of minimal civilized necessities.

228.    As described in this Complaint, the Foregoing Defendants subjected Mitchell to conditions creating an extreme deprivation of minimal civilized necessities, such as blankets, workable toilet, food, water, clothing, showers, shoes, medical care, and basic human interaction.

229.    In particular, the Foregoing Defendants subjected Mitchell to harsh and inhumane conditions, such as prolonged periods of solitary confinement, denial of basic social interaction, no clothing, no workable toilet, no showers, no shoes, no sheet or blanket, no water, food deprivation, bodily harm, verbal abuse, and neglect, including as a direct response to conduct that was a manifestation of Mitchell's disabilities. In turn, these harmful conditions exacerbated these same disabilities and caused irreparable harm to Mitchell.

230.    Moreover, the Foregoing Defendants denied Mitchell necessary medical and psychological care.

231.    The Foregoing Defendants engaged in this injurious conduct with deliberate indifference to Mitchell's health and safety, in light of his extensive and detailed record of mental health diagnoses, placing Mitchell in substantial risk of serious harm.

232.   At numerous times throughout the course of his detention, the Foregoing Defendants were informed by Mitchell's family and other inmates that the conditions of his confinement were extreme and causing Mitchell permanent harm; accordingly, the Foregoing Defendants also had actual or constructive knowledge that Mitchell's constitutional rights were being violated.

233.   The acts or omissions of the Foregoing Defendants were conducted within the scope of their official duties and employment.

234.   As a direct and proximate result of the Foregoing Defendants' conduct, Mitchell was injured in various respects, including, without limitation, suffering physical injuries and severe mental anguish due to the egregious nature of the Foregoing Defendants' actions, all attributable to the deprivation of his constitutional rights guaranteed by the Fourteenth Amendment of the U.S. Constitution and protected under 42 U.S.C. §1983.

235.   As a direct and proximate result of the Foregoing Defendants' conduct, Mitchell died. Mitchell's death constitutes a deprivation of his constitutional rights guaranteed by the Fourteenth Amendment of the U.S. Constitution and protected under 42 U.S.C. §1983.

236.   The Foregoing Defendants' aforesaid actions and omissions constitute a willful, wanton, reckless, and conscious disregard of Mitchell's rights, by reason of which Plaintiff is entitled to recover punitive damages.

237.   The Foregoing Defendants' violations of the Fourteenth Amendment to the U.S. Constitution establish a cause of action, pursuant to 42 U.S.C. § 1983, for monetary relief consisting of compensatory damages and punitive damages, attorney's fees and costs to the Estate.

238.    WHEREFORE, Plaintiff respectfully requests that the Court enter judgment in her favor and against the Foregoing Defendants, jointly and severally, in the amount of $50 million dollars ($50,000,000.00), or in such greater amount to be determined at trial, costs, pre-judgment interest,  attorneys' fees, punitive damages in the amount of $10 million dollars ($10,000,000.00) or in such greater amount to be determined at trial, and grant such other and further relief that the Court may deem  appropriate.

## COUNT 4

### Deprivation of Civil Rights – 42 U.S.C. § 1983

### (Physical Abuse /Excessive Force)

### (Defendants Epperson, Steven W. Whitehead, Reginald Whitehead, Whitaker, Butcher, Dixon, Brown, Barnes, Bourne and Blakely)

239.    Plaintiff incorporates the foregoing paragraphs of the Complaint as if fully set forth herein.

240.    The Fourteenth Amendment to the U.S. Constitution provides the right to be free of physical abuse and excessive force.

241.    As set forth in this Complaint, Defendants Epperson, Steven W. Whitehead, Reginald Whitehead, Whitaker, Butcher, Dixon, Brown, Barnes, Bourne and Blakely physically abused and/or used unreasonably excessive force against Mitchell.

242.    Through their actions and omissions set forth in the Complaint, and while acting under color of state law, and in their individual capacities, Defendants Epperson, Steven W. Whitehead, Reginald Whitehead, Whitaker, Butcher, Dixon, Brown, Barnes, Bourne and Blakely acted in a manner that was deliberately indifferent to Mitchell's Fourteenth Amendment rights.

243.    Defendants Epperson, Steven W. Whitehead, Reginald Whitehead, Whitaker, Butcher, Dixon, Brown, Barnes, Bourne and Blakely's use of force against Mitchell was

objectively unreasonable.

244.    Defendants Epperson, Steven W. Whitehead, Reginald Whitehead, Whitaker, Butcher, Dixon, Brown, Barnes, Bourne and Blakely's physical abuse and use of excessive force on Mitchell involved reckless and callous disregard for Mitchell's Constitutional rights.

245.    Defendants Epperson, Steven W. Whitehead, Reginald Whitehead, Whitaker, Butcher, Dixon, Brown, Barnes, Bourne and Blakely engaged in the injurious conduct described in the Complaint with wantonness by applying force maliciously and sadistically for the very purpose of causing harm, rather than in a good-faith effort to maintain or restore discipline, particularly in light of Mitchell's severe mental illness.

246.    Defendants Epperson, Steven W. Whitehead, Reginald Whitehead, Whitaker, Butcher, Dixon, Brown, Barnes, Bourne and Blakely's acts and omissions were conducted within the scope of their duties and employment and under color of state law.

247.    As a direct and proximate result of Defendants Epperson, Steven W. Whitehead, Reginald Whitehead, Whitaker, Butcher, Dixon, Brown, Barnes, Bourne and Blakely's conduct, Mitchell was injured in various respects, including, without limitation, suffering physical injuries and severe mental anguish due to the egregious nature of Defendants Epperson, Steven W. Whitehead, Reginald Whitehead, Whitaker, Butcher, Dixon, Brown, Barnes, Bourne and Blakely's actions, all attributable to the deprivation of Mitchell's constitutional rights guaranteed by the Fourteenth Amendment of the U.S. Constitution and protected under 42 U.S.C. §1983.

248.    As a direct and proximate result of Defendants Epperson, Steven W. Whitehead, Reginald Whitehead, Whitaker, Butcher, Dixon, Brown, Barnes, Bourne and Blakely's

conduct, Mitchell died.  Mitchell's death constitutes a deprivation of his constitutional rights guaranteed by the Fourteenth Amendment of the U.S. Constitution and protected under 42 U.S.C. §1983.

249.    Defendants Epperson, Steven W. Whitehead, Reginald Whitehead, Whitaker, Butcher, Dixon, Brown, Barnes, Bourne and Blakely's aforesaid actions and omissions constitute a willful, wanton, reckless, and conscious disregard of Mitchell's rights, by reason of which Plaintiff is entitled to recover punitive damages.

250.    Defendants Epperson, Steven W. Whitehead, Reginald Whitehead, Whitaker, Butcher, Dixon, Brown, Barnes, Bourne and Blakely's violations of the Fourteenth Amendment to the U.S. Constitution establish a cause of action, pursuant to 42 U.S.C. § 1983, for monetary relief consisting of compensatory damages and punitive damages, attorney's fees and costs to the Estate.

251.    WHEREFORE, Plaintiff respectfully requests that the Court enter judgment in her favor and against Defendants Epperson, Steven W. Whitehead, Reginald Whitehead, Whitaker, Butcher, Dixon, Brown, Barnes, Bourne and Blakely, jointly and severally, in the amount of $ 50 million dollars ($50,000,000.00), or in such greater amount to be determined at trial, costs, pre-judgment interest, attorney's fees, punitive damages in the amount of $10 million dollars ($10,000,000.00) or in such greater amount to be determined at trial, and grant such other and further relief that the Court may deem appropriate.

## COUNT 5

### Deprivation of Civil Rights – 42 U.S.C. § 1983

### (Against all Individual Defendants except for Davis and Boyd)

252.    Plaintiff incorporates the foregoing paragraphs of the Complaint as if fully set forth herein.

253.    Through their actions and inactions as described throughout this Complaint, Defendants Kolongo, MD; Edwards, LCSW; Ray, NP-Psych; Ngwa, NP; Pam Johnson, RN; Thomas, RN, HSA; Rivers, LPN; Nicholson, MA; Murphy, MSW; John / Jane Doe NaphCare Nurses 1-11; Simons; Taylor, III; Barnes; Blakely; Bourne; Butcher; Gibbs; Hilliard; Howard; Keister; Whitaker; Powell; Smith; Dixon; Johnson; Brown; Phillips; Epperson; Steven W. Whitehead; Everette; Madison; Reginald Whitehead; Cowan; Ferguson, Licensed Clinical Psychologist; and Hart (collectively referred to *in this Count* as "the Foregoing Defendants"), while acting under color of state law, acted in a manner which was recklessly and callously indifferent to Mitchell's Fourteenth Amendment rights, including the right to due process under the law, including the right to a minimum level of appropriate medical treatment for well-documented disabilities. The Foregoing Defendants ignored Mitchell's obvious and serious medical needs and/or exigent need for relevant action, and callously failed to provide adequate care to, and/or take appropriate action for, Mitchell in violation of Mitchell's rights under the Fourteenth Amendment of the U.S. Constitution. Through their actions, the Foregoing Defendants violated Mitchell's constitutional rights by showing deliberate indifference to his medical needs and/or circumstances, and causing him severe physical suffering and his wrongful death. The Foregoing Defendants violated Mitchell's constitutional rights (secured by the Constitution and laws of the United States) by the actions and inactions described in the Complaint, including, among other things, acting or failing to act with deliberate indifference; failing to transfer or cause the transfer of Mitchell to Eastern State Hospital or another appropriate facility; confining Mitchell in conditions creating an extreme deprivation of minimal

civilized necessities, such as clothing, shoes, blankets, a workable toilet, sheets, food and water;

denying prescribed medications; verbally and physically abusing Mitchell; ignoring Mitchell's

pleas for help and medical treatment and those made on his behalf; failing to provide adequate

and appropriate treatment to address Mitchell's serious medical needs, including, without

limitation, his deteriorating mental status, significant weight loss, deteriorating medical

condition, and severe edema; violating the dictates of Section 53.1-126 of the Code of Virginia,

which states that, with regard to detainees/inmates, "...medical treatment shall not be withheld

for any ... serious medical needs, or life threatening conditions"; and/or otherwise failing to take

appropriate action.

254.    The Foregoing Defendants' acts and omissions evidence a deliberate indifference

to Mitchell's circumstances, including, but not limited to, Mitchell's need for medical care.

255.    As a result of the Foregoing Defendants' unconstitutional, deliberate indifference

to Mitchell's circumstances, pleas for help and medical needs, Mitchell suffered a denial of his

constitutional rights and severe physical pain and suffering.  The Foregoing Defendants'

unconstitutional, deliberate indifference to Mitchell's medical needs and circumstances caused

his untimely death.

256.    The Foregoing Defendants' aforesaid actions and omissions constitute a willful,

wanton, reckless, and conscious disregard of Mitchell's rights, by reason of which Plaintiff is

entitled to recover punitive damages.

257.    The Foregoing Defendants' violations of the Fourteenth Amendment to the U.S.

Constitution establish a cause of action, pursuant to 42 U.S.C. § 1983, for monetary relief

consisting of compensatory damages and punitive damages, attorney's fees and costs to the

Estate.

258.    WHEREFORE, Plaintiff respectfully requests that the Court enter judgment in her favor and against each of the Foregoing Defendants, jointly and severally, in the amount of $ 50 million ($50,000,000.00), or in such greater amount to be determined at trial, costs, pre-judgment interest, attorney's fees, punitive damages in the amount of $10 million ($10,000,000.00) or in such greater amount to be determined at trial, and grant such other and further relief that the Court may deem appropriate.

**COUNT 6**

**Deprivation of Civil Rights – 42 U.S.C. § 1983**

**(Deliberate Indifference - Supervisory Liability)**

**(Defendant Ferguson)**

259.    Plaintiff incorporates the foregoing paragraphs of the Complaint as if fully set forth herein.

260.    Through her actions and omissions set forth above, and while acting under color of state law, and in her individual capacity, Defendant Ferguson acted in a manner that was deliberately indifferent to Mitchell's Fourteenth Amendment rights.

261.    Defendant Ferguson had actual or constructive knowledge that her subordinates, including Defendant Hart, were engaged in conduct that posed a pervasive and unreasonable risk of constitutional injury to citizens like Mitchell. As noted above, prior to Mitchell's death, DBHDS's employees (and Defendant Ferguson) regularly disregarded CROs and others on the relevant hospital waiting lists despite the fact that beds at Virginia state mental hospitals were readily available.

262.    Defendant Ferguson's response to that knowledge was so inadequate as to show deliberate indifference to or tacit authorization of the alleged offensive practices.

263.    There was an affirmative causal link between Defendant Ferguson's inaction and the particular constitutional injury suffered by Mitchell.  Specifically, as a result of the Defendant Ferguson's unconstitutional, deliberate indifference to the needs, circumstances, and requirements regarding Virginia inmates and detainees subject to CRO's, Mitchell was not transferred to Eastern State Hospital.  He thereby suffered a denial of his constitutional rights and severe physical pain and suffering.  Defendant Ferguson's unconstitutional, deliberate indifference to Mitchell's circumstances caused his untimely death.

264.    Defendant Ferguson's aforesaid actions and omissions constitute a willful, wanton, reckless, and conscious disregard of Mitchell's rights, by reason of which Plaintiff is entitled to recover punitive damages.

265.    Defendant Ferguson's violations of the Fourteenth Amendment to the U.S. Constitution establish a cause of action, pursuant to 42 U.S.C. § 1983, for monetary relief consisting of compensatory damages and punitive damages, attorney's fees and costs to the Estate.

266.    WHEREFORE, Plaintiff respectfully requests that the Court enter judgment in her favor and against Defendant Ferguson in the amount of $ 50 million ($50,000,000.00), or in such greater amount to be determined at trial, costs, pre-judgment interest, attorney's fees, punitive damages in the amount of $10 million ($10,000,000.00) or in such greater amount to be determined at trial, and grant such other and further relief that the Court may deem appropriate.

**TRIAL BY JURY IS DEMANDED.**

ROXANNE ADAMS, ADMINISTRATOR
OF THE ESTATE OF JAMYCHEAL M.
MITCHELL, DECEASED

By: _____
Counsel

Mark J. Krudys (VSB# 30718)
THE KRUDYS LAW FIRM, PLC
SunTrust Center
919 E. Main Street, Suite 2020
Richmond, VA  23219
Phone: (804) 774-7950
Fax:    (804) 381-4458
Email: mkrudys@krudys.com
Web:   www.krudys.com

*Counsel for Plaintiff Roxanne Adams, Administrator of the Estate of*
*Jamycheal M. Mitchell, Deceased*