## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
### Norfolk Division

| | |
|---|---|
| ROXANNE ADAMS,<br>    **Administrator of the Estate**<br>    **of Jamycheal M. Mitchell,**<br><br>       Plaintiff,<br><br>v.<br><br>**NAPHCARE, INC. et al.,**<br><br>       Defendant. | Civil Action No: 2:16-cv-229 |

## REPORT AND RECOMMENDATION

Before the Court is Plaintiff's Time-Sensitive Motion for a Protective Order to Prevent Retaliation by Jail Personnel Against Inmate Witnesses, filed on June 21, 2016 ("Motion" or "Motion for a Protective Order").  ECF No. 17.  On June 24, 2016, Defendant Superintendent David Simons ("Defendant") filed an opposition.  ECF No. 25.  Plaintiff filed a reply that same day, ECF No. 26, and two additional "notices" regarding the Motion on June 27 and June 30, 2016, ECF Nos. 27 and 34.  The Court held two hearings on the matter at which Mr. Mark Krudys represented the Plaintiff and Mr. Jeff Rosen represented the Defendant.[1]  This matter was referred to the undersigned United States Magistrate Judge for a report and recommendation pursuant to a Referral Order from the Chief United States District Judge.  ECF No. 39; *see also* 28 U.S.C. §§ 636(b)(1)(B); Fed. R. Civ. P. 72(b); E.D. Va. Local Civ. R. 72.

---

[1] The Court held an evidentiary hearing on July 14, 2016, but, at the request of the parties, continued the hearing until July 22, 2016, for the parties to submit further evidence, supplement their briefs, and argue their pleadings. ECF No. 50. Mr. Mark Colombell, who represents several correctional officer defendants, appeared at the hearing but did not participate or proffer any briefing or evidence.

The gravamen of Plaintiff's motion is that correctional officers in the employ of the Hampton Road Regional Jail ("HRRJ") are threatening and taking retaliatory action against four inmates because they are purported witnesses to HRRJ's alleged maltreatment of Jamycheal M. Mitchell, ("Mr. Mitchell"), which Plaintiff contends resulted in Mr. Mitchell's death. Defendant has denied that any threats or retaliation have occurred, and instead has contended that these four inmates are either exaggerating, falsely attributing appropriate discipline for their disruptive misconduct to retaliation, or simply lying. Based on the voluminous evidence proffered by both sides, this Court believes that the truth lies somewhere between these two positions. However, for the reasons stated herein, the undersigned **RECOMMENDS** that the Plaintiff's Motion for a Protective Order, ECF No. 17, be **DENIED**.

## I. FACTUAL AND PROCEDURAL BACKROUND

Plaintiff Roxanne Adams is the aunt of the late Mr. Mitchell, and the administrator of his estate. Compl. ¶ 20 and attach. 1. According to the Complaint, Mr. Mitchell was diagnosed with a mild intellectual disability and suffered from mental illnesses, such as bipolar disorder and schizophrenia. Compl. ¶ 2. Mr. Mitchell was arrested on April 22, 2015, in Portsmouth, Virginia for allegedly stealing $5.00 in snacks from a 7-Eleven. *Id.* ¶ 54. The Portsmouth General District Court ("PGDC") ordered Mr. Mitchell to be psychologically evaluated for competency and eligibility in a jail diversion program. *Id.* ¶ 57. The case manager determined that Mr. Mitchell was an appropriate candidate for the diversion program, but that Mr. Mitchell refused to accept the services. *Id.* ¶ 58. On May 11, 2015, Mr. Mitchell was transferred to Hampton Roads Regional Jail ("HRRJ") in Hampton, Virginia for medical and psychotropic treatment. *Id.* ¶ 61. Mr. Mitchell received a psychological evaluation upon entering HRRJ pursuant to the PGDC order. *Id.* ¶ 62. The evaluation concluded that Mr. Mitchell was manic,

2

and should be committed to Virginia's Department of Behavioral Health and Developmental Services for inpatient treatment to restore his competency under Virginia Code § 19.2-169.2. *Id.* The PGDC then issued a competency restraining order ("CRO"), ordering Mr. Mitchell to be treated at Eastern State Hospital, a state mental hospital. *Id.* ¶ 63. Mr. Mitchell remained in custody at HRRJ, awaiting transfer to Eastern State Hospital. *Id.* ¶ 64. Mr. Mitchell died on August 19, 2015 at HRRJ. *Id.* ¶ 2.

On May 10, 2016, Plaintiff filed her Complaint in this Court, naming forty defendants (the "Mitchell litigation"). Compl. at 1-4. Plaintiff's Complaint references multiple facts relating to the alleged conditions Mr. Mitchell experienced while in jail: Mr. Mitchell was regularly seen naked and muttering to himself in his cell, he was never allowed to take a shower, he was never permitted to leave his cell, he was regularly denied food, water, and a mattress, his cell was regularly covered in feces and urine, he did not receive prescribed medication, he was physically and verbally abused, and days before his death, Mr. Mitchell laid slumped on the rack in his cell. *Id.* ¶¶ 67-74. Most of these allegations come from current and former inmates who agreed to testify in Plaintiff's case-in-chief.

According to Plaintiff, four of these inmates—Dominique Vaughan ("Vaughan"), Steven Gray ("Gray"), David Hurst ("Hurst"), and Jade Johnson ("Johnson") (collectively, "inmate witnesses")—"have been subject to threats and other abuse by Jail personnel." ECF No. 18 at 1; ECF No. 17 ¶ 5 ("Immediately after the case was filed, HRRJ correctional officers began to target the above named inmates with threats, denials of food, and other wrongful and abusive practices."). Specifically, Plaintiff alleged the inmate witnesses have:

- received threats of physical harm, such as, "you are walking the Green Mile, Dead Man Walking," and "you are going to get what you deserve."
- been characterized as "snitch[es]" in front of other inmates.

- had their food tampered with, or have received threats that their food will be tampered with
- been denied showers
- had the water to their cells turned off
- been subject to disparate treatment by correctional officers (as compared to other inmates)
- had letters written by Plaintiff's counsel confiscated in the unusual searching of their room by four sergeants, some of whom are Defendants in the above-referenced matter
- been denied medical care
- had at least one grievance filed by them improperly destroyed
- been placed in segregation for insufficient reasons
- been punished for fictitious violations

ECF No. 17 ¶ 10. Plaintiff further alleged that these inmate witnesses "are being made subject to unwarranted acts of abuse and intimidation simply as a result of providing information concerning this case." *Id.* ¶ 17. Consequently, Plaintiff filed the instant Motion for a Protective Order, asking this Court to "intervene on behalf of inmate witnesses Johnson, Vaughan, Hurst, and Gray, and, to ensure the preservation of their health, safety and civil rights." *Id.* ¶ 18. In addition to Plaintiff's Motion and memorandum, Plaintiff attached letters from inmate witnesses Johnson, Gray, and Hurst to Plaintiff's attorney, describing the alleged acts of abuse by jail personnel and seeking relief from Plaintiff's attorney for their circumstances as witnesses. ECF No. 17 attach. 2.

On June 24, 2016, Defendant Simons filed a memorandum in opposition, disputing most of Plaintiff's allegations regarding retaliation. ECF No. 25. Defendant also disputed the incarceration conditions that Plaintiff alleged Mr. Mitchell endured while at HRRJ. *Id.* at 2-3. Defendant addressed each inmate witness individually, contradicting their abuse allegations and disputing their credibility. *Id.* at 5-11. That same day, Plaintiff filed a reply. ECF No. 26 at 3. The Court scheduled an evidentiary hearing on the Motion and directed the parties to notify each of the inmate witnesses' attorneys that are handling their unrelated criminal matters to provide

4

them an opportunity to appear on behalf of the inmate witnesses that would testify. ECF No. 42. An evidentiary hearing was held on July 13, 2016,[2] and was continued until July 22, 2016, to allow the parties to file evidentiary support and fully brief their arguments pertaining to respective relief. ECF No. 50.

While this Court declines to make any specific findings with regard to the facts in the underlying Mitchell litigation, the inmate witnesses' allegations are serious and must be weighed against Defendant's evidence. Thus, this Court finds it necessary to summarize the evidence before the Court:

a) Sheriff William Watson

Plaintiff first proffered the testimony of Sheriff William Watson ("Sheriff Watson") for the purpose of establishing that certain of the inmate witnesses could be transferred to the Portsmouth City Jail ("PCJ") if the Court so ordered. Sheriff Watson is in charge of the PCJ. Hr'g Tr. at 22-23.[3] Sheriff Watson explained to the Court that the PCJ does not house, *inter alia*, inmates with disciplinary problems or inmates with medical problems. *Id.* at 25. Due to these limitations, Sheriff Watson stated that he would not be able to house two of the four inmate witnesses, though from his testimony it was unclear which two inmates he was not willing to house. *Id.* at 27-30. Sheriff Watson testified that PCJ and HRRJ have a contract whereby they can hold inmates for one another on a "courtesy request." *Id.* at 25. He clarified that he gets inmates from the Portsmouth courts via a committal slip, but that he can transfer inmates to HRRJ without court permission if needed. *Id.* at 32-33. Plaintiff presented Sheriff Watson's testimony to demonstrate that the Court could, theoretically, order the transfer of inmates between state-facilities with ease, in addition to the hope that Sheriff Watson would agree to take

---

[2] Of the four inmates' attorneys notified, only Mr. Taz Richarson, Hurst's attorney, appeared at the evidentiary hearing.
[3] The hearing transcript for July 13, 2016 can be found on CM/ECF, Docket Entry No. 51.

two of the four inmate witnesses. *See* ECF No. 53 at 27 ("Plaintiff had initially believed that the Portsmouth City Jail would accept all four of the inmate witnesses, but Sheriff Watson's testimony was not clear in the matter.").

    b) Dominique Vaughan

      Vaughan was previously incarcerated at HRRJ but subsequently was transferred to Western Tidewater Regional Jail[4] ("WTRJ") after Sergeant Pamela Ellis ("Sgt. Ellis") from HRRJ Internal Affairs interviewed the four inmate witnesses at the request of Superintendent Simons, who had received a letter from Plaintiff's attorney regarding allegations of threats and abuses from officers. ECF No. 51 attach. 1. At the time of the hearing, Vaughan was held at WTRJ; however, on July 20, 2016, Defendant submitted an affidavit from WTRJ Superintendent William C. Smith ("Supt. Smith") averring that inmates Vaughan and Hurst "have caused and continued to cause interruptions in WTRJ operations," and would be returned to HRRJ. ECF No. 54 attach. 1. At the hearing, Vaughan listed a number of jail personnel that allegedly threatened him at HRRJ. Hr'g Tr. at 41. Specifically, he stated, Sergeant Epperson "made a lot of threats as far as I better keep my mouth closed before something happen [sic] to me . . . [and] made a lot of derogatory homosexual slurs. . . . He also told me things of the nature that I my [sic] as well stop what I'm doing because I'm not a saint." *Id.* at 41-42. Vaughan stated that MJO Allen called him "Master Splinter"[5] for so-called snitching, and that another officer told him that he has some "rat poison" for rats. *Id.* at 42-43. Another officer allegedly told Vaughan that "snitches get stitches, or snitches get put in ditches." *Id.* at 43. Vaughan indicated that this

---

[4] At the hearing, Vaughan testified that he was first transferred to Middle Peninsula Jail but only remained there for about a week before being transferred to WTRJ. Hr'g Tr. at 40 and 71. According to Supt. Smith, Middle Peninsula Jail refused to house Vaughan because of his disciplinary problems and subsequently transferred him to WTRJ. *Id.* at 206; *see also id.* at 72.

[5] Master Splinter is a fictional character that is a rat from the Teenage Mutant Ninja Turtles comics. Because Master Splinter is a rat, this term is also used to describe snitches.

"snitch" name-calling occurred in front of both officers and inmates, spreading a dangerous stereotype. *Id.* at 52-53.

Vaughan stated that Officer Bourne warned Vaughan that he would "fix" Vaughan's mouth. *Id.* at 45. Vaughan also alluded to an instance where he apparently wrote an internal complaint about Officer Anchar. *Id.* at 46-47. In turn, Vaughan claimed that Officer Anchar took off his badge and belt in a manner to threaten Vaughan that he would fight with him. *Id.* at 47, 49-51. Vaughan testified that correctional officers continued to threaten him even when he was transferred to WTRJ. *Id.* at 56. He described an occasion where WTRJ officers allegedly manhandled him, threatened him and called him a snitch, indicating that he should "keep [his] mouth closed," and withdraw from the case. *Id.* at 58. Vaughan also testified that he had been denied certain meal trays, showers, recreation time, and a haircut because of his participation in this lawsuit, but was unable to acutely link such occurrences with his participation as a witness. *Id.* at 60-63.

In response, Defendant submitted Vaughan's inmate incident report, demonstrating over sixty-six disciplinary violations and multiple prison policy violations before and after he became a named-witness in the Mitchell litigation. ECF No. 52 attach. 5. Included among Vaughan's discipline history is an incident in which he grabbed a correctional officer's handcuffs and handcuffed himself to a basketball goal. Hr'g Tr. at 172-73, 196-97. Defendant elicited Vaughan's admission that he had his mother attempt to get Plaintiff's attorney to pay him for his testimony in the case. *Id.* at 74-75. Defendant also submitted an audio recording whereby Vaughan said to his mother that he is "playing both sides of the fence," with regard to the Mitchell litigation, ECF No. 25 attach 7. When questioned by the Court, Vaughan testified that he meant he was telling the correctional officers certain things he hoped would mollify them so

that he would not be punished, at the same time as he was prepared to act as a witness for the Plaintiff, stating, "So that is what I meant when I say I'm playing both sides of the fence, to ensure my safety and make sure that I can get out physically and unmaimed." Hr'g Tr. at 79.

  c) David Hurst

Hurst was incarcerated at HRRJ during the time of Mr. Mitchell's incarceration, but was also subsequently transferred to WTRJ after the HRRJ Internal Affairs interview by Sgt. Ellis. *See* Hr'g Tr. at 28; ECF No. 52 attach. 1 at 2 (Sgt. Ellis: "I recommend it may be in our best interest to move inmate Hurst to another facility due to him alleging staff has approached him about testifying even though he could not give any specific dates and times or names."). Similar to Vaughan, Hurst was transferred back to HRRJ on July 20, 2016, due to his continuous disruptive behavior. ECF No. 54 attach. 1. Hurst wrote a letter to Plaintiff's attorney on May 8, 2016, complaining that he felt his life would be in jeopardy if he stayed at HRRJ, and requested Mr. Krudys' help in getting him sent back to his city jail. ECF No. 17 attach. 2 at 1. Hurst also reported that he was denied his seizure medication, denied food, and placed in segregation against his will. *Id.* On June 8 and June 13, 2016, Hurst wrote two more letters, complaining that he was in segregation at WTRJ and had been convicted of a major rules violation, but linked this conviction to his participation as a witness in the Mitchell litigation. *Id.* at 9, 11 ("I was pulled by some officers hear [sic] at WTRJ and told 'Mr. Hurst you are being housed in 20-Day cell restriction isolation because you violated the conduct of our officers, we know your [sic] testifying on our fellow officers at Hampton Roads Regional Jail because of this we are not going to take it easy on you.'"). At the hearing, Hurst testified that officers threatened him not to testify while he was at HRRJ, and that these threats were linked to his participation in the Mitchell litigation because the threats started happening only after he voluntarily made himself

8

known to Plaintiff's attorney. Hr'g Tr. at 87. Specifically, when asked whether he would identify HRRJ officers that threatened him, he stated, "I'd rather not say right now because I don't feel them [sic] safe while they're in here." *Id.* Even after Hurst was transferred to WTRJ, he alleged that he was threatened: "I've been told not to testify or I better learn what to say against law enforcement officers in court." *Id.* at 84. Hurst stated that WTRJ officers have called him derogatory names and characterized him as a snitch in the presence of other inmates. *Id.* at 85.

In rebuttal, Defendant submitted Hurst's inmate incident report, which, like Vaughan, demonstrated a history of disciplinary violations dating back to 2012. ECF No. 52 attach. 11. Defendant also submitted a series of letters that Hurst wrote to another inmate in early June of 2016 in an attempt to sexually proposition that inmate. ECF No. 25 attach. 9. As a result, Hurst was taken in front of the disciplinary board and found guilty of committing a major rule violation, receiving twenty days of cell restriction starting on June 8, 2016. *Id.* attach. 10.

d) Jade Johnson

Johnson is currently incarcerated at HRRJ. Plaintiff submitted multiple unsworn letters from Johnson detailing his present situation while incarcerated. *See* ECF No. 17 attach. 2 at 3. On May 15, 2016, Johnson alleged that the officers did not let him use the phone or allow him to clean his cell, that they threatened him and that he was scared to eat his food because it looked like it was tampered with. *Id.* Johnson then wrote, "I am in fear for my safety," and requested to be sent to Newport News City Jail. *Id.* Johnson linked this abuse to his role as a witness: "[The officers] came back here the day before yesterday and asked us not to testify against them and they try to bribe us. I'm in the upmost fear to be around these officers cause anything could happen and the same officers that was [sic] working 3/1 when Jamicheal [sic] died is [sic] some

of the ones that's workin [sic] back here with us now." *Id.* On June 6, 2016, Johnson wrote to Plaintiff's attorney, stating that the officers put cleaning chemicals in his food, they put him in a cell that had blood and feces on the walls with no air conditioning, and that his water was cut off. *Id.* at 7. Again, he reiterated his fear, stating, "I'm around this [sic] officers who said they going [sic] to kill me and they also said they glad Mr. Mitchell is dead." *Id.* On June 27, 2016, Johnson wrote another letter to Plaintiff's attorney, spotlighting similar complaints as before. ECF No. 34 attach. 1. He indicated that he was refused a shower and denied water, stripped of his personal property and his mattress, put in the "buck" chair,[6] and warned by MJO Allen that if he did not stop talking to Plaintiff's attorney then he would "suffer the consequence." *Id.* Johnson again requested to be sent to Newport News City Jail. *Id.* At the hearing, Johnson refused to testify, indicating that he feared for his safety and was concerned that he would have to return to HRRJ and face the same officers he just testified about. Hr'g Tr. at 105-06. Because Johnson did not testify, Defendant did not have an opportunity to cross-examine him as to the allegations in these letters. Consequently, as self-serving unsworn hearsay, the Court gives little weight to them.

Defendant proffered first that the Court should give no credence to Johnson's allegations of abuse in that he was not an actual witness to the Mitchell litigation because he was not incarcerated at HRRJ until August 21, 2015, days after Mr. Mitchell's death. ECF No. 52 at 3. Defendant also attached Johnson's inmate incident report. ECF No. 52 attach. 3. The report demonstrates numerous incidents starting in January of 2010, and in 2012 and 2014, but classifying Johnson as a "new intake" on August 21, 2015, *id.* at 21, thus implying that he must have left HRRJ at some point and subsequently returned on August 21, 2015.

---

[6] Although Johnson did not testify, apparently the "buck chair" is a chair in which Johnson was restrained in straps for his "intractable behavior." ECF No. 52, attach. 4.

e) Steven Gray

Steven Gray is currently incarcerated at HRRJ. Hr'g Tr. at 111. On June 1, 2016, Gray sent a letter to Plaintiff's attorney, claiming that when officers took him to the gym, they told him to "keep [his] eyes open while in HRRJ because it aint safe for [him] and not to feel safe when [he] get[s] to WTRJ." ECF No. 17 attach. 2 at 6. He also stated in his letter, "I don't feel safe and I don't know why the officer said anything about WTRJ!?" *Id.* Gray testified that he only experienced "minor threats" and "nit-picking things" but nothing physical. Hr'g Tr. at 111-12. Specifically Gray indicated the officers would call him a "snitch" or refer to him as "witness." *Id.* at 112. He stated, though, that these minor threats only started happening after he got involved in the Mitchell litigation. *Id.* Unlike Hurst and Johnson, Gray testified that he did not fear for his safety: "I don't feel in danger as far as like physically like somebody is trying to physically hurt me. So if that's what this is about me being physically scared or somebody is going to hurt me, then it's no reason for me to testify if I don't fear." *Id.* at 114. However, Gray testified that he felt like his food had been tampered with because it smelled like pepper spray. *Id.* at 116.

Defendant submitted Gray's inmate incident report, which had only a few disciplinary incidents. ECF No. 52 attach. 2. Defendant also submitted a letter that Gray wrote to a reporter at the Washington Post, indicating that he would provide information about Mr. Mitchell's death but, in return, requested the reporter "shine light on [his] situation!" ECF No. 25 attach. 12.

f) Sergeant Pamela Ellis

Sgt. Ellis is the Internal Affairs supervisor at HRRJ, and was the first witness called by Defendant. Hr'g Tr. at 122. She testified about the interviews she conducted with the inmate witnesses at HRRJ regarding the claims of retaliation and mistreatment they alleged to Plaintiff's

11

attorney. Hr'g Tr. at 122-170. Sgt. Ellis testified that she interviewed each inmate separately, asking them four general questions:   whether officers were targeting them, whether officers threatened them, whether officers denied them food, and whether there was any other wrongful or abusive conduct by officers. *Id.* at 124. Sgt. Ellis stated that Gray answered "no" to all questions and was only concerned with why he was in segregation. *Id.* She testified that after the interview she learned that he was housed in segregation at the request of the Commonwealth's Attorney for Newport News because he allegedly threatened witnesses in his criminal case. *Id.* at 125.[7] Sgt. Ellis stated that Johnson also answered "no" to all questions but stated that he would feel safer outside the facility and specifically requested restrictive housing when he entered HRRJ because of gang violence. *Id.* at 126. Sgt. Ellis stated that Vaughan answered "yes" to all questions and focused on complaints about his tray not having the right food on it for his dietary restrictions. *Id.* at 127. Sgt. Ellis also testified that Vaughan has been a disciplinary problem since he entered HRRJ: "[H]e's had several disciplinary charges; refusing direct orders, assaulting staff, he's been found with weapons, creating a disturbance, taking -- he snatched keys off an officer[,] . . . destruction of property. Another engaging in sexual acts. Tampering with jail equipment. He's very famous for blocking the tray slot from securing." *Id.* at 135. Sgt. Ellis stated that Hurst answered "yes" to all questions and complained about a situation where the tray server assaulted him. *Id.* at 128. Sgt. Ellis reviewed the video footage of the incident, which revealed that Hurst actually assaulted the tray server first. *Id.* at 129. Sgt. Ellis referred to the recommendation she made regarding the results of her interviews, "[I] recommended to the superintendent it would be in the best interest of the facility, due to all of

---

[7] Defendant's attorney, Mr. Rosen, also proffered that Gray was a gang member, which he argued would limit this Court's ability to transfer him to another facility for safety reasons. Hr'g Tr. at 126 ("I want the Court to also be aware of that when, if it's a fashioning remedy is to put him somewhere else, he just can't go anywhere because of that background.").

the allegations that we are receiving, that maybe he might want to consider sending those two[, Vaughan and Hurst], to another facility." *Id.* at 132.

Sgt. Ellis then explained that she investigated some of the inmate witnesses' specific complaints in the letters they wrote to Plaintiff's attorney. *Id.* at 141. She determined that Johnson's complaints that an officer called him a "snitch" and that he was refused a shower were unsubstantiated because the officer told her that he never called Johnson any names and that when she pulled up his confinement sheet, it indicated that Johnson actually refused to shower. *Id.* at 142-43. Sgt. Ellis also testified about HRRJ's complaint and grievance process, an internal remedy available for inmates if they have any complaints about treatment by jail personnel. *Id.* at 136, 169.

g) Correctional Officers William Epperson, Steven Whitehead, and Robert Whitaker

Sergeant William Epperson ("Sgt. Epperson") began his testimony by describing Vaughan as a "very disruptive inmate," who tries to provoke and manipulate staff, and tamper with jail equipment. *Id.* at 171-73. He testified that Vaughan's destructive behavior existed prior to Mr. Mitchell's death, and continued after. *Id.* at 183. When asked about Vaughan's testimony that officers threatened him in an attempt to dissuade him from testifying, Sgt. Epperson responded, "None of it is true," and stated that Vaughan advised Sgt. Epperson quite contrarily, "You're going to lose your job. You coming [sic] to work for me." *Id.* at 173. Sgt. Epperson emphasized that he never even discussed the Mitchell litigation with Vaughan and, as he was a supervisor in Vaughan's unit, Vaughan would routinely try to engage in conversations concerning Mr. Mitchell. *Id.* Sgt. Epperson stated that it did not bother him to guard the inmate witnesses even though he was a named defendant in the Mitchell litigation. *Id.* at 180.

13

Officer Steven Whitehead ("Officer Whitehead") also testified that Vaughan was a "destructive inmate" because when he acts up a supervisor has to be called in to deal with it. *Id.* at 187. When asked whether he ever attempted to intimidate or threaten Vaughan about his testimony, Officer Whitehead responded that he never did, "not in the slightest," and indicated that he thought he actually had a good relationship with Vaughan. *Id.* at 188-90.

Officer Robert Whitaker ("Officer Whitaker") also testified that Vaughan was "[d]isruptive and manipulative," but that he personally had a good rapport with him. *Id.* at 194, 198. Officer Whitaker stated that he was not aware of any retaliatory conduct by any HRRJ staff member due to Vaughan's role as a witness, and, in fact, testified that he was unaware that Vaughan was even a named witness in the Mitchell litigation until Defendant's attorney approached him. *Id.* at 196. Officer Whitaker also confirmed that at HRRJ, inmates serve other inmates food and officers are not involved. *Id.* at 199.

h) Superintendent William Smith

Superintendent William Smith ("Supt. Smith") of WTRJ testified regarding the allegations raised by Hurst and Vaughan that they were experiencing threats and retaliation by WTRJ staff based on their roles as witnesses. *Id.* at 200. Supt. Smith stated first that he was not aware of any WTRJ staff threatening Hurst. *Id.* at 201. Supt. Smith testified that he only informed his three captains and his medical house services administrator of the reason why Hurst was transferred, but that Hurst himself gave interviews to the press about the Mitchell litigation. *Id.* at 201-02. Because HRRJ transferred Hurst due to his claim that he feared for his life, Supt. Smith detained Hurst in protective custody to ensure that he would not be threatened. *Id.* at 202. However, soon after he was transferred, Hurst engaged in serious misconduct by writing sexually explicit letters in an attempt to proposition another inmate, and thus was disciplined and

14

sentenced to twenty days of segregation as a result of violating prison policy. *Id.* at 202-03. With regard to Hurst's claims that WTRJ denied him medical treatment, Supt. Smith testified that Hurst was transferred with three medications, one of which he received the entire time, another that expired when he arrived but was not renewed in turn for a different prescription, and another that was delayed due to a "paperwork error." *Id.* at 204. As to Vaughan, Supt. Smith testified that when Vaughan arrived at the facility he threatened to fight WTRJ staff members. *Id.* at 206. Supt. Smith stated that Vaughan filed an administrative complaint, alleging that a WTRJ officer called him a "snitch," but, upon investigation, the officer denied making the statement and the complaint was ultimately categorized as unsubstantiated. *Id.* at 206-07, 213. Supt. Smith also testified about the courtesy hold and jail-to-jail inmate transfer processes in the region. *Id.* at 210-11.

i) Post-Hearing Briefs

After the hearing, each party submitted post-hearing briefs. ECF Nos. 52 and 53. Defendant Simons attached Sgt. Ellis' report, the inmate incident reports for all four inmates, the summary of an investigation regarding claims by Vaughan that Officer Brinkley assaulted him at WTRJ, video footage of the claimed assault, and sworn affidavits from Officer Roderick Allen, Officer Sylvester Bourne, Captain Felicia Cowan, Lieutenant Roderick Madison, Sergeant Earl Ward, Sergeant Karas Mack, Sergeant Kuanasia Murphy, and Master Jail Officer Robert Sunukjian. ECF No. 52 attachs. 1-8. Sgt. Ellis' report aligns closely with her testimony at the hearing. *Id.* at attach. 1. The incident reports demonstrate that each inmate witness has a long history of disciplinary problems at HRRJ. *Id.* attachs. 2-6. The video showed an interaction that two correctional officers and their supervisor had with Vaughan in his cell pod, meant to rebut Vaughan's claim that he had been accosted by one of the officers during this exchange. The

affidavits expressed that none of the officers threatened Vaughan or attempted to influence his testimony in the Mitchell litigation. *Id.* attach. 8. Plaintiff attached a HRRJ press release that included a timeline of events surrounding Mr. Mitchell's death, and a letter from an anonymous source that advised Plaintiff's attorney to request Mr. Mitchell's Daily Confinement Log Sheets, and indicated that it was apparent that LTC Taylor improperly erased video footage of the jail. ECF No. 53 attachs. 1 and 2.

## II. DISCUSSION

What the Court has before it is a not-uncommon situation where jail inmates claim they are being threatened and retaliated against by correctional officers, and jail personnel deny any misconduct and claim they are merely doing their jobs supervising difficult inmates. Specifically here, the inmates alleged that they have been threatened and retaliated against, not merely because their jailors are abusive, but because they are named witnesses to the treatment of the late Mr. Mitchell while he was incarcerated at HRRJ, and possess information that could lead to findings of liability of the jail and its personnel in the death of Mr. Mitchell. As detailed above, the inmate witnesses alleged that correctional officers have called them names, such as "snitches" and "rats" and warned them to keep their mouths shut and not testify. They alleged that officers have retaliated against them by depriving them of certain rights, such as medical treatment, water, showers, food, and the ability to file grievances. They also alleged that these officers may have tampered with their food and imposed inappropriate disciplinary measures, including physical abuse.

Defendant responded by arguing that these inmates are not worthy of belief, are disciplinary problems who constantly act out in order to gain attention, and are exploiting their status as purported witnesses for fame, attention, and, in the case of Vaughan, money. Defendant

16

argued that the inmate witnesses' allegations are wholly unsubstantiated and incredulous. Testimony and affidavits from correctional officers depicted a different view of Plaintiff's evidence.   Officers testified from the witness stand or in affidavits that they never called the inmate witnesses names or threatened them in any manner, including by manhandling.   Officers also either denied the acts of retaliation alleged by the inmates, or argued that those acts, such as administrative segregation or restraint measures, were the result of typical disciplinary processes, providing incident reports demonstrating lengthy histories of misconduct (extending long before the Mitchell litigation).

Based on the inmate witnesses' allegations of threats and retaliation, Plaintiff filed a motion for a protective order to protect the inmate witnesses and essentially preserve their testimony—a pertinent part of Plaintiff's evidence—until trial.   Plaintiff clarified her request for relief in her post-hearing brief,[8] asking for the following:

(A) That the inmates be confined in a truly "neutral" facility, *i.e.* transferred away from

HRRJ to a jail where they will not be threatened or harassed;

(B) That the inmate witnesses be guarded, and directly supervised by, correctional

officers who have no connection with the Mitchell litigation (neither a Defendant in the

---

[8] In Plaintiff's initial pleading, she requested:
> [1] the appointment of an appropriate outside party to interview the subject inmates, to monitor continually their safety and circumstances, and to report back to the Court upon the same. Plaintiff also respectfully [2] requests the transfer of Gray and Johnson to another appropriate facility/facilities. [3] Plaintiff also respectfully requests such other and further relief as this Court deems just and proper.

ECF No. 18 at 7.   In her reply, Plaintiff further requested this Court to appoint counsel for the inmate witnesses; "Such counsel may employ abbreviated and expedited discovery concerning the manner in which the inmate witnesses are being treated, and then appear before the Court, with their clients, concerning the same." ECF No. 26 at 3.   Appointing counsel for witnesses is generally only necessary when the witness is likely to incriminate himself. *See United States v. Melendez*, 228 F.3d 19, 24 (1st Cir. 2000) (noting that it "may be salutary in a particular case for a judge to issue warnings, or even to appoint counsel, if a witness appears likely to incriminate herself.  Still, this practice entails certain risks, and we leave its employment to the sound discretion of the district courts") (internal citations omitted).   Because there was clearly a chance of possible self-incrimination, the Court ordered that the parties notify each of the attorneys who were representing the inmate witnesses on their underlying criminal charges to be present at the evidentiary hearing on July 13, 2016.  ECF No. 42.

matter or related to any Defendant);

(C) That a special master be appointed (preferably from the ranks of the Department of Justice) to regularly interview and monitor the inmate witnesses and their jailers and to report in writing, or otherwise, to this Court, the Plaintiff, and Defendant Simons at least every 90 days, but earlier if necessary, regarding the effectiveness of actions undertaken to eliminate threats, intimidation, and bullying of witnesses; and

(D) That the Court order any and all relief necessary to safeguard the inmate witnesses from threats, bullying, intimidation, and disparate treatment, and/or to avoid the appearance thereof.

ECF No. 53 at 28-29. Given this request for relief and the unusual nature of the motion, the Court had to consider the following questions: 1) What standard of proof should the Court apply to determine whether officers are threatening and retaliating against the inmate witnesses because of their role in the Mitchell litigation? 2) Applying that standard of proof, are the inmates *actually* being so threatened and retaliated against? 3) If so, what remedies are available to the Court? 4) What standard should the Court apply to determine the appropriate remedy?

Plaintiff filed her Motion on the premise that the Court could issue an order protecting the inmate witnesses from retaliation by jail personnel. In Plaintiff's initial pleading, she cited Federal Rule of Civil Procedure 60, arguing that the Court could issue such an order through its "inherent power." ECF No. 18 at 2-3. Moreover, Plaintiff's vehicle for obtaining relief was through a Motion for a Protective Order under Rule 26, which provides, "The court may, for good cause, issue an order to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense." Fed. R. Civ. P. 26(c). Plaintiff cited *Disability Rights New Jersey, Inc. v. Velez*, No. CIV. 10-3950 DRD, 2011 WL 2937355 (D.N.J. July 19, 2011)

(unreported) for an example of the Court's inherent equitable power to issue orders protecting witnesses from retaliation. The plaintiff in *Disability Rights* represented psychiatric patients at psychiatric hospitals in the state of New Jersey. *Id.* at *1. The plaintiff filed an emergency motion for a protective order to prevent defendants from engaging in retaliation that might have interfered with the ability of the court to conduct a thorough and just inquiry into the dispute at hand. *Id.* at *5. The plaintiff claimed that the defendants, who were in control of the witnesses, "engaged in efforts to harass, intimidate, and threaten potential witnesses who have cooperated with [p]laintiff." *Id.* The court evaluated the mechanism by which relief might be afforded in a case of possible witness intimidation or retaliation, and considered the argument that such relief may be effected by a preliminary injunction. *Id.* at *4. The court found that "[w]hile some forms of witness intimidation or document destruction doubtlessly necessitate injunctive relief under Rule 65, protective orders are also an appropriate vehicle to prevent interference with potential witnesses." *Id.* The court relied heavily on a case from the First Circuit, *Ben David v. Travisono*, 495 F.2d 562 (1st Cir. 1974), in affirming that the court had such an inherent equitable power, but ultimately found that in this particular case, the plaintiff was unable to link the treatment of the psychiatric patient witnesses to their participation in the lawsuit against the defendant. *Id.* at *5. The court concluded, "While the rational fears of a witness may be grounds for relief, it would be inappropriate to issue an order based solely upon irrational fears or mere conjecture," and advised the parties of the ethical duties of litigants and the severe penalties associated with witness tampering. *Id.*

In *Travisono*, the First Circuit reviewed a district court order enjoining Rhode Island prison officials and state police from, in essence, retaliating against prisoners who were plaintiffs in a class action filed against the prison officials. 495 F.2d at 562-63. Specifically, the district

court's order enjoined prison officials:

> 1. from perpetrating or suffering to be perpetrated the physical and mental abuse, brutalization and beatings of plaintiffs and members of plaintiffs' class by the defendants and their agents;
> 2. from taking any action in retaliation against plaintiffs and members of plaintiffs' class or of depriving plaintiffs and members of plaintiffs' class of any and all rights and privileges on account of plaintiffs and members of their class participating, assisting, or volunteering any facts or circumstances in the furtherance of this lawsuit.

*Id.* Upon review, the First Circuit created a standard to support such a protective order: (1) That the plaintiffs (or witnesses) reasonably fear retaliation, and (2) that the court's fact-finding may be materially impaired unless there is provided the tangible protection of a suitable court order. *Id.* at 564. In addition to delineating the standard for implementing such a protective order, the First Circuit reviewed the language in the district court's order, and found that paragraph one of the order should be stricken, since the "brutalization" language was "too vague," and that "[t]hose enjoined, since under threat of judicial punishment, are entitled to be told 'precisely what conduct is outlawed.'" *Id.* (citing *Schmidt v. Lessard*, 414 U.S. 473 (1974)). The court, though, upheld the second paragraph of the district court's order enjoining the defendants from retaliating against the plaintiffs. *Id.* at 564-65.

Accordingly, based on *Disability Rights* and *Travisono*, an order directing jail personnel to not "retaliate" against the inmate witnesses for their participation in this lawsuit would likely be available through this Court's inherent equitable power in the form of a protective order, should sufficient findings be made that the inmate witnesses reasonably fear retaliation, and that the court's fact-finding may be materially impaired unless a protective order is entered. *But see Memphis Invest, GP v. Waite*, No. 2:13-CV-01282-JAD-NJ, 2014 WL 547962, at *5 (D. Nev. Feb. 11, 2014) (rejecting the court's authority to issue a Rule 26 protective order to prevent witness harassment under a "reasonable fear of retaliation" standard and instead applying the

Rule 65 preliminary injunction standard"). The language in such an order would have to be specific and unambiguous so as to notify Defendant as to precisely what conduct is prohibited. *See Travisono*, 495 F.2d at 565 (finding the court's order enjoining retaliation to be "sufficiently within the court's discretionary authority"). *But see Karmatzis v. Godinez*, No. 11-CV-3373, 2012 WL 1439164, at *3 (C.D. Ill. Apr. 26, 2012) ("[A] blanket order prohibiting undefined "retaliation" would not satisfy the requirements for preliminary injunctive relief under 18 U.S.C. § 3626(a)(2)."); *cf. Rissman, Hendricks & Oliverio, LLP v. MIV Therapeutics, Inc.*, No. CIV.A. 11-10791-MLW, 2011 WL 5025206, at *7 (D. Mass. Oct. 20, 2011) (finding language in the protective order that provided that the defendant "shall have no contact" with the witnesses to be "too broad" and narrowed the language to "shall not communicate personally with, or cause a third party . . . to communicate on his behalf" with the witnesses).

Nonetheless, Plaintiff did not merely request an order from the Court discussing the "dos and don'ts" of conduct towards the inmate witnesses, but instead requested relief more commonly sought under a motion for a preliminary injunction: transferring the inmate witnesses to a neutral facility, ordering the inmate witnesses to be guarded by correctional officers that are not privy to the Mitchell litigation, and appointing a special master or guardian to monitor the inmate witnesses' well-being. ECF No. 53 at 28-29. The issuance of a preliminary injunction would require the Plaintiff to show more than a reasonable fear of retaliation.[9] At the hearing,

---

[9] "The authority of the district court judge to issue a preliminary injunction, especially a mandatory one should be sparingly exercised. Mandatory preliminary injunctions do not preserve the status quo and normally should be granted only in those circumstances when the exigencies of the situation demand such relief." *Wetzel v. Edwards*, 635 F.2d 283, 286 (4th Cir. 1980). "A mandatory preliminary injunction must be necessary . . . to protect against irreparable harm in a deteriorating circumstance created by the [non-moving party]." *Sun Microsystems, Inc.*, 333 F.3d at 526. "A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008) (citing *Munaf v. Geren*, 553 U.S. 674, 689-690 (2008)); *Real Truth About Obama, Inc. v. Fed. Election Comm'n*, 575 F.3d 342, 346 (4th Cir. 2009) (reiterating the Supreme Court's standard). All four factors must be shown, and the movant bears the burden on each. *Real Truth*, 575 F.3d at 345-46. "Precisely because equitable relief is an

the Court pointed out that Plaintiff's request appeared consistent with relief obtained in a preliminary injunction, not merely a protective order as per the Plaintiff's request. Hr'g Tr. at 5 (THE COURT: "Mr. Krudys, the relief requested appears to be more closely aligned with equitable relief properly pursued by a motion for preliminary injunction."). In her post-hearing brief, Plaintiff disputed that the relief requested was injunctive and instead embarked on a quest to demonstrate to the Court that this relief was more consistent with "an ordinary procedural order intended to maintain the integrity of its proceedings." ECF No. 53 at 5. Plaintiff analogized such an order with orders regularly issued by courts that require some *affirmative action* but are not injunctions, such as an oral sequestration order in a courtroom that requires witnesses to leave the courtroom, or an order directing parties to provide electronically stored information (or e-discovery) that would in turn require parties to store information on hard drives or write new software. *Id.* Accordingly, Plaintiff argued that when a court must determine whether to apply the standard for a preliminary injunction, the court should ask "*whether the motion seeks relief of the sort sought on the underlying claim,*" not whether the court's order would require some affirmative action. *Id.* at 6 (emphasis in original). Plaintiff then applied this standard to her present request, finding that transferring the inmate witnesses, re-staffing the inmates' pods with uninvolved officers, and appointing a guardian (*i.e.* protecting the inmate witnesses to preserve their testimony), is not injunctive relief because "Plaintiff Adams' ultimate purpose is to obtain money damages." *Id.* at 7.

While Plaintiff made an interesting argument, she failed to cite any specific authority that supports her proposition, and that would apply with analogous requests for relief. Instead,

---

extraordinary remedy to be cautiously granted, it follows that the scope of relief should be strictly tailored to accomplish only that which the situation specifically requires and which cannot be attained through legal remedy." *Aluminum Workers Int'l Union, AFL-CIO, Local Union No. 215 v. Consol. Aluminum Corp.*, 696 F.2d 437, 446 (6th Cir. 1982).

Plaintiff disregards authority which quite clearly applies the preliminary injunction standard when courts consider the type of relief Plaintiff here has sought. This is true particularly in cases where inmates are suing for money damages under 42 U.S.C. § 1983, as Plaintiff does here, but during the course of the litigation seek interlocutory or collateral relief of the kind sought here. For instance, Plaintiff's initial request seeks to have the inmate witnesses transferred to a neutral facility. Generally, when the court-ordered transfer of an inmate is the plaintiff in a case, a court considers the four preliminary injunction factors. *See Wilson v. Hall*, No. 7:09CV00503, 2010 WL 753338, at *2 (W.D. Va. Mar. 1, 2010) (unreported) (denying motion for a preliminary injunction by a prisoner seeking a transfer to another prison after he filed § 1983 civil actions seeking money damages against correctional officers at Red Onion State Prison because he failed to show any likelihood that he would suffer irreparable harm in the absence of a court-ordered transfer"); *Houck v. Dep't of Pub. Safety & Corr. Servs.*, No. GJH-15-1883, 2015 WL 7721813, at *4 (D. Md. Nov. 30, 2015) (applying the standard for a preliminary injunction: "Houck's claims of prospective harm are conclusory and speculative. The claims fail to demonstrate he is [f]acing irreparable harm in the absence of injunctive relief, *i.e.* transfer to another facility, or that the harm is neither 'remote nor speculative, but actual and imminent'"); *Salvatierra v. Connolly*, No. 09 CIV 3722 SHS DF, 2010 WL 5480756, at *24 (S.D.N.Y. Sept. 1, 2010), *report and recommendation adopted,* No. 09 CIV 3722 SHS, 2011 WL 9398 (S.D.N.Y. Jan. 3, 2011) (construing § 1983 plaintiff's collateral request for a transfer to another prison facility under the preliminary injunction standard). But, unlike those cases, this Court must consider the request for a court-ordered transfer of a *witness* who happens to be a prisoner.

Second, Plaintiff sought the appointment of an appropriate outside party—a guardian—to interview the inmate witnesses, to monitor their safety and circumstances, and to report back to

the Court every ninety days. ECF No. 18 at 7; ECF No. 53 at 28. Appointing a guardian or special master is also generally consistent with relief available only after the standard for a preliminary injunction is met. *Cf. Halderman v. Pennhurst State Sch. & Hosp.*, 545 F. Supp. 410, 416 (E.D. Pa. Aug. 12, 1982) (construing the appointment of a special master as injunctive relief when ensuring the protection for hospital patients). Further, Plaintiff requested the inmate witnesses be guarded, and directly supervised by, only correctional officers who have no connection with the underlying litigation. ECF No. 53 at 28. Such relief is essentially court-ordered staffing of a state facility, an intrusive remedy rejected by the Fourth Circuit in *Taylor v. Freeman*, 34 F.3d 266 (4th Cir. 1994), and one that this Court is not willing to undertake for the reasons stated below.

Apart from the issue of whether the type of relief Plaintiff requested is consistent with relief commonly sought only in a preliminary injunction, and thus must be viewed under that standard, there is a bigger picture that must be addressed.

Federal court-ordered transfers of prisoners, court-ordered staffing of prison pods, and court-ordered guardian appointments to monitor the well-being of prisoners in state facilities is likely beyond this Court's equitable authority under the present circumstances. *Taylor v. Freeman* cautions against court involvement in prison administration, especially state prisons: "[I]ntervention in the management of state prisons is rarely appropriate when exercising the equitable powers of the federal courts. This is true where conditions at the prison have been adjudged unconstitutional following trial on the merits. It is especially true where mandatory injunctive relief is sought and only preliminary findings as to the plaintiffs' likelihood of success on the merits have been made." 34 F.3d at 269; *see also Nasim v. Warden, Maryland House of Correction*, 64 F.3d 951, 958 (4th Cir. 1995) (discussing the different ways that federal courts

are asked to intervene in day-to-day prison operations that are of the state's domain); *O'Dell v. Netherland*, 112 F.3d 773, 777 (4th Cir. 1997) ("As we have repeatedly held, on instruction from the Supreme Court, it is not for the federal courts to so micromanage the Nation's prisons.").

Appointing a special master would involve the Court in administration of the jail, inasmuch as an outside person would be monitoring and reporting to the Court on the administration and management of the HRRJ as it pertains to these four inmates. This is the type of overreaching the *Taylor* court counseled against. Courts must consider the "bedrock principles" of comity and federalism before intervening into the state function of prison administration. *Taylor*, 34 F.3d at 269-70. Any relief fashioned by this Court that affects the administration of a state facility must be reconciled with these overarching principles. Moreover, court-ordered staffing of the inmate witnesses' pods would not only intrude on the Commonwealth's ability to manage its prisons, but would impact HRRJ's ability to ensure the safety of the officers and inmates. Such intrusion should not occur "absent the most extraordinary circumstances." *Id.* at 268. Similarly, ordering the transfer of prisoners is assuming the substitution of the Court's judgment as to the most appropriate placement of these inmates for that of the jail. As *Taylor* noted, courts are ill-suited to making these judgments. This fact is further reinforced by the evidence that Vaughan already has been transferred from two facilities (Middle Peninsula and WTRJ) based on his disruptive conduct, which, as determined by his institutional record, has been ongoing for a long period of time. This is further supported by Sheriff Watson's testimony that at least one inmate's record of misconduct would preclude the Sheriff from accepting the inmate into his jail.[10]   Moreover, Plaintiff by her own

---

[10] Sheriff Watson first testified that he would not take two of the four inmate witnesses because "one of them is a super disciplinary problem, and the other has a medical problem;" Hr'g Tr. at 28-29, though his testimony was muddled as to which inmate witnesses he would not accept. Towards the end of his testimony, Sheriff Watson appeared to testify upon questioning by Defendant's counsel that he would not be willing to take any of the inmates:

evidence alleged that inmates Vaughan and Hurst continued to be threatened and harassed even after they were transferred away from HRRJ to a facility wholly unconnected to it. Consequently, the Court has no basis upon which to conclude that an order transferring these inmates to any other facility would ameliorate the concerns Plaintiff has raised.[11] Given the multifaceted considerations which must be taken into account to determine the appropriate supervision and management of inmates, this Court is not suited to make any kind of determination as to where an inmate should be housed.

Thus, transferring the inmates, re-staffing the pods with certain correctional officers, or appointing a third party to monitor the administration of the jail vis-à-vis these four inmates are not remedies this Court will consider based on the facts presented here. At this juncture, there simply is not *enough* evidence (or an extraordinary circumstance) of threatening or retaliatory conduct that would compel this Court to recommend imposing the relief Plaintiff requested.

Nonetheless, the Court must still consider whether sufficient evidence has been proffered to justify and warrant imposition of a protective order in the fashion of *Travisono*. Despite the fact that the inmate witnesses' allegations are troublesome, and some of Defendant's responses

---

"Q. In fact, I called you before court, and you said you don't want any of the inmates, didn't you tell me that? A. Correct." Hr'g Tr. at 37.

[11] Plaintiff also attempted to argue the informalities of transferring prisoners in the region, pointing out that a courtesy request is all it takes. But Plaintiff oversimplifies the circumstances. HRRJ attempted to alleviate the problem by transferring Vaughan and Hurst, but such a transfer was unsuccessful and resolved no problems. In fact, Plaintiff's attorney conceded at the hearing that even though the two inmate witnesses were transferred, they still allegedly experienced threats and abuse by jail personnel at WTRJ, ultimately leaving Plaintiff to speculate that true relief would require the Court to appoint a guardian or special master to monitor the inmate witnesses' wellbeing. Another issue with a court-ordered transfer is *where* to transfer the inmate witnesses? As Supt. Smith indicated in his affidavit, WTRJ transferred Vaughan and Hurst back to HRRJ due to their disruptive behavior, similar to Middle Peninsula Jail, which transferred Vaughan to WTRJ due to his disruptive behavior, and Sheriff Watson testified that he did not want at least two of the inmates because of their disciplinary records and medical problems. The Defendant argued that, because of alleged gang affiliations—according to their jail records, Gray and Johnson are affiliated with gangs, ECF No. 52 attach. 2 at 1, and attach. 3 at 1—certain inmates could not be located to certain other jails in the region. Thus, Plaintiff's request for transfer would require this Court to make policy decisions that exceed the fundamental and routine judgment of the courts. Moreover, as Defendant argued, if this Court were to simply order the transfer of an inmate or re-arrange correctional guards in the jail based on unsubstantiated allegations, the floodgates likely would open and the federal courts would be inundated with such requests, which could very well impede a jail's ability to safely operate.

and explanations are problematic, overall this Court must conclude that Plaintiff has failed to establish that the inmate witnesses' allegations give rise to a reasonable fear of retaliation that, without an appropriate protective order, may materially impair the Court's fact-finding. This conclusion is based on several factors, including the overreaching nature of the claims advanced by the inmates, the lack of credible evidence to support many of their claims, and the evidence proffered by the Defendant which directly rebuts many of their claims.

The inmate witnesses treated nearly *everything* that happened to them at HRRJ or WTRJ as retaliatory conduct for participating in the Mitchell litigation, despite the fact that they have lengthy histories of disruptive conduct which predates HRRJ's experience with Mr. Mitchell. For instance, Hurst testified and had written letters to Plaintiff's attorney alleging that he was in segregation as a result of his status as a witness. However, as Defendant's evidence demonstrated, the WTRJ Disciplinary Board placed Hurst in isolation after convicting him of repeatedly sexually propositioning another inmate. Although Johnson did not testify, his jail record, from 2010 to 2016, is replete with instances of misconduct for which disciplinary action seems appropriate. Vaughan testified to a series of incidents that he alleged were the result of retaliatory conduct, such as being denied food and showers, for his participation in this lawsuit. However, when considering Vaughan's disciplinary record and the testimony of the officers, it is highly likely that most if not all of the discipline he has experienced in jail was a result of his own unruly actions. For instance, he chained himself to a basketball goal after snatching the handcuffs from a correctional officer and, understandably, was disciplined for this conduct. He asked his mother to demand money from Plaintiff's attorney in exchange for his testimony, and his explanation of his statement to his mother about "playing both sides of the fence" is not credible. In another instance, Gray claimed that his food was doctored because it smelt like

pepper spray, but Officer Whitaker established that inmates, not correctional officers, serve other inmates food trays, thereby rendering it highly unlikely Gray's food could have been doctored by a correctional officer. The evidence is littered with allegations like these—allegations that sound alarming but are combatted by evidence from the Defendant that again leaves this Court with uncertainty, and "it would be inappropriate to issue an order based solely upon irrational fears or mere conjecture." *Disability Rights*, 2011 WL 2937355, at *5. In essence, there is a fair grey area between retaliatory conduct and routine inmate discipline, which again highlights the Court's concern with intruding into the day-to-day operations of a jail.

Moreover, the evidence also failed to establish that the Court's fact-finding may be materially impaired unless there is provided the tangible protection of a suitable court order. *Travisono*, 495 F.2d at 564. Each of these inmates have given statements to Plaintiffs' counsel and/or been interviewed by media. All are able to provide deposition testimony as soon as discovery begins. Gray specifically testified that he had no concerns regarding testifying, Hr'g. Tr. at 111, and Mr. Hurst specifically testified that he planned on testifying in this case and would not refuse based on any alleged conduct by correctional officers. *Id.* at 97-98. Johnson refused to testify at the hearing, so the Court is unable to make any finding regarding whether its fact-finding with respect to him might be impaired at trial. Defendant proffered during argument that Johnson was not at HRRJ when Mr. Mitchell was, so there may be no relevant facts regarding Mr. Mitchell's situation that could be obtained from Johnson, but Defendant offered no direct evidence of this, either at the hearing or with his briefing, so that question is uncertain.[12] Finally, Vaughan testified that, despite the fact he asked for money to testify, he

---

[12] The incident report proffered by Defendant indicated an HRRJ intake date of August 21, 2015, which suggests that Johnson arrived at the jail on that date. But, the incident report also established that Johnson had been at the HRRJ previously, so the Court is left to speculate as to when, exactly, he was present at HRRJ. Defense counsel advised at the July 22 hearing that he believed he had offered an exhibit during the first hearing demonstrating

would testify in any event because it was the right thing to do. Hr'g Tr. at 68.

In addition, Defendant assured the Court that HRRJ could safely house the inmate witnesses, advocating that the facility has been operating for almost twenty years and is one of national stature. Defendant also advised the Court that the jail personnel working near the inmate witnesses are currently wearing body cameras as a result of the inmates' complaints of abuse, which should act as a deterrent to both potential inmate mistreatment and false allegations of correctional officer misconduct. The jail also has an internal administrative process to handle complaints and grievances, which Sgt. Ellis testified is an internal remedy that is always available to inmates. As the Internal Affairs supervisor, it is her job to investigate and recommend an appropriate response to all allegations of inmate mistreatment. Her initial investigation and report, ECF No. 52, attach 1, appears thorough and objective, and her recommended remedial action, i.e., the transfer of Vaughan and Hurst, was, in fact, adopted by Defendant. Further, through the course of this litigation, should Plaintiff suspect that that the correctional officers have engaged in witness tampering, Plaintiff has other remedies. *See generally* Fed. R. Evid. 404(b); Fed. R. Civ. P. 37; 18 U.S.C. § 1512.

Without more persuasive evidence of a reasonable fear of retaliation or other misconduct based on the inmates' status as witnesses in this case, and proof that the Court's fact-finding may be impaired, entry of a protective order is not justified based on the evidence presented. However, the Court is concerned about both the allegations of specific threats against the inmate witnesses, and some of the explanations Defendant offered to the Court to justify certain actions taken. Consequently, the undersigned finds it appropriate to raise those concerns here and stress its expectations as to how all parties should conduct themselves as this litigation progresses.

---

specifically that Johnson was at a different facility during the entire time Mr. Mitchell was at HRRJ, but neither exhibit proffered at that hearing pertain to this issue. *See* Defendant's Exhibits 1 and 2, July 13, 2016 Hearing.

First, the Court acknowledges that these witnesses, as inmates in a facility operated and strictly controlled by Defendant, are in a vulnerable position. They are incarcerated in a facility that controls all aspects of their lives, and is operated by individuals who have been named as defendants in a case that has received widespread publicity. These individuals purportedly have knowledge of information that, Plaintiff avers, will prove that the Defendants are responsible for the death of Mr. Mitchell. As a result, threats and retaliation are possible. All four inmate witnesses alleged that officers called them "snitches" or referred to them as "rats," which, due to the stigma of such label in prison, could subject them to harassment while incarcerated. Additionally, allegations that correctional officers have admonished or threatened the inmate witnesses not to testify in the Mitchell litigation are unsettling, in that such conduct implicates both witness tampering and possible spoliation of Plaintiff's evidence. Certainly such conduct has no place in this litigation, and if proven, would merit serious sanction.

Second, some of the Defendant's explanations to the Court are problematic. Vaughan alleged that on one occasion two correctional officers at WTRJ came into his pod, and Officer Brinkley entered his cell and grabbed him by the front of the shirt and threatened him because he was a witness in the Jamycheal Mitchell case:

> He said, "This is my house. You listen to my rules. You do what we say, you won't be hurt. It can be -- it is plenty people die in jail. We can do anything to you. This is our house. We run it. I'm like, what is all this for? He said, because you over here snitching. The other -- you over here snitching. The other jail know what to do with you, but this ain't no turning back once you get here. So keep your mouth closed, and if I was you I would withdraw from the case.

Hr'g. Tr. 56. In response, the Defendant proffered a video purporting to show the extent of the interaction between correctional officers and Vaughan. ECF No. 52, attach. 8. The Defendant argued that the video demonstrated that Brinkley never entered the cell and therefore Vaughan's complaint was not true. However, while the video does not show Brinkley enter the cell, the

video has a twenty second stretch where the screen is blank.  Upon restoration of the picture, a correctional officer, presumably Sgt. McQueen, is seen exiting Vaughan's cell.  *See* Summary of Investigation, ECF No. 52, attach. 7.  At the second hearing on July 22, 2016, Defendant's counsel explained that the blank screen was due to the fact that recording by the video camera is initiated by motion detection, and thus when the screen went blank, it was because there was no movement in the picture.  The problem with this explanation is that the first five to ten seconds of the video show the pod as being completely empty, with no motion or movement from any source, and yet the video is recording.

Additionally, the Court is troubled by the failure of jail personnel to provide Hurst with the medication he had been prescribed, including medication to treat his seizure disorder which had accompanied him from HRRJ to WTRJ when he was transferred there.  Supt. Smith explained this omission was due to "a paperwork error."  Hr'g Tr. at 204.  Such errors are unacceptable if commonplace and are, potentially, life threatening.  The Court recognizes, however, that each of these incidents involved staff at WTRJ, not HRRJ, and thus does not see the need to inquire further, since Vaughan and Hurst are no longer incarcerated at WTRJ.

In *Disability Rights*, the action involving psychiatric inpatients who claimed they were threatened or retaliated against because of their role as potential witnesses, the district court declined to enter a protective order because the plaintiff failed to proffer sufficient evidence of conduct giving rise to a reasonable fear of retaliation.  Nonetheless, that court stated that it was "cognizant of the significant power that Defendants have over a multitude of potential witnesses to this action."  2011 WL 2937355 at *5.  After acknowledging that Defendants had taken steps to prevent any retaliation against patients for participating in the lawsuit, the court went on to caution:

> That no order is immediately forthcoming should not be taken as an endorsement of physician commentary on or interference with this case. Any efforts by agents of Defendants to coerce or intimidate witnesses will be addressed with severity. The Court does not dismiss the possibility that judicial intervention, including a protective order, preliminary injunction, or sanctions may be later required if evidence of harassment or intimidation is found. To be clear, even some of the conduct that Defendants already admit is clearly improper. Counsel would be advised to ensure that physicians and staff who may have access to patient files or occasion to discuss this litigation with patients are well informed as to the ethical duties of litigants and the severe penalties associated with witness tampering and/or spoliation. Plaintiff is entitled to a fair hearing, and the Court is obligated to protect the integrity of that process.

*Id.* Given "the significant power that Defendants have over . . . potential witnesses to this action," a similar admonition is appropriate here. This litigation must be conducted honestly and fairly. Attempts at intimidation or retaliation will not be countenanced. Defendant is advised to remind his staff at HRRJ that threats and retaliatory conduct are simply unacceptable. Should Plaintiff present to this Court more substantiated evidence of threats or retaliatory conduct, this Court will not hesitate to recommend relief, including a possible protective order or the more extraordinary relief Plaintiff requested in her Motion. [13]

## III. RECOMMENDATION

For these reasons, the undersigned **RECOMMENDS** that Plaintiff's Motion for a Protective Order, ECF No. 17, be **DENIED**.

## IV. REVIEW PROCEDURE

By receiving a copy of this Report and Recommendation, the parties are notified that:

1. Any party may serve on the other party and file with the Clerk of this Court specific written objections to the above findings and recommendations within fourteen days from the date this Report and Recommendation is mailed to the objecting party, *see* 28 U.S.C. § 636(b)(1)(C)

---

[13] Of course, if these inmates believe themselves subject to threatening or retaliatory treatment, they have remedies available to them personally, either through their own attorneys or independently, including via the HRRJ grievance procedure and potential civil actions of their own under 42 U.S.C. § 1983.

and Federal Rule of Civil Procedure 72(b), computed pursuant to Federal Rule of Civil Procedure Rule 6(a) plus three days permitted by Federal Rule of Civil Procedure Rule 6(d). A party may respond to another party's specific written objections within fourteen days after being served with a copy thereof. *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b).

2. The Chief United States District Judge shall make a *de novo* determination of those portions of this Report and Recommendation or specified findings or recommendations to which objection is made. The parties are further notified that failure to file timely specific written objections to the above findings and recommendations will result in a waiver of the right to appeal from a judgment of this Court based on such findings and recommendations. *Thomas v. Arn*, 474 U.S. 140 (1985); *Carr v. Hutto*, 737 F.2d 433 (4th Cir. 1984); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984).

The Clerk is **DIRECTED** to forward a copy of this Report and Recommendation to all counsel of record.

Lawrence R. Leonard
United States Magistrate Judge

Norfolk, Virginia
July 25, 2016