UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
**Norfolk Division**

ROXANNE ADAMS, ADMINISTRATOR OF
THE ESTATE OF JAMYCHEAL M. MITCHELL,
Deceased,

        Plaintiff,

                                                    Case No.: 2:16-cv-229

v.

NAPHCARE, INC., *et al.*,

        Defendants.

## RESPONSE TO ORDER TO SHOW CAUSE

COMES NOW, John F. Preis, counsel for Plaintiff Roxanne Adams, Administrator of the Estate of Jamycheal M. Mitchell, Deceased, with this Response to an Order to Show Cause. ECF 140. This Response is accompanied by five exhibits, one of which declares under penalty of perjury that the statements made in this Response are true and accurate to the best of the undersigned counsel's belief. *See* Exhibit 1.

## Introduction

The legitimacy of the judicial process depends in large part upon the integrity of its participants. For that reason, it was entirely appropriate for the Court to issue a show cause order on October 27, 2016. Also appropriate was the apparent decision of judicial law clerks who, having concern about the integrity of the judicial process, shared their experiences with the Judge in this case. The undersigned counsel shares this commitment to the integrity of the judicial process and submits this Response to address the concerns raised by the Court.

1

Before addressing those concerns in detail, however, the undersigned counsel wishes to express his regret that his conduct has given rise to such concerns. As with all matters relating to integrity, the best course is to avoid conduct that would raise even the slightest doubt about the propriety of a particular course of action. Had counsel appreciated the context—that clerks connected with this case would be at his academic presentation on October 21—he would have certainly chosen a different course. Regretfully, he failed to foresee this circumstance and thus has burdened the Court, the clerks, the parties, and the attorneys in this case with the necessity of further inquiry.

The remainder of this brief recounts the facts that gave rise to this issue, the law pertaining to ex parte communications, and the reasons why the undersigned counsel has not violated Virginia Rule of Professional Conduct 3.5(e).

## **Statement of Facts**

The current matter arises out of a conference sponsored by the Fourth Circuit Institute for Judicial Law Clerks. The conference is held every two years at the University of Richmond School of Law, where I am a professor of law. The goal of the conference is to provide judicial clerks with training in legal matters that they are likely to encounter on a regular basis. Attendance at the event varies from year to year because not all clerks attend. This year, 127 clerks attended.

I have presented at this conference four times, 2010, 2012, 2014 and 2016. Within the conference, my portion of the program has variously been described as a "Supreme Court Review" or a review of "Recent Developments" in the Supreme Court or Fourth Circuit. The first year I presented at the conference, I addressed high-profile cases as well as less prominent cases that would nonetheless arise in a clerk's daily work. For

the past three presentations, however, I have ignored high profile cases and focused only on cases that that (1) are within my field of study (which includes civil procedure, federal courts, and civil rights litigation) and (2) implicate issues likely to arise in cases that clerks are likely to encounter.

One issue that is within my field of study, and that I have addressed every year at this conference, is qualified immunity. In 2010, for example, I discussed the doctrine in connection with the recent case of *Pearson v. Callahan*, 555 U.S. 223 (2019). *See* Exhibit 2, at 1. Then, in 2012, I discussed the doctrine in connection with *Ryburn v. Huff* 132 S. Ct. 987 (2012). *See* Exhibit 3 at 3. In 2014, I discussed it again in connection with *Tolan v. Cotton*, 134 S.Ct. 1861 (2014). *See* Exhibit 4, at 2. Although I framed the issue that year as a summary judgment issue, I chose to discuss the relatively inconsequential *Tolan* case (which was decided per curiam) rather than another summary judgment case because *Tolan* allowed me to discuss qualified immunity.

To prepare for this year's conference, I scanned the opinions issued by the Supreme Court last term and picked out cases that dealt with issues commonly faced by law clerks. Unlike most years, I did not see a particularly useful qualified immunity decision and, because I believed I had enough material to fill the hour-long presentation, did not include such a case in my materials.

I was scheduled to present at 1:00pm on October 21, 2016. I arrived at 12:55pm and chatted in the front of the room with Judge Fredrick P. Stamp, a district court judge from West Virginia who organized the event. I did not speak with or mingle with any clerks. I was unaware which clerks were in attendance and never once formed the belief that clerks assigned to this case were present.

I began my presentation by explaining that my presentation, though titled a "Supreme Court Review" would not involve any high-profile cases as such presentations often do. Rather, because the goal of the conference was to assist them in better performing their jobs, I explained that I would cover topics that commonly arise in cases addressed by federal law clerks.

About half-way through the hour-long presentation, I realized that my presentation might not take up the entire hour. I stated this aloud mainly to alert Judge Stamp and, seeing no particular response or concern from him, I continued my presentation but attempted to stretch it out as long as possible.

The last topic I had planned to address that day was "Section 1983 and *Bivens* Actions." (I developed the materials for this conference on September 22, 2016.) See Exhibit 5, at 3. I explained the doctrine of exhaustion in prisoner actions as well as the Supreme Court's recent decision on the matter in *Ross v. Blake*, 136 S.Ct. 1850 (2016). When I was finished with this explanation, I noticed that I still had 10-15 minutes remaining in my allotted time.

Given that qualified immunity often arises in Section 1983 and *Bivens* cases, it occurred to me at that time that a useful way to spend the final 10-15 minutes would be to briefly explain the doctrine of qualified immunity. My goal here was simply to educate the audience on the doctrine, not to advance a particular point of view. As explained below, I pointedly defended the doctrine on at least two occasions and, on one occasion, also criticized plaintiff's attorneys for overreaching in this field.

I began this discussion by stating that the key inquiry in a qualified immunity analysis is whether there is any "clearly established law" on the situation presented.

4

Then, I explained that the standard is an effort to protect law enforcement officers from liability in situations where they make non-obvious mistakes. I illustrated this concept by discussing the complexities of Fourth Amendment law. Somewhat humorously, I suggested to the clerks that, if they thought that their Criminal Procedure exam was hard in law school, they should try taking the exam on the street in the middle of the night when they have just stopped a car on a crowded street. I asked, rhetorically, if anyone there knew whether it was constitutionally permissible to look inside a pack of gum that was inside a paper bag that was inside an arm rest that was inside a car. I explained that qualified immunity is an essential defense for state and federal actors because without it, few actors would stake their livelihood on getting Fourth Amendment questions exactly right, day after day.

After making this point, I returned to the clearly established law standard and illustrated how to apply it in a given case. I stated that defendants often want to state the factual circumstances as narrowly as possible because, the more specific the circumstances, the less likely a circuit court opinion (which would establish clear law) could be found. In contrast, I continued, plaintiffs attempt to frame the circumstances as generally as possible. At this point, I took a jab at plaintiffs' attorneys who frequently claim that there's one piece of law that's crystal clear—the Fourth Amendment itself. This line was met with laughter from the audience.

Given the competing approaches to qualified immunity that clerks will encounter in their briefs, I then explained how to frame the question. The proper frame derives from the purpose of the qualified immunity standard—which is to excuse officers who make non-obvious constitutional errors. Imagine that you had assembled 100 police

officers, I suggested, and could poll each of them on a particular allegation. If 95 of them thought the actions alleged in a complaint amounted to a constitutional violation, then a court could reasonably conclude that the violation was obvious. In contrast, if a much smaller proportion of officers identified a constitutional violation as obvious, then the court would reasonably conclude that the violation would not have been obvious to a reasonable officer.

After finishing this discussion, I looked at the clock and noticed that I still had 3 or 4 minutes remaining in my presentation. Wanting to use the remaining time, I looked for one more example to illustrate this point. Because I had recently addressed qualified immunity before this Court on Wednesday, October 19, the example that, regrettably, popped into my head was the immunity of a high-ranking government officer in a case alleging deprivation of health care. I said something to the effect of "let me give you one more example." I explained that I was involved in a case in which the head of an agency was claiming qualified immunity. I did not mention Debra Ferguson by name, but believe that I stated that the claim involved the provision of health care. I stated that the parties disagreed on whether the qualified immunity defense should apply and had taken positions commonly encountered in qualified immunity situations—one side defines the facts in very particular terms and the other defines the facts in very general terms. I then said something to the effect of: "so to figure this out, we need to do just what we did with the case involving police officers—i.e., imagine polling 100 agency leaders and asking them each whether the behavior alleged, taken in the light most favorable to the plaintiff, would be unconstitutional." I did not advocate a particular answer to the qualified immunity question; I simply said that the answer would depend on how our hypothetical

6

class of 100 persons answered. When this illustration was finished, I closed my presentation by thanking the clerks for their attention and wishing them well. Altogether, I believe that my statements pertaining to the qualified immunity of an agency head totaled approximately 2-3 minutes.

After the presentation was over, I left the room to return to my office. On my way there, I ran into a former student and her co-clerk (who are clerking on the district court in Richmond). I spoke with them for about 2 minutes and then returned to my office.

### Argument

The Court has ordered that the undersigned counsel show cause "why the Court should not consider his conduct to constitute an attempted ex parte communication as to the merits of this case, in contravention of Rule 3.5(e) of the Virginia Rules of Professional Conduct." ECF 140. Although, as stated, counsel regrets the comments he made, respectfully, there are three primary reasons why the Court should not consider counsel's conduct an attempted ex parte communication. First, counsel did not know that the clerks involved in this case were present and thus cannot reasonably be deemed to have attempted to communicate with such clerks. Second, if counsel's actions amount to an attempted ex parte communication, then many other public statements could reasonably be deemed ex parte communications as well. Third and finally, counsel did not advocate a particular result or urge a particular position. He spoke as a teacher and discussed the matter in an even-handed fashion.

First, counsel did not attempt to communicate with any judicial clerks involved in this case because he did not know that those clerks were present. According to the Court's order, there were apparently two or three clerks present at the event. These

7

clerks were present in an audience of approximately 130 persons—an audience that did not apparently include all clerks in the Fourth Circuit. Counsel did not know that these clerks were in the audience; nor did he anticipate that they might be in the audience. In hindsight, of course, counsel can see reason to believe that they might be present and regrets not making that connection earlier, but he had no intention at the time of communicating with the clerks.

To understand why counsel reasonably did not make that connection, it is important to understand that counsel, in his role as a full time teacher, is often called on to speak on legal matters to large groups on a regular basis. Whether in or out of a classroom, such presentations are made in his capacity as an educator, and, consistent with that capacity, he often—extemporaneously—draws on information that is likely to achieve the educational purpose of the presentation. Obviously, if counsel involves himself in a particular lawsuit, he should be mindful of instances in which his role as an educator could conflict with his role as an attorney. In this context, however, he was speaking to a group of nearly 130 persons for approximately 55 minutes as an educator. Respectfully, that he did not immediately realize during the final 2-3 minutes of his presentation that these two roles were suddenly in tension does not mean that he knowingly attempted an ex parte communication.

Second, counsel's statements—which were made to a large audience—cannot reasonably be deemed as an attempt to communicate matters related to the case. There is a paucity of cases involving ex parte communications with judges or judicial officers but the cases that do exist all concern private messages specifically directed at a single recipient. *See, e.g., Barrett v. Virginia State Bar*, 269 Va. 583, 597 (2005) (upholding

violation of Rule 3.5(e) because the attorney "sent a letter to Judge Padrick"). Counsel has uncovered no case in which a statement made to a large audience or to the public at large constituted an ex parte communication. To see why this is a sensible rule, one need only consider the numerous press accounts of this exact case. Almost on a daily basis, regional and statewide newspapers have covered this case and some articles have contained statements from counsel or the parties themselves. One can be fairly certain that, among the judges and clerks involved in this case, at least *one* of them will read at least *one* news story. With such knowledge, has an attorney or party attempted an ex parte communication by making a statement to the press pertaining to a case? This would be an unreasonable conclusion because—even though it is very likely if not certain to be encountered judicial officials—there is no evidence that the speaker is intentionally communicating a legal argument to the Court.

Third, counsel did not advocate any result concerning the merits of this case (or any result at all). Consistent with his prior presentations at this conference, counsel offered instruction to the attendees on the law of qualified immunity. He did not mention any parties involved in this suit or advocate a specific result. He did not adduce new evidence or law, or make any new arguments. He did not plan to speak about qualified immunity and did not prepare any statements on that issue. He did not criticize or otherwise discredit arguments made by the defendants in this case. He did not criticize the law of qualified immunity generally; in fact, he defended it as an appropriate protection for officials who face difficult constitutional decisions on a daily basis. What he *did do* was extemporize on the law of qualified immunity during the final 10-15

9

minutes of his presentation, and only in the final 2-3 minutes did he use the fact pattern implicated in this suit as an illustration.

## Conclusion

In sum, counsel acknowledges that, from the position of a clerk attending the conference, his statements could have reasonably been perceived as an attempt to address the merits of this case. That is unfortunate and, as counsel stated at the outset, he deeply regrets that his behavior has given rise to such a perception and inconvenienced the Court and parties. This reasonable perception, however, does not comport with counsel's actual goals. Counsel's goals were to educate clerks on law that they would frequently encounter, one of which is qualified immunity. It was not counsel's goal to advocate matters related to this case. Indeed, counsel had no idea that clerks connected with the case were present in an audience of approximately 130 largely unknown persons. Moreover, respectfully, if a communication of this sort were deemed to be an ex parte communication, other routine public statements could be deemed ex parte communications as well. Finally, and quite importantly, counsel did not advance any new evidence or arguments during the 2-3 minute discussion. His goal was simply to teach, not to advocate. He deeply regrets the confusion caused by his behavior but sincerely and respectfully resists the conclusion that he "attempted [an] ex parte communication."

ROXANNE ADAMS, ADMINISTRATOR
OF THE ESTATE OF JAMYCHEAL M.
MITCHELL, DECEASED

By:_____/s/_____
         John F. Preis, Counsel

John F. Preis (VSB# 45764)
7719 Rock Creek Rd.
Henrico, VA 23229
Phone: (804) 289-8682
Email: jpreis@richmond.edu


Mark J. Krudys (VSB# 30718)
THE KRUDYS LAW FIRM, PLC
SunTrust Center
919 E. Main Street, Suite 2020
Richmond, VA  23219
Phone: (804) 774-7950
Fax:     (804) 381-4458
Email: mkrudys@krudys.com
Web:   www.krudys.com
*Counsel for Plaintiff Roxanne Adams, Administrator of the Estate of Jamycheal M. Mitchell, Deceased*

**Certificate of Service**

I hereby certify that on this 28th day of October 2016, I will electronically file the foregoing pleading with the Clerk of Court using the CM/ECF system, which will then send a notification of the filing to the following:

Ryan Furgurson, Esq.
Gregory F. Holland, Esq.
Setliff & Holland, P.C.
4940 Dominion Boulevard
Glen Allen, VA 23060
rfurguson@setliffholland.com
gholland@setliffholland.com
*Counsel for Defendant Gail Hart*

Jeff W. Rosen, Esq.
Lisa Ehrich, Esq.
Jeffrey Hunn, Esq.
Pender & Coward
222 Central Park Avenue
Virginia Beach, VA 23462
jrosen@pendercoward.com
*Counsel for Defendants Hampton Roads Regional Jail Authority, Hampton Roads Regional Jail, David Simons, Eugene Taylor, III, Officer Gibbs, Officer Hilliard, Officer Howard, Officer Keister, Officer Powell, MJO Smith, MJO Johnson, Sgt. T. Phillips, Sgt. Tamara Everett, Lt. Roderick Madison, Capt. Felicia Cowan*

Nicholas F. Simopoulous, Esq.
Alexander K. Page, Esq.
Office of the Virginia Attorney General
202 North 9th Street
Richmond, VA 23219
Nsimopoulos@oag.state.va.us
Ayost@oag.state.va.us
*Counsel for Defendants Lenna Jo Davis and Kelly N. Boyd*

David P. Corrigan, Esq.
Jeremy D. Capps, Esq.
M. Scott Fisher, Jr., Esq.
Harman, Claytor, Corrigan & Wellman
P.O. Box 70280
Richmond, VA 23255
dcorrigan@hccw.com

jcapps@hccw.com
sfisher@hccw.com
*Counsel for Defendant Debra K. Ferguson*

William W. Tunner, Esq.
Michael G. Matheson, Esq.
William D. Prince, IV, Esq.
*Thompson*McMullan, P.C.
100 Shockoe Slip, Third Floor
Richmond, Virginia 23219
wtunner@t-mlaw.com
mmatheson@t-mlaw.com
wprince@t-mlaw.com
*Counsel for Defendants Officer Dale Barnes, Officer Blakely, Officer Bourne, Derrick Brown, Officer Butcher, MJO Dixon, Sgt. William A. Epperson, Officer Whitaker, Sgt. Steven W. Whitehead, and Lt. Reginald Whitehead*

Edward J. McNelis, III, Esq.
Grace Morse-Brumagin, Esq.
Rawls, McNelis & Mitchell, P.C.
211 Rocketts Way, Suite 100
Richmond, VA 23231
emcnelis@rawlsmcnelis.com
gbrumagin@Rawlsmcnelis.com
*Counsel for Defendants NaphCare, Inc.; Nsekenene Kolongo, MD; Renee Edwards, LCSW; Justin Ray, NP-Psych; Benedict Ngwa, NP; Pam Johnson, RN; Natalya Thomas, RN, HSA; Jalessa Rivers, LPN; Hope Nicholson, MA; and Doris Murphy, MSW*

*Counsel for Plaintiff Roxanne Adams, Administrator of the Estate of Jamycheal M. Mitchell, Deceased*

    /s/    

John F. Preis (VSB# 45764)
7719 Rock Creek Rd.
Henrico, VA 23229
Phone: (804) 289-8682
Email: jpreis@richmond.edu

Mark J. Krudys (VSB# 30718)
THE KRUDYS LAW FIRM, PLC
SunTrust Center
919 E. Main Street, Suite 2020

13

Richmond, VA 23219
Phone: (804) 774-7950
Fax:    (804) 381-4458
Email: mkrudys@krudys.com

*Counsel for Plaintiff Roxanne Adams,*
*Administrator of the Estate of*
*Jamycheal M. Mitchell, Deceased*