UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Norfolk Division

| | |
|---|---|
| ROXANNE ADAMS,<br>    Administrator of the Estate<br>    of Jamycheal M. Mitchell,<br><br>    Plaintiff,<br>v.<br><br>NAPHCARE, INC. et al.,<br><br>    Defendant. | Civil Action No: 2:16-cv-229 |

## REPORT AND RECOMMENDATION

Before the Court is Defendant Natalya Thomas' Motion to Dismiss for Failure to State a Claim ("Motion to Dismiss"), and an accompanying memorandum, filed on August 15, 2016. ECF Nos. 109-110. This matter was referred to the undersigned United States Magistrate Judge pursuant to a Referral Order from the Chief United States District Judge. ECF No. 137; *see also* 28 U.S.C. § 636(b)(1)(B); Fed. R. Civ. P. 72(b); E.D. Va. Local Civ. R. 72. For the following reasons, the undersigned **RECOMMENDS** that Defendant's Motion to Dismiss, ECF No. 109, be **DENIED**.

### I. PROCEDURAL AND FACTUAL BACKGROUND

In deciding a motion to dismiss under Fed. R. Civ. P. 12(b)(6), the Court is required to "accept as true all of the factual allegations contained in the complaint," *Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (per curiam), and all reasonable inferences must be drawn in the plaintiff's favor, *Ibarra v. United States*, 120 F.3d 472, 474 (4th Cir. 1997). Those allegations include the following. Plaintiff Roxanne Adams is the aunt of the late Jamycheal Mitchell ("Mitchell"), and

1

the administrator of his estate. ECF No. 1 at ¶ 20 and attach. 1. According to the Complaint, Mitchell was diagnosed with a mild intellectual disability and suffered from mental illnesses, such as bipolar disorder and schizophrenia. *Id.* at ¶ 2. Mitchell was arrested on April 22, 2015, in Portsmouth, Virginia, for allegedly stealing $5.00 in snacks from a 7-Eleven. *Id.* at ¶ 54. Judge Whitlow of The Portsmouth General District Court ("PGDC") ordered Mitchell to be psychologically evaluated for competency and eligibility in a jail diversion program. *Id.* at ¶ 57. The case manager determined that Mitchell was an appropriate candidate for the diversion program, but Mitchell refused to accept the services. *Id.* at ¶ 58. On May 11, 2015, Mitchell was transferred to Hampton Roads Regional Jail ("HRRJ") in Hampton, Virginia, for medical and psychotropic treatment. *Id.* at ¶ 61. Mitchell received a psychological evaluation upon entering HRRJ pursuant to the PGDC order. *Id.* at ¶ 62. The evaluation concluded that Mitchell was manic, and should be committed to Virginia's Department of Behavioral Health and Developmental Services ("DBHDS") for inpatient treatment to restore his competency under Virginia Code § 19.2-169.2. *Id.* On May 21, 2015, the PGDC then issued a competency restoration order ("CRO"), ordering Mitchell to be treated at Eastern State Hospital, a state mental hospital. *Id.* at ¶ 63. Mitchell remained in custody at HRRJ, awaiting transfer to Eastern State Hospital. *Id.* at ¶ 64. Mitchell died on August 19, 2015, at HRRJ. *Id.* at ¶ 2. An autopsy determined the cause of death as "Probable cardia arrhythmia accompanying wasting syndrome of unknown etiology." *Id.* at ¶ 14. Moreover, the Assistant Chief Medical Examiner described him as "'nearly cachectic,' meaning the loss of body mass ... cannot be reversed nutritionally." *Id.*

Defendant Natalya Thomas was "a licensed registered nurse and the Health Services Administrator at HRRJ." *Id.* at 27. In her Complaint, Plaintiff asserted four counts against

Thomas: one count of negligence, gross negligence, and willful and wanton negligence (Count 1), *id.* at ¶¶ 202-11, and three counts of deprivation of civil rights (denial, delay, and withholding of medical care; conditions of detention; and general deprivation of civil rights based on medical neglect) pursuant to 42 U.S.C. § 1983, *id.* at ¶¶ 212-38, 252-58, (Counts 2, 3, and 5). Plaintiff sued Thomas in her individual capacity, though "[a]t all relevant times, Defendant Thomas, RN, HSA, was an employee and/or agent of Defendant NaphCare acting within the scope of her employment and/or agency with Defendant Naphcare, and under color of state law." *Id.* at ¶ 27.

In her Complaint, Plaintiff stated that Thomas was one of several Defendants "collectively referred to herein as the 'NaphCare Defendants.'" *Id.* at ¶ 32. Plaintiff summarized the allegations against the NaphCare Defendants at the beginning of her 112 page Complaint as follows. Mitchell lost between 40-50 lbs., and was 6'1" and 144 lbs. when he died. *Id.* at ¶ 4. HRRJ told Plaintiff that "Mitchell's weight loss was due to *his* failure to eat; however, Jail detainees/inmates have stated that Mitchell ate ravenously *when* he was provided food." *Id.* (emphasis in original). The water in Mitchell's cell was turned off, including the water in his toilet, so his cell "reeked from the stench of unflushed urine and feces" and "Mitchell smeared feces in the Plexiglas window to his cell." *Id.* at ¶ 5. Mitchell was denied "clothing, a mattress, a sheet, and blankets" and he slept on a "metal sheet" until he received a bare mattress just a few days before he died. *Id.* at ¶ 6. Mitchell stood "cold and naked at the doorway of his cell" that had a cement floor "because he felt that there was some warmth provided by the overhead light." *Id.* Mitchell told the other inmates approximately four days before his death "that he was feeling very bad and needed medical help," and they "relayed that information to Correctional Officer Defendants and implored them to help Mitchell, but the "COs" ignored the requests, or otherwise did not obtain medical help for Mitchell." *Id.* at ¶ 12. In addition, although psychotropic

medications were prescribed for Mitchell for his mental health conditions, "and important for the maintenance of his mental competency, Mitchell reportedly received virtually no psychotropic medication at the Jail, and, about a month before his death, his medication was discontinued altogether." *Id.* at ¶ 7. After Mitchell's legs and feet were "so swollen that it looked as if he was wearing a large cast," he was sent to Bon Secours Maryview Medical Center where he was diagnosed with Bilateral lower extremity edema, hypoalbuminemia, and elevated transaminase level as well as told to have a GI consult. *Id.* at ¶ 10. "However, Jail medical records reveal that upon Mitchell's return to the Jail...other NaphCare employees and/or agents, provided no follow up care, including no GI consult, for the remaining 19 days of Mitchell's confinement before his death" and they did not " provide proper care or refer Mitchell to an ED again when his medical condition considerably worsened." *Id.* at ¶¶ 10, 83. Furthermore, "[r]eported deplorable conditions and indications of mental and physical deterioration were allowed to continue unchecked" by the NaphCare Defendants and they "failed, among other things, to carry out basic procedures and provide proper care." *Id.* at ¶ 66.

The Complaint further alleged that the "NaphCare Defendants deliberately neglected Mitchell despite his significant weight loss, mental and physical deterioration, and severely swollen feet and legs." *Id.* at ¶ 104. Moreover, "Mitchell was *never* medically or psychologically cleared or stabilized at HRRJ" and "there are no records of Mitchell seeing a psychiatrist" despite "reports of his somehow purportedly 'refusing' psychotropic medication while incompetent." *Id.* In April 2016, the Office of the State Inspector General issued a report that "the care provided to Mitchell by NaphCare...raised significant concerns regarding the quality of assessment, care, follow-up, and documentation" and that the NaphCare Defendants "failed to respond to Mitchell's dramatic weight loss" even though it "was readily apparent and

4

disturbing." *Id.* at ¶¶ 79, 105. Although Mitchell's medical records stated he "refused" his medication, Mitchell had an "inability to conscientiously refuse" and the NaphCare Defendants knew "of such and of the danger to Mitchell in not receiving his medication." *Id.* at ¶ 106.

"[I]nmates report[ed] that NaphCare nurses regularly bypassed Mitchell when distributing medications" and "failed to provide medication as prescribed to Mitchell for this condition, failed to report alleged 'refusals,' and/or otherwise failed to treat Mitchell adequately in connection with this condition." *Id.* During Mitchell's incarceration from May 17, 2015, until August 19, 2015, he should have received segregation or restricted rounds once a day for medical treatment. *Id.* at ¶ 118. Although Mitchell should have received ninety-four rounds between May and August, "NaphCare providers appear to have performed only a handful" and "[w]hen the segregation rounds were supposedly performed, the records are incomplete and/or conflicting, and there is no indication that a doctor or nurse practitioner was contacted when Mitchell supposedly refused segregation rounds." *Id.* During the final nineteen days of Mitchell's life, he only received segregation rounds twice. *Id.*

Specifically in regards to Thomas, the Complaint alleged that "[a]s a Health Services Administrator, Defendant Thomas was charged with planning, directing, and coordinating medical and health services at HRRJ." *Id.* at ¶ 128. As such, Defendant Thomas "would have known" that: (1) "there was no effective coordination of care among providers at HRRJ"; (2) "nursing staff was not properly communicating to nurse practitioners/doctors conditions such as non-receipt or 'refusal' of medication/otherwise failure to ingest medication; non-receipt or 'refusal' of other treatments; mental deterioration; extreme weight loss and physical deterioration; unsanitary conditions; and distress"; (3) "nurse practitioners, doctors, social workers, and others were not communicating effectively amongst each other"; (4) "nursing staff

5

was not properly administering medication, was not properly performing segregation rounds, was not properly developing treatment plans, was not properly taking vital signs, and was not properly documenting, and would have known that mental health staff also were not properly assessing and treating Mitchell's mental health condition"; (5) there were "widespread documentation failures in Mitchell's chart"; (6) "Mitchell was issued a CRO order by the Court, but that it was not being carried out"; (7) there were "failures of medical and mental health providers to medically and psychologically stabilize mentally ill inmates"; and (8) there were "unsanitary conditions that mental health inmates were being forced to endure in segregation." *Id.* Further, "Thomas likely knew about Mitchell's particular circumstances, including physical and mental deterioration, unsanitary living conditions, and distress" and that "[a]s an RN, Thomas would have known of the danger to Mitchell that those conditions presented." *Id.* Furthemore, the Complaint stated:

> Thomas, in addition to apparently failing to do anything directly to improve Mitchell's situation, failed to facilitate coordination of care and communication among and between mental health and medical providers, failed to audit records and nursing practices, failed to have systems in place to track CROs, failed to have systems in place to effectively monitor segregation inmates, failed to have systems in place to ensure that there was documented showing of medical and mental health stabilization, and otherwise failed to provide for a correctional health care system that would allow access to adequate medical and mental health treatment and monitoring to Mitchell and inmates like him.

*Id.* Thomas also "did not adequately monitor, treat, and/or attempt to treat, Mitchell, did not have adequate systems in place to allow Mitchell proper medical/mental health care, and did not follow up with DBHDS regarding the failure to transfer Mitchell to Eastern State Hospital per court order." *Id.* at ¶ 7. She was "well aware that Mitchell was decompensating and physically deteriorating, but did not adequately address such" and "failed to have systems in place to effectively check the performance and quality of medical and mental health care at the jail." *Id.*

6

at ¶¶ 11, 66.

When NaphCare submitted a bid in March 2012 to provide HRRJ's medical and mental health services, it stated that it would "generate and provide the Regional Jail Administration a monthly report on all inmates who have not received medications as ordered." *Id.* at ¶ 170 (emphasis omitted). Additionally, NaphCare stated its "on-site continuous quality improvement program monitors, evaluates, and improves efficiency, cost-effectiveness, quality, and appropriateness of care provided to the inmate population." *Id.* The program was to be overseen by the Institution Continuous Quality Improvement Committee, which consisted of five members, including the Health Services Administrator, the position occupied by Defendant Thomas. *Id.*

Thomas allegedly had a "dut[y] to have systems in place to allow for the proper care and monitoring of, among others, Mitchell, and to properly audit such, but [she] did not" and a "dut[y] to render that degree of knowledge, skill, diligence and care to Mitchell that is rendered by a reasonably prudent health care provider or similar professional in the Commonwealth." *Id.* at ¶¶ 80, 185. Thomas' "conduct, as described throughout this Complaint, constituted negligence" or a breach of her duty. *Id.* at ¶¶ 203, 205. Moreover, Thomas' breach was grossly negligent because it "showed such a level of indifference to Mitchell so as to constitute an utter disregard of prudence, amounting to a complete neglect for Mitchell's safety." *Id.* at ¶ 206. Lastly, Thomas was "willfully and wantonly negligent in that [she] acted, or failed to act, in the manner described throughout this Complaint, consciously in disregard to Mitchell's rights" and she "acted, or failed to act, in the manner described throughout this Complaint, with a reckless indifference to the consequences to Mitchell when [she was] aware of their conduct and also aware, from [her] knowledge of existing circumstances and conditions, that [her] conduct would

result in injury to Mitchell." *Id.* at ¶ 207. Thomas' negligence and gross negligence caused Mitchell to suffer "great physical pain, and mental anguish" that resulted in his death. *Id.* at ¶¶ 208-09. Thomas' actions contributed to the deprivation of Mitchell's constitutional rights protected under 42 U.S.C. § 1983, specifically the denial of "necessary medical care, and/or access to medical care, to include prescribed medications, medical treatment, and appropriate mental health care," *id.* at ¶ 215, "to be free from extreme deprivations of minimal civilized necessities," which includes a deprivation of medical care, *id.* at ¶¶ 227-28, 230, and "showing deliberate indifference to his medical needs and/or circumstances," *id.* at ¶ 253.

On August 15, 2016, Thomas timely filed the present Motion to Dismiss with an accompanying memorandum. ECF Nos. 109-110. On September 12, 2016, Plaintiff timely filed a memorandum in opposition, ECF No. 129, and Thomas timely replied on September 30, 2016, ECF No. 135. The undersigned conducted a hearing in this matter on October 19, 2016, ECF No. 139, which is now ripe for recommended disposition.

## II. STANDARD OF REVIEW

A motion filed under Fed. R. Civ. P. 12(b)(6) challenges the legal sufficiency of a complaint. *Jordan v. Alternative Resources Corp.*, 458 F.3d 332, 338 (4th Cir. 2006). In considering this motion, the Court must assume that the facts alleged are true, and view them in the light most favorable to the plaintiff. *Eastern Shore Mkts., Inc. v. J.D. Assocs. Ltd. P'ship*, 213 F.3d 175, 180 (4th Cir. 2000); *Mylan Labs., Inc. v. Matkari*, 7 F.3d 1130, 1134 (4th Cir. 1993). Rule 8(a) requires that "[a] pleading that states a claim for relief must contain . . . a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a). To be sufficient under Rule 8, the pleading must meet two basic requirements: it must contain sufficient factual allegations and those allegations must be plausible. *Adiscov, LLC v.*

*Autonomy Corp.*, 762 F. Supp. 2d 826, 829 (E.D. Va. 2011) (citing *Ashcroft v. Iqbal*, 556 U.S. 662 (2009) and *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007)). First, sufficient factual allegations include "more than labels and conclusions, and a formulaic recitation of the elements of the cause of action will not do;" rather, "factual allegations must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555. Second, to "nudge[] their claims across the line from conceivable to plausible," *id.* at 570, "plaintiff[s] [must] plead[] factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged," *Iqbal*, 556 U.S. at 678. Indeed, to achieve factual plausibility, plaintiffs must allege more than "naked assertions ... without some further factual enhancement." *Twombly*, 550 U.S. at 557. Otherwise, the complaint will "stop[] short of the line between possibility and plausibility of entitlement to relief." *Id.*

Consequently, when considering a motion to dismiss, only those allegations which are factually plausible are "entitled to the assumption of truth." *Iqbal*, 556 U.S. at 679 (noting that legal conclusions must be supported by factual allegations). "At bottom, determining whether a complaint states on its face a plausible claim for relief and therefore can survive a Rule 12(b)(6) motion will be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Francis v. Giacomelli*, 588 F.3d 186, 193 (4th Cir. 2009) (citations omitted).

### III. ANALYSIS

#### A. Pleading Requirements

##### 1. Count 1

Because the situs of this tort claim is Virginia, Virginia's substantive law applies. *Alevromagiros v. Hechinger Co.*, 993 F.2d 417, 420 (4th Cir. 1993) (citing Restatement (Second)

of Conflict of Laws § 146 (1971)) ("In an action for a personal injury, the local law of the state where the injury occurred determines the rights and liabilities of the parties...."). In order to survive Thomas' motion, Plaintiff must have sufficiently pled the requirements for ordinary, gross, and willful and wanton negligence. "In traditional negligence cases, the plaintiff must satisfy the following four basic elements by a preponderance of the evidence: 1) duty; 2) breach; 3) causation; and 4) harm." *Murray v. United States*, 215 F.3d 460, 463 (4th Cir. 2000).

Furthermore, to establish gross negligence Plaintiff must show a "degree of negligence which shows indifference to others as constitutes an utter disregard of prudence amounting to a complete neglect of the safety of [another]...such a degree of negligence as would shock fair minded [people] although something less than willful recklessness." *Ferguson v. Ferguson*, 181 S.E.2d 648, 653 (Va. 1971) (emphasis omitted). To demonstrate willful and wanton negligence, Plaintiff must plead facts evidencing the defendant acted "consciously in disregard of another person's rights or act[ed] with reckless indifference to the consequences, with the defendant aware, from his knowledge of existing circumstances and conditions, that his conduct probably would cause injury to another." *Cowan v. Hospice Support Care, Inc.*, 603 S.E.2d 916, 919 (Va. 2004).

2.  <u>Count 2</u>

Plaintiff has brought a claim against Thomas under 42 U.S.C. § 1983 for Deprivation of Civil Rights based on Denial, Delaying, and Withholding of Medical Care to Mitchell. ECF No. 1 at ¶¶ 212-23. Such a claim derives from the right of pretrial detainees under the Fourteenth Amendment of the United States Constitution to receive adequate medical care. *Jones v. Johnson*, 781 F.2d 769, 771 (9th Cir. 1986) (citing *Bell v. Wolfish*, 441 U.S. 520, 535 n.16 (1979)) (holding that because the plaintiff "was a pretrial detainee and not a convicted prisoner at

the time of the claimed wrongful conduct, his § 1983 action for inadequate medical treatment arises from the due process clause of the fourteenth amendment and not from the eighth amendment prohibition against cruel and unusual punishment."). To survive Thomas' motion, Plaintiff must have properly pled that Mitchell (1) had a serious medical condition; (2) Thomas knew of the substantial risk of harm; and (3) acted with deliberate indifference to it. *Farmer v. Brennan*, 511 U.S. 825, 837 (1994).

3.  Count 3

In addition, Plaintiff has brought a claim against Thomas under 42 U.S.C. § 1983 for Deprivation of Civil Rights, specifically in regards to Mitchell's Conditions of Detention. ECF No. 1 at ¶¶ 224-38. Her claim derives from the right of pretrial detainees who, having not been convicted of a crime, are entitled under the due process clause of the Fourteenth Amendment of the United States Constitution to be free from conditions of confinement that constitute punishment. *Bell*, 441 U.S. at 535 ("In evaluating the constitutionality of conditions or restrictions of pretrial detention that implicate only the protection against deprivation of liberty without due process of law, we think that the proper inquiry is whether those conditions amount to punishment of the detainee.") To survive Thomas' motion, Plaintiff must have properly pled that (1) Mitchell's deprivation of medical care and/or other necessities constituted a punishment; and (2) that Thomas was deliberately indifferent to the prison conditions Mitchell expereinced. *Hill v. Nicodemus*, 979 F.2d 987, 991 (4th Cir. 1992). "In order to establish that a particular condition or restriction of detention constitutes constitutionally impermissible 'punishment' a detainee must show either 1) an 'expressed intent' to punish or 2) lack of a reasonable relationship 'to a legitimate nonpunitive governmental objective, from which a punitive intent may be inferred." *Id.*

11

4.  Count 5

Lastly, Plaintiff brought a claim against Thomas under 42 U.S.C. § 1983 for Deprivation of Civil Rights. ECF No. 1 at ¶¶ 252-58. Count 5 is basically a catch-all claim seeking vindication of the general right of pretrial detainees, under the Due Process Clause of the Fourteenth Amendment of the United States Constitution, to be free from "conditions or restrictions of pretrial detention that...amount to punishment of the detainee." *Bell*, 441 U.S. at 535. Plaintiff has alleged that the various deprivations, injuries, damages and wrongs suffered by Mitchell as alleged in the Complaint, taken together, amounted to such medical neglect that it constituted a violation of his due process rights under the Constitution. ECF No. 1 at ¶ 253. To survive Defendants' motion, Plaintiff must have properly pled that Mitchell was (1) deprived a right secured by the Constitution or Laws of the United States, (2) the alleged deprivation was committed by Thomas under color of state law, and (3) she acted personally in depriving the plaintiff's rights. *Am. Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 49-50 (1999); *Wright v. Collins*, 766 F.2d 841, 850 (4th Cir. 1985).

**B.  Plaintiff Asserted Plausible Claims against Thomas.**

Thomas sought dismissal on each of the four counts against her. She argued that Plaintiff failed to state a claim under Count 1 for negligence because "the allegations amount to a long-form claim of negligent supervision," which is not a recognized cause of action in Virginia. ECF No. 110 at 8. Moreover, Thomas stated Plaintiff failed to state a claim for gross and willful and wanton negligence because "Plaintiff alleges no facts showing that HSA Thomas appreciated Mr. Mitchell's condition or the risk to his well-being" and that her "alleged omissions lack a plausible concurrent mental state of consciously disregarding Mr. Mitchell's well-being and accepting a probability of his injury." *Id.* at 10. Further, Thomas argued Plaintiff failed to

sufficiently plead Counts 2, 3, and 5 because she "fail[ed] to show that HSA Thomas was ever aware that Mr. Mitchell was in substantial risk of serious harm or that she subjectively appreciated the seriousness of his condition." *Id.* at 5. Thomas claimed that "Plaintiff never factually demonstrates that HSA Thomas ever realized that Mr. Mitchell was in serious medical need" and that her "job title or duties" is not a "sufficient factual basis for inferring that she actually knew of Mr. Mitchell's serious medical condition." *Id.* at 5-6.

Accepting Plaintiff's allegations as true, Plaintiff has sufficiently pled all four counts against Thomas. For Count 1, Plaintiff alleged that Thomas had "among other duties, duties to exercise reasonable care with regard to Mitchell," ECF No. 1 at ¶¶ 203, 205, and that Thomas breached her duty of reasonable care by ignoring "his significant weight loss, mental, and physical deterioration, and severely swollen feet and legs" and "fail[ing] to facilitate coordination of care" for Mitchell. *Id.* at ¶¶ 104, 128. Thomas argued that Plaintiff's claim against her is really one for negligent supervision, which must fail because Virgina does not recognize a negligent supervision claim. However, Plaintiff alleges much more than that Thomas did not properly supervise the Naphcare nurses, as Plaintiff pled sufficient allegations against Thomas beyond her role as a supervisor to survive a 12(b)(6) motion. Importantly, Thomas served on the Institution Continuous Quality Improvement Committee where she was tasked with "monitor[ing], evaluat[ing], and improv[ing] efficiency, cost-effectiveness, quality, and appropriateness of care provided to the inmate population." *Id.* at ¶ 170. This allegation plausibly asserts that Thomas owed a duty to Mitchell to see that he was provided quality and appropriate medical care. Moreover, it permits the plausible inference that Thomas was familiar with the care provided to each inmate at HRRJ, since it was part of her job to evaluate that very thing. Given the extraordinary behavior in which Mitchell engaged, such as smearing feces on

13

his cell window, *id.* at ¶ 5; standing naked in the doorway of his cell, *id.* at ¶ 6; his extreme weight loss, *id.* at ¶¶ 4, 32; having legs and feet that were "so swollen that it looked as if he was wearing a large cast," *id.* at ¶ 10, and the fact that even other inmates recognized that Mitchell needed medical attention, *id.* at ¶¶ 155, 159, 161-64, as an individual responsible for monitoring the care provided to the inmate population, it is further plausible that Thomas was aware of Mitchell's serious medical needs. Plaintiff's allegations of such knowledge and Thomas' attendant failure to see that Mitchell was provided with appropriate medical care are sufficient to state a claim for negligence. Plaintiff has also sufficiently pled claims for gross negligence and willful and wanton negligence because these allegations against Thomas plausibly suggest both "an utter disregard of prudence amounting to a complete neglect" of Mitchell's safety and that she acted with "reckless indifference to the consequences" that her "conduct probably would cause injury" to Mitchell. *Ferguson v. Ferguson*, 181 S.E.2d 648, 653 (Va. 1971) (emphasis omitted); *Cowan v. Hospice Support Care, Inc.*, 603 S.E.2d 916, 919 (Va. 2004). Furthermore, given the claimed acts of misconduct and Mitchell's impaired physical and mental condition, Plaintiff plausibly alleged Thomas' actions caused or contributed to cause Mitchell's death, thus demonstrating the causation and damages elements for Count 1.

Likewise, Plaintiff plausibly alleged in Count 2 that Mitchell had a serious medical condition due to these factual allegations regarding his physical and mental health conditions, that Thomas was aware of them, and that she acted with deliberate indifference to them. ECF No. 1 at ¶¶ 215-16, 220. In Thomas' motion and at the hearing, she argued that Plaintiff did not sufficiently plead Counts 2, 3, or 5 because she did not demonstrate that Thomas had actual knowledge of Mitchell's serious medical conditions, thus she could not have acted indifferently to them. ECF No. 110 at 5-6; ECF No. 144 at 126-29. This argument is unpersuasive. Thomas

served on a committee tasked with monitoring and evaluating the care provided to inmates. ECF No. 1 at ¶ 170. The Complaint is replete with allegations of Mitchell's serious medical needs which manifested themselves in noticeable ways: Mitchell smeared feces on his cell window, *Id.* at ¶ 5; he stood naked in the doorway of his cell, *id.* at ¶ 6; he lost between 40-50 pounds, weighed only 144 pounds and suffered from wasting syndrome at the time of his death, *id.* at ¶¶ 32, 14; officers referred to Mitchell as "crazy" and encouraged nurses "not to bother with" him, *id.* at ¶ 7; and records show he was regularly not provided prescribed medication, *id.* at ¶121. Furthermore, Mitchell's legs and feet were "so swollen that it looked as if he was wearing a large cast" and he had to be sent to Bon Secours Maryview Medical Center. *Id.* at ¶ 10. Even after Bon Secours diagnosed Mitchell with Bilateral lower extremity edema, hypoalbuminemia, and elevated transaminase level as well as advised that he be sent for a GI consult, the Complaint alleged he did not receive medical care or a GI consult when he returned to HRRJ. *Id.* at ¶¶ 10, 83. Mitchell also is alleged to have not received seventeen segregation rounds in his last nineteen days alive and that "NaphCare nurses regularly bypassed Mitchell when distributing medications." *Id.* at ¶¶ 106, 118. At the present stage of these proceedings, the allegations must be accepted as true and, given Thomas' role on the committee designated to review the medical care provided to the inmate population, Plaintiff has plausibly demonstrated that Thomas was "aware of facts from which the inference could be drawn that a substantial risk of serious harm exists." *Farmer*, 511 U.S. at 837.[1] These allegations that Thomas was aware of Mitchell's

---

[1] In Thomas' motion and at the hearing she relied on *Reid v. Newton*, No. 3:13-cv-572, 2014 WL 1493569, at *17 (E.D. Va. Apr. 14, 2014) and *Williams v. Branker*, 462 F. App'x 348, 355 n.3 (4th Cir. 2012) as support for the proposition that Plaintiff's allegations meant to support the conclusion that Thomas had actual knowledge of Mitchell's serious medical needs are improperly based solely on Thomas' position as a supervisor and her responsibility for making sure HRRJ had sufficient systems in place to provide inmates with medical care. ECF No. 110 at 5; ECF No. 135 at 6-7; ECF No. 144 at 126-28. However, Thomas' knowledge is alleged to have come from more than just her job title. Her role on the quality assurance committee charged her with actually knowing the care the inmate population, including Mitchell, received, and thus demonstrates sufficient support for the conclusion that she showed deliberate indifference under the objective and subjective standards enunciated in *Farmer v. Brennan*,

health condition and failed to act are sufficient to demonstrate a plausible claim that Thomas deprived Mitchell of his civil rights by denying, delaying and withholding medical care to him. Therefore, Plaintiff has sufficiently alleged a constitutional claim in Count 2.

Regarding Count 3, Plaintiff alleged that Mitchell as "a pretrial detainee may not be punished" and that Thomas punished Mitchell by refusing to provide him medical care and other "minimal civilized necessities." ECF No. 1 at ¶¶ 226-28, 230. Even if the facts alleged against Thomas did not demonstrate an expressed intent to punish, Mitchell's deprivation of medical care showed a "lack of a reasonable relationship 'to a legitimate nonpunitive governmental objective, from which a punitive intent may be inferred." *Hill*, 979 F.2d at 991. Furthermore, the Fourth Circuit has stated that depriving a pretrial detainee of medical care is punishment because "the due process clause mandates the provision of medical care to detainees who require it." *Id.* Moreover, Plaintiff has pled that Thomas herself was deliberately indifferent to Mitchell's lack of medical care and other needs as she was a member of a committee specifically responsible for monitoring his care and, as discussed *supra*, Plaintiff has sufficiently alleged that he did not receive, *inter alia*, the necessary medical attention. While Thomas argued that the Complaint failed to demonstrate she had actual knowledge sufficient to demonstrate deliberate indifference, for the reasons explained regarding Count 2, Plaintiff has provided enough information to give Defendant Thomas notice of the allegations against her, and which plausibly could entitle Plaintiff to relief. *Twombly*, 550 U.S. at 555. Consequently, Plaintiff has alleged sufficient and plausible facts to meet her 12(b)(6) burden.

Lastly, Plaintiff sufficiently alleged in Count 5 that Thomas acted personally to deny

---

511 U.S. 825, 838-39 (1994). Moreover, Plaintiff alleged eight examples of information she would have known given her role as Health Services Administrator. Section I, *infra*; ECF No. 1 at ¶ 128. At the present stage of these proceedings, these allegations must be accepted as true and are further evidence that Thomas possessed actual knowledge.

Mitchell a right under the Constitution or federal law under color of state law, based on medical neglect. Thomas is plausibly alleged to have been aware of Mitchell's need for medical care, which went unattended. As discussed *supra*, the allegations against Thomas plausibly assert a claim that she infringed Mitchell's rights protected by the Constitution and federal law without due process by subjecting him to medical neglect. *See, Farmer*, 511 U.S. at 837; *Jones*, 781 F.2d at 771; *Strickler*, 989 F.2d at 1382. As a licensed registered nurse and the Health Services Administrator at HRRJ, Thomas acted under color of state law. Thomas also acted personally against Mitchell as the Complaint's allegations concerning her role on the quality assurance committee pertained specifically to her. Although Thomas argued that Count 5 should be dismissed because it sought similar relief as Counts 2 and 3, ECF No. 135 at 3-4 n.1, she failed to cite any authority for the proposition that a claim which overlaps another should be dismissed solely on this ground, or for the proposition that counts which seek duplicative relief are appropriately dismissed at the Rule 12(b)(6) stage. Thus, Count 5 should not be dismissed at this stage of the proceedings.

## IV. RECOMMENDATION

For these reasons, the undersigned **RECOMMENDS** that Defendant's Motions to Dismiss, ECF No. 109, be **DENIED**.

## V. REVIEW PROCEDURE

By receiving a copy of this Report and Recommendation, the parties are notified that:

1. Any party may serve on the other party and file with the Clerk of this Court specific written objections to the above findings and recommendations within fourteen days from the date this Report and Recommendation is mailed to the objecting party, *see* 28 U.S.C. § 636(b)(1)(C) and Federal Rule of Civil Procedure 72(b), computed pursuant to Federal Rule of Civil

Procedure Rule 6(a). A party may respond to another party's specific written objections within fourteen days after being served with a copy thereof. *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b).

2. The Chief United States District Judge shall make a *de novo* determination of those portions of this Report and Recommendation or specified findings or recommendations to which objection is made. The parties are further notified that failure to file timely specific written objections to the above findings and recommendations will result in a waiver of the right to appeal from a judgment of this Court based on such findings and recommendations. *Thomas v. Arn*, 474 U.S. 140 (1985); *Carr v. Hutto*, 737 F.2d 433 (4th Cir. 1984), *cert. denied*, 474 U.S. 1019 (1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984), *cert. denied*, 467 U.S. 1208 (1984).

The Clerk is **DIRECTED** to forward a copy of this Report and Recommendation to all counsel of record.

/s/ Lawrence R. Leonard
Lawrence R. Leonard
United States Magistrate Judge

Norfolk, Virginia
February 22, 2017