UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
Norfolk Division

ROXANNE ADAMS, ADMINISTRATOR OF
THE ESTATE OF JAMYCHEAL M. MITCHELL,

     Plaintiff,

v.                       CIVIL ACTION NO. 2:16cv229

NAPHCARE, INC., et al.,

     Defendants.

## OPINION

This matter comes before the court on the Motion to Dismiss ("Motion") and Memorandum in Support filed by Defendant Debra K. Ferguson ("Ferguson") on August 1, 2016. ECF Nos. 84, 85. The Plaintiff filed a Response on September 1, 2016, ECF No. 123, and on September 13, 2016, Ferguson filed a Reply. ECF No. 130. On September 20, 2016, Ferguson also filed a Request for Hearing. ECF No. 133.

On September 21, 2016, this court referred the Motion to a United States Magistrate Judge, pursuant to the provisions of 28 U.S.C. § 636(b)(1)(B) and Federal Rule of Civil Procedure 72(b), to conduct hearings, including evidentiary hearings, if necessary, and to submit to the undersigned District Judge proposed findings of fact, if applicable, and recommendations for the disposition of the Motion. ECF No. 134.

Having conducted a hearing regarding the Motion on October 19, 2016, ECF No. 139, the Magistrate Judge filed the Report and Recommendation ("R&R") on February 21, 2017. ECF No. 162. The Magistrate Judge recommended granting the Motion. R&R at 1. By copy of the R&R, the parties were advised of their right to file written objections to the findings and recommendations made by the Magistrate Judge. See id. at 21-22. On March 7, 2017, the Plaintiff filed Objections to the R&R. ECF No. 167. On March 21, 2017, Ferguson filed a Response to the Objections. ECF No. 171. The matter has been fully briefed and is ripe for review.

## I.

This action was brought by the Plaintiff in her capacity as the administrator of the estate of Jamycheal Mitchell ("Mitchell"), who died as a pretrial detainee in the Hampton Roads Regional Jail ("HRRJ"). Compl. ¶¶ 1, 20. During Mitchell's period of pretrial detention, Defendant Ferguson was the Commissioner of the Virginia Department of Behavioral Health and Developmental Services ("DBHDS"), a department which, through an Office of Forensic Services, provides services to individuals with disabilities who are involved in Virginia's legal system. Id. ¶ 41. The Complaint alleges the following claims against Defendant Ferguson: negligence, gross negligence, and willful and wanton negligence under Virginia law (Count One), id.

2

¶¶ 202-203, 205-211; deprivation of civil rights through the denial, delay, and withholding of medical care, under 42 U.S.C. § 1983 (Count Two), id. ¶¶ 212-223; deprivation of civil rights under 42 U.S.C. § 1983 (Count Five), id. ¶¶ 252-258; and deprivation of civil rights, with the heading "Deliberate Indifference - Supervisory Liability," under 42 U.S.C. § 1983 (Count Six), id. ¶¶ 259-266.

In the instant Motion, filed pursuant to Federal Rule of Civil Procedure 12(b)(6), Ferguson seeks dismissal of the aforementioned claims due to the Plaintiff's failure to show plausible factual allegations for each of these counts. Mot. at 1. Ferguson also claims the protection of qualified immunity for Counts Two, Five, and Six, and absolute immunity under the Eleventh Amendment for Counts Two, Five, and Six. Id. at 2.

The Magistrate Judge, accepting the facts as alleged in the Plaintiff's Complaint as true, found that the Plaintiff failed to state claims under 42 U.S.C. § 1983, in Counts Two, Five, and Six, because the Plaintiff failed to allege facts showing that Ferguson knew of a substantial risk of harm to the Plaintiff and others like him, in terms of their treatment by the DBHDS. See R&R at 9-14. The Magistrate Judge also found that Ferguson is entitled to the protection of qualified immunity for these § 1983 claims, see id. at 14-16, and to absolute immunity for all of the Plaintiff's claims, under the Eleventh Amendment. See

id. at 16-20. Finally, the Magistrate Judge found that the Plaintiff failed to state claims of negligence, gross negligence, and willful and wanton negligence under Virginia law, because the Plaintiff failed to assert that Ferguson owed Mitchell a duty of care. See id. at 20-21.

## II.

Pursuant to Rule 72(b) of the Federal Rules of Civil Procedure, the court, having reviewed the record in its entirety, shall make a de novo determination of those portions of the R&R to which a party has specifically objected. Fed. R. Civ. P. 72(b). The court may accept, reject, or modify, in whole or in part, the recommendation of the magistrate judge, or recommit the matter to him with instructions. 28 U.S.C. § 636(b)(1)(C).

Pursuant to Federal Rule of Civil Procedure 12(b)(6), a complaint must be dismissed when a plaintiff's allegations fail to state a claim upon which relief can be granted. Fed. R. Civ. P. 12(b)(6). "A motion to dismiss under Rule 12(b)(6) tests the sufficiency of a complaint; importantly, it does not resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses." Republican Party of N.C. v. Martin, 980 F.2d 943, 952 (4th Cir. 1992). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible

4

on its face.'" <u>Ashcroft v. Iqbal</u>, 556 U.S. 662, 678 (2009) (quoting <u>Bell Atl. Corp. v. Twombly</u>, 550 U.S. 544, 570 (2007)). Facial plausibility means that a "plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." <u>Id.</u> (citing <u>Twombly</u>, 550 U.S. at 556). It is, therefore, not enough for a plaintiff to allege facts demonstrating a "sheer possibility" or "mere[] consist[ency]" with unlawful conduct. <u>Id.</u> (citing <u>Twombly</u>, 550 U.S. at 557).

The Supreme Court has offered the following guidance to courts evaluating a motion to dismiss:

> [A] court considering a motion to dismiss can choose to begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth. While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations. When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief.

<u>Id.</u> at 679. That is, the court accepts facts alleged in the complaint as true and views those facts in the light most favorable to the plaintiff. <u>See, e.g.</u>, <u>Venkatraman v. REI Sys., Inc.</u>, 417 F.3d 418, 420 (4th Cir. 2005). After doing so, the court should not grant the defendant's motion if the plaintiff "demonstrate[s] more than 'a sheer possibility'" that the defendant has violated his rights, by "articulat[ing] facts, when accepted as true, that 'show' that the plaintiff has stated

5

a claim entitling him to relief . . . ." Francis v. Giacomelli, 588 F.3d 186, 193 (4th Cir. 2009) (quoting Iqbal, 556 U.S. at 678) (as only quoting "a sheer possibility").

### III.

The Plaintiff has submitted four (4) objections to the R&R. ECF No. 167. Specifically, the Plaintiff has objected to the Magistrate Judge's finding that (1) the suit against Ferguson is an official capacity suit that is protected by Eleventh Amendment immunity; (2) the Plaintiff has failed to state claims against Ferguson under 42 U.S.C. § 1983; (3) Ferguson is entitled to qualified immunity from suit under 42 U.S.C. § 1983; and (4) the Plaintiff has failed to state claims of negligence, gross negligence, and willful and wanton negligence against Ferguson under Virginia law. Having reviewed the record in its entirety, the court herein makes a de novo determination of these portions of the R&R to which the Plaintiff has specifically objected. Fed. R. Civ. P. 72(b). The court will address each of the objections in turn.

### A. Eleventh Amendment Immunity

The Plaintiff asserts that the Magistrate Judge incorrectly found that Ferguson is entitled to absolute immunity from the § 1983 claims under the Eleventh Amendment. Objs. at 3. In the R&R, the Magistrate Judge stated, "despite the nomenclature used by Plaintiff, [Ferguson] has been sued in her official capacity,

6

and therefore the absolute immunity defense is also applicable here." R&R at 17. In particular, the Magistrate Judge found that the state was "the real, substantial party in interest," id. at 18 (quoting Pennhurst State Sch. & Hosp. v. Halderman, 465 U.S. 89, 101 (1984)), because "the [DBHDS]'s 'policy or custom' is what played the role in preventing Mitchell's transfer" to Eastern State Hospital. R&R at 18 (quoting Hafer v. Melo, 502 U.S. 21, 25 (1991)). The Magistrate Judge also found the "Plaintiff's claim that, because she seeks money damages from [Ferguson] personally and not from the Virginia treasury, this must be considered a personal capacity suit," to be an immaterial distinction, and that the Plaintiff's "reliance on Edelman v. Jordan, 415 U.S. 651 (1974) for that point is entirely misplaced." R&R at 19. The Magistrate Judge stated that "it matters not which pocket Plaintiff seeks to recover from, but rather the substance of her claim, which is based on the agency's alleged policy or custom failure." Id. at 19-20.

The Plaintiff argues that the Magistrate Judge's findings on the Eleventh Amendment are, first and foremost, based on a misunderstanding of the nature of the § 1983 claims against Ferguson. See Objs. at 3-4. The Plaintiff states that these claims are based on Ferguson's "woefully mismanaging the DBHDS's available beds." Id. at 3 (citing Compl. ¶ 87). The Plaintiff further states that, because Defendant Hart was also accused of

7

mismanaging beds, but was not found to be immune from claims under § 1983, the Magistrate Judge's "finding of sovereign immunity comes down to this: when a low-level state employee commits a constitutional violation, a claim against the employee is not barred by sovereign immunity, but when a high-level state employee commits a constitutional violation, the claim is barred by sovereign immunity." Id. at 4. For support, the Plaintiff draws a comparison to Scheuer v. Rhodes, 416 U.S. 232 (1974). See Objs. at 5-7. The Plaintiff argues that Ferguson, like the defendant state governor in Scheuer, is being sued for her personal actions, and that the Magistrate Judge's interpretation of Edelman for a contrary finding is mistaken. See Objs. at 7-10. Overall, the Plaintiff contends that the § 1983 claims against Ferguson are not barred by the Eleventh Amendment, because the Plaintiff alleges that Ferguson, though a high-ranking official, "personally violated the United States Constitution." Id. at 10.

The Eleventh Amendment of the United States Constitution provides: "The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." U.S. CONST. amend. XI. Because the Plaintiff and Ferguson are citizens of Virginia, the language of the Eleventh Amendment

8

does not itself apply, but, "[w]hile the [Eleventh] Amendment by its terms does not bar suits against a State by its own citizens," it is established that "an unconsenting State is immune from suits brought in federal courts by her own citizens as well as by citizens of another State." Edelman, 415 U.S. at 662-63; see Alden v. Maine, 527 U.S. 706, 713 (1999) (explaining that Eleventh Amendment immunity "is convenient shorthand but something of a misnomer, for the sovereign immunity of the States neither derives from, nor is limited by, the terms of the Eleventh Amendment"). With this nomenclature in mind, it is also established that Eleventh Amendment immunity prevents claims against a state under 42 U.S.C. § 1983 without the state's waiver of immunity, see Will v. Mich. Dep't of State Police, 491 U.S. 58, 66 (1989), and that "even though a State is not named a party to the action, the suit may nonetheless be barred by the Eleventh Amendment." Edelman, 415 U.S. at 663. Although "the Eleventh Amendment provides no shield for a state official confronted by a claim that he had deprived another of a federal right under the color of state law," Scheuer, 416 U.S. at 237, "relief sought nominally against an officer is in fact against the sovereign if the decree would operate against the latter." Pennhurst, 465 U.S. at 101 (quoting Hawaii v. Gordon, 373 U.S. 57, 58 (1963) (internal quotation marks omitted)). In other words, "[w]hen the suit is brought only against state

officials, a question arises as to whether that suit is a suit against the State itself." Id.

Thus, when a state official is sued for damages in his or her official capacity under § 1983, the action should be treated as one against the state, which is the "real party in interest," and Eleventh Amendment immunity applies. Hafer, 502 U.S. at 25. However, when a state official is sued for damages in his or her individual capacity under § 1983, Eleventh Amendment immunity does not apply, and the state official remains subject to liability. See id. at 23, 25-26.

In the instant case, while the Complaint states that the § 1983 claims for damages are brought against Ferguson in her individual capacity, Ferguson contends that it should be considered a suit brought against her in an official capacity, due to the "Plaintiff's claims that Ferguson did not fulfill her statutory obligations as the Commissioner of DBHDS." Mem. Supp. at 15. However, this argument does not reach the applicable standard for Eleventh Amendment immunity regarding § 1983 claims. As the Supreme Court has explained, "the phrase 'acting in their official capacities' is best understood as a reference to the capacity in which the state officer is sued, not the capacity in which the officer inflicts the alleged injury." Hafer, 502 U.S. at 26. That understanding is reflected in the following distinction: "Personal-capacity suits seek to impose

10

personal liability upon a government official for actions he takes under color of state law," whereas "[o]fficial-capacity suits . . . 'generally represent only another way of pleading an action against an entity of which an officer is an agent.'" Kentucky v. Graham, 473 U.S. 159, 165-66 (1985) (quoting Monell v. Dep't of Soc. Servs., 436 U.S. 658, 690 n.55 (1978)).

Whether Ferguson's conduct was undertaken pursuant to, or in contravention of, a state policy or custom has no bearing on the availability of Eleventh Amendment immunity for a § 1983 claim. Although the Supreme Court in Hafer explained that "the plaintiff in a personal-capacity suit need not establish a connection to a governmental 'policy or custom,'" Hafer, 502 U.S. at 25 (quoting Graham, 473 U.S. at 166), that statement does not mean a claim's relation to a state policy or custom automatically converts the claim into an official capacity claim. Rather, it means that an official capacity claim under § 1983, as opposed to a personal capacity claim under § 1983, requires "the entity itself [to be] a 'moving force' behind the deprivation." Graham, 473 U.S. at 166 (quoting Polk Cnty. v. Dodson, 454 U.S. 312, 326 (1981)). In other words, for an official capacity suit, "the entity's 'policy or custom' must have played a part in the violation of federal law." Id. (citations omitted) (emphasis added).

11

The burden of proof for official capacity suits under § 1983 has no bearing on the definition or viability of a personal capacity suit under § 1983. Indeed, Hafer explicitly rejected the contention that Eleventh Amendment immunity protects "state officials from personal liability for acts within their authority and necessary to fulfilling governmental responsibilities." Hafer, 502 U.S. at 28. Rather, to be immune from personal liability based on such acts, an official must have either absolute immunity from suit, because the official's "special functions or constitutional status requires complete protection from suit," or qualified immunity. Id. at 29 (quoting Harlow v. Fitzgerald, 457 U.S. 800, 807 (1982) (internal quotation marks omitted)). Eleventh Amendment immunity plays no part.[1]

---

[1] Although Ferguson has argued that she "is entitled to qualified immunity, as well [as] absolute immunity under the Eleventh Amendment," Mem. Supp. at 5, a joint finding of Eleventh Amendment immunity and qualified immunity for the Plaintiff's § 1983 claims against Ferguson would be inconsistent, because it would mean that the claims were brought against Ferguson both in an official capacity and a personal capacity. See Graham, 473 U.S. at 166-67 ("When it comes to defenses to liability, an official in a personal-capacity action may, depending on his position, be able to assert personal immunity defenses, such as [absolute or qualified immunity]. In an official-capacity action, these defenses are unavailable. The only immunities that can be claimed in an official-capacity action are forms of sovereign immunity that the entity, qua entity, may possess, such as the Eleventh Amendment.") (citations omitted).

The relevant inquiry for Eleventh Amendment immunity, as opposed to absolute or qualified immunity, is whether the state is the real party of interest, and in the context of a § 1983 claim, the existence of a state policy or custom does not provide the answer. In terms of Eleventh Amendment immunity, therefore, the parties' arguments over whether this action seeks to hold Ferguson liable for failing to follow a statute, or whether it addresses her mismanagement of beds, are non-starters. Instead, the sole question is whether "the action is in essence one for the recovery of money from the state." Edelman, 415 U.S. at 663 (quoting Ford Motor Co. v. Dep't of Treasury, 323 U.S. 459, 464 (1945)).

In Edelman, the Supreme Court reinforced this line of inquiry. Specifically, the Court clarified that a federal suit for injunctive relief against state officials runs afoul of Eleventh Amendment immunity when it seeks retroactive relief that "is in practical effect indistinguishable in many aspects from an award of damages against the State," as opposed to seeking prospective relief that may nonetheless "require[] payment of state funds . . . as a necessary consequence of compliance in the future with a substantive federal-question determination." Edelman, 415 U.S. at 668. However, the Court did not change the scope of Eleventh Amendment immunity for § 1983 claims, which remains based on a determination of whether the

13

relief sought constitutes "damages against the State." Id.; see Quern v. Jordan 440 U.S. 332, 337 (1979) ("In Edelman we reaffirmed the rule that had evolved in our earlier cases that a suit in federal court by private parties seeking to impose a liability which must be paid from public funds in the state treasury is barred by the Eleventh Amendment.").

This principle does not mean that the source of funds is always dispositive in suits brought against public officials in federal court. In other contexts, beyond claims for relief under 42 U.S.C. § 1983, the Fourth Circuit has focused on the substance of the claims in determining Eleventh Amendment immunity. See Martin v. Wood, 772 F.3d 192, 196 (4th Cir. 2014) ("To identify the real, substantial party in interest, we thus examine the substance of the claims stated in the complaint . . . ."). The court in Martin listed five factors to consider when evaluating the real party in interest, including whether the official's underlying conduct was inextricably tied to the official's duties, and whether that conduct was taken to further personal interests distinct from the state. See id. However, the court in Martin addressed Eleventh Amendment immunity regarding a claim under the Fair Labor Standards Act, not a claim under § 1983, and "the Fourth Circuit has never extended Martin to § 1983 claims, likely because it would 'absolutely immunize state officials from personal liability for acts within their

14

authority and necessary to fulfilling government responsibilities.'" Patterson v. Lawhorn, No. 1:15cv477, 2016 WL 3922051, at *6 (E.D. Va. July 20, 2016) (Brinkema, J.), appealed on other grounds, No. 16-1936 (4th Cir. Aug. 17, 2016) (quoting Hafer, 502 U.S. at 28).[2] Accordingly, the standard for Eleventh Amendment immunity in a § 1983 claim remains the standard reinforced by the Supreme Court in Edelman, requiring only that the damages sought come from public funds. See Quern, 440 U.S. at 337.

Here, the Plaintiff is seeking to hold Ferguson personally liable for damages in a § 1983 action, and no award of damages

---

[2] Additionally, the plaintiff in Martin "candidly state[d]" that "[she] took care in drafting the [c]omplaint . . . to avoid sovereign immunity" by suing her supervisors at a state hospital in their individual capacity, as opposed to suing the state hospital itself. Martin, 772 F.3d at 195 (second alteration in original). However, she sought damages from them "in the form of 'overtime compensation.'" Id. at 194 (emphasis added). In ruling that the defendants were being sued in their official capacities, the Fourth Circuit noted that the plaintiff's "complaint alleges that [the defendants] had authority to authorize overtime pay [from state funds] and refused to do so and that, if they had authorized overtime pay, it would have been funded by [the state hospital]." Id. at 196 (emphasis in original). Accordingly, in Martin, the Fourth Circuit recognized that the plaintiff was trying to circumvent the Eleventh Amendment by attempting to recover monies from the state employees' personal pockets, which monies would actually be owed to her by the state. That is not the case here, as there is nothing to suggest in the Complaint that the damages sought from Ferguson are actually owed to the Plaintiff by the state, and/or that the claims against Ferguson are being drafted to circumvent sovereign immunity.

against Ferguson would come from state coffers.[3] Therefore, Ferguson, not Virginia, is the real party of interest, and Eleventh Amendment immunity does not apply to the § 1983 claims against Ferguson. Accordingly, the Plaintiff's objection to the finding of Eleventh Amendment immunity, as to the § 1983 claims, is **SUSTAINED**.[4]

### B. Sufficiency of the Plaintiff's § 1983 Claims

The Plaintiff objects to the Magistrate Judge's finding that the Plaintiff has failed to state claims against Ferguson under 42 U.S.C. § 1983. See Objs. at 15-22. Given the numerous layers of argument underlying this objection, the court will first review the Magistrate Judge's findings, the Plaintiff's objection to those findings, and Ferguson's responses, before evaluating the objection itself.

---

[3] Should Virginia have an agreement with Ferguson to indemnify her for this action, such an agreement would not cause the action to run afoul of Eleventh Amendment immunity. See Sales v. Grant, 224 F.3d 293, 298 (4th Cir. 2000) (explaining that "a state's promise of indemnification cannot invest governmental officers, sued in their individual capacities, with sovereign immunity that they would not otherwise enjoy") (citing Beardsley v. Webb, 30 F.3d 524, 531 (4th Cir. 1994)).

[4] The Magistrate Judge also applied the Eleventh Amendment immunity finding to the state law claims against Ferguson. See R&R at 16 n.2. Because the Eleventh Amendment immunity inquiry for state law claims is distinct from the above analysis regarding § 1983 claims, see Pennhurst, 465 U.S. at 103-06, the court's analysis above does not apply to the Plaintiff's state law claims. The court, therefore, will determine elsewhere in this Opinion whether Eleventh Amendment immunity applies to the Plaintiff's state law claims. See infra Part III.D.4.

In the R&R, the Magistrate Judge explained that for each of the Plaintiff's § 1983 claims against Ferguson, the Plaintiff is required to allege "some independent knowledge or awareness on the part of [Ferguson] to the fact that Mitchell's constitutional rights were being violated, and that she was deliberately indifferent to these violations." R&R at 10. After reviewing the applicable legal standards for each of the Plaintiff's § 1983 claims against Ferguson, the Magistrate Judge stated that "the salient facts necessary to assert plausible constitutional claims must establish that [Ferguson] knew of the constitutional violations and acted deliberately indifferent towards them." Id. at 10-11. The Magistrate Judge found that "[i]t is these facts which Plaintiff's Complaint fails to assert." Id. at 11.

Specifically, the Magistrate Judge found that, "even accepting Plaintiff's allegation that [Ferguson] 'could not have failed to know' that available hospital beds were not being filled by inmates on waiting lists, she has failed to allege facts which establish that, because they were on waiting lists, such class of inmates were necessarily subject to 'a substantial risk of serious harm,' and that [Ferguson] was aware of this fact." Id. at 12 (citing Farmer v. Brennan, 511 U.S. 825, 837 (1994)). The Magistrate Judge further explained: "Merely because an inmate may be improperly on a waiting list does not lead to

17

the plausible inference that, but for the failure to transfer him, he will be subject to a deprivation so extreme that it poses 'a serious or significant physical or emotional injury resulting from the challenged conditions,' or 'a substantial risk of such serious harm resulting from . . . exposure to the challenged conditions.'" Id. (quoting De'Lonta v. Angelone, 330 F.3d 630, 634 (4th Cir. 2003)). The Magistrate Judge noted that the Plaintiff "admits that [Ferguson] was not aware of Mitchell in particular," and stated that the Plaintiff "did not allege that any other inmates on the waiting list suffered any constitutional deprivation or other serious injury at all." Id. Although, as the Magistrate Judge explained, "an official's awareness of substantial risk can be based on their knowledge that all prisoners in [Mitchell's] situation face such a risk," id. (citing Farmer, 511 U.S. at 842), the Magistrate Judge found that the "Plaintiff never pled what specific substantial risk all prisoners who are not transferred face." Id. Thus, the Magistrate Judge concluded, "while Commissioner Ferguson might be aware that all prisoners who need to be transferred are not being transferred, Plaintiff failed to allege facts showing she was aware that all such prisoners faced substantial risk of serious harm; i.e., abuse, starvation, withholding of specific medical care, and death." Id. at 12-13. In other words, the Magistrate Judge found that "no facts were pled to establish

18

that it is 'obvious' that prisoners who do not get hospital beds face the substantial harm Mitchell is alleged to have faced." Id. at 13.

In sum, the Magistrate Judge found that "it was incumbent upon Plaintiff to allege facts asserting a plausible claim that [Ferguson] was aware that the class of inmates who were not transferred to hospitals with available beds faced the extreme deprivation which constituted a serious or significant physical or emotional injury resulting from the challenged conditions." Id. (citing De'Lonta, 330 F.3d at 634). The Magistrate Judge concluded that the Plaintiff failed to do so. Id.

As a final note, the Magistrate Judge observed that, while the "Plaintiff's allegations of constitutional deprivations suffered by Mitchell go far beyond merely alleging that he should have been treated in a hospital instead of at the HRRJ," the Plaintiff "only alleged that [Ferguson] was aware of waiting lists and empty beds," not that Ferguson was aware that inmates in Mitchell's class would suffer constitutional harms such as "beatings, denial of food, clothing, shoes, medication and sanitary living conditions," and "taunting and other humiliations" that Mitchell allegedly suffered at the HRRJ. Id. at 14. "Absent allegations of this nature," the Magistrate Judge stated, the "Plaintiff has not stated a claim under 42 U.S.C. § 1983." Id.

The Plaintiff objects to the Magistrate Judge's above findings for several reasons. Primarily, the Plaintiff argues that the Magistrate Judge's findings are incorrect because the Magistrate Judge "misperceives the legal standard applicable to these claims." Objs. at 16. In particular, the Plaintiff states that the Magistrate Judge applied <u>Farmer</u>'s standard for "serious harm," when the Magistrate Judge should have applied the standard for a "serious medical need." <u>Id.</u> The Plaintiff states that "the Court in <u>Farmer</u> did not intend to replace the 'serious medical need' standard with a 'substantial risk of harm' standard," and that "[b]oth tests are still alive and well; they simply apply in different contexts." <u>Id.</u> The Plaintiff argues that, based on this "serious medical need" standard, the relevant inquiry here is "whether inmates on the waiting lists were, in the opinion of a medical professional, required to receive treatment." <u>Id.</u> at 17. In response to that inquiry, the Plaintiff states that "[t]o ask this question is almost to answer it, because <u>one's name is only added to the waiting list after a professional diagnosis that medical care is mandated</u>." <u>Id.</u> (emphasis in original).

Thus, the Plaintiff argues, "<u>all</u> inmates on the waiting list were there because a medical professional had diagnosed them as requiring medical care and advised the court of such," and "<u>all</u> inmates on the waiting list had a 'serious medical

need' that was not being met." Id. at 18. The Plaintiff further argues that, although the Magistrate Judge found that the Complaint does not permit "the plausible inference that delays in transferring inmates must necessarily, by the nature of the delay, cause substantial harm," id. (quoting R&R at 13 (internal quotation marks omitted)), the delay here satisfied the Fourth's Circuit's test that it "exacerbated the injury or unnecessarily prolonged an inmate's pain." Id. (quoting Sharpe v. S.C. Dep't of Corr., 621 F. App'x 732, 734 (4th Cir. 2015) (internal quotation marks omitted)). The Plaintiff states that, "if a transfer to a hospital is delayed simply because the agency charged with the transfer cannot get its paperwork straight, and [Ferguson] knows such and does not take reasonable steps to remedy it, the delay is hardly 'necessary.'" Id. at 19. Moreover, the Plaintiff states that "a jury could reasonably infer that a significant number of inmates who had been slated for a court-ordered transfer to a hospital after evaluation and diagnosis by a healthcare professional (i.e., inmates with a serious medical need) suffered pain and/or exacerbation of their conditions because of the delay in receiving treatment." Id. The Plaintiff argues that the Magistrate Judge, therefore, "was incorrect in finding that Ferguson's failures do not allow an inference that those on the waiting list suffered 'serious harm.'" Id.

Finally, as to the Magistrate Judge's finding that the Plaintiff has not sufficiently alleged Ferguson's knowledge, the Plaintiff draws a comparison to the Fourth Circuit decision in Slakan v. Porter, 737 F.2d 368 (4th Cir. 1984), see Objs. at 19-22, and argues that "there is ample ground for a reasonable factfinder to infer that Ferguson knew of problems with the waiting list." Id. at 22.

In response to the Plaintiff's objection, Ferguson states that the factual allegations against her are "extremely limited," and that it is "important to consider what Plaintiff did not allege." Def.'s Resp. to Pl.'s Objs. at 3-4. Specifically, Ferguson states that "[t]here are no allegations that Ferguson had knowledge of Mitchell, his condition, or the CRO issued by the Portsmouth General District Court," and that the "Plaintiff also does not allege that Ferguson knew that [Defendant Gail Hart ("Hart")] had received Mitchell's CRO and placed it in a desk drawer without entering Mitchell into the system." Id. at 4.[5] Moreover, Ferguson states that "there are no allegations that Ferguson knew Hart had placed any other CROs in a desk drawer without taking action on them," and that "there are no allegations that Ferguson had authority or jurisdiction over HRRJ, where the allegedly horrible treatment of Mitchell

---

[5] During the relevant time underlying this action, Defendant Hart was a subordinate of Ferguson, working as an admissions employee at Eastern State Hospital. See Compl. ¶ 2.

occurred." Id. at 4-5. Having thus described the Plaintiff's allegations, Ferguson argues that she "was not deliberately indifferent to Mitchell's medical needs." Id. at 5. Ferguson challenges the Plaintiff's argument that the deliberate indifference standard in Farmer does not apply to Count Two, citing the Fourth Circuit's recent opinion in Scinto v. Stansberry, 841 F.3d 219, 225-26 (4th Cir. 2016). Def.'s Resp. to Pl.'s Objs. at 5. Ferguson asserts that, while the "Plaintiff argues that all individuals who were on the waiting list to be transferred to a state mental health institution inherently had a serious medical need," the instant case shows that is not so. Id. at 6. Ferguson states that "Mitchell was merely ordered to have his competency restored so that he could be tried for his crimes," and that "[t]here is nothing that is inherently medically serious about the need for competency restoration like there would be for someone who, for instance, was a risk to himself or others." Id. Ferguson further states that "the Complaint does not allege Ferguson was aware that all prisoners such as Mitchell had a serious medical need that was not being met merely by virtue of being on a waiting list." Id. Moreover, Ferguson asserts that "[t]he law requires that all prison facilities . . . provide medical care to their prisoners," and that "[t]here is no reason to believe that medical care was not being provided to those who happened to be on waiting lists to

23

be transferred to a state mental health facility." Id. For these reasons, Ferguson argues, "the facts alleged and the reasonable inferences that can be drawn therefrom do not satisfy the objective prong of the Farmer analysis." Id.

Additionally, Ferguson argues that, "even if it were assumed . . . that the Complaint alleges Mitchell had a serious medical need, there are no allegations that satisfy the subjective prong of the analysis," under which the "Plaintiff must demonstrate that Ferguson 'subjectively recognized a substantial risk of harm' and actually perceived the risk." Id. at 6-7 (quoting Parrish ex. rel. Lee v. Cleveland, 372 F.3d 294, 303 (4th Cir. 2004)). Ferguson notes that "[i]t is not enough that the [official] should have recognized" such a risk, Def.'s Resp. to Pl.'s Objs. at 7 (quoting Parrish, 372 F.3d at 303) (second alteration in original) (emphasis in Parrish), and states that "this is the argument Plaintiff makes by asserting that Ferguson is liable because her department was failing to move people off waiting lists and into state mental health facilities." Def.'s Resp. to Pl.'s Objs. at 7. As a final point, Ferguson asserts that the facts here are distinguishable from the facts underlying the Fourth Circuit's decision in Slakan, upon which the Plaintiff relies. See id. at 9-10.

Overall, Ferguson contends that "Plaintiff's arguments that Mitchell's incarceration necessarily would result in

24

constitutional violations are unsupported and not found in the allegations against Ferguson in the Complaint." Id. at 8. Stating "[t]here are no allegations that Ferguson was aware that inmates awaiting transfer when beds were available would be unconstitutionally punished due to the delay by being exposed to beatings, taunting, and denial of food, clothing, shoes, medication, and sanitary living conditions in state facilities not under her authority," Ferguson ultimately argues that the Plaintiff has failed to state a claim that Ferguson was deliberately indifferent to Mitchell's serious medical needs or conditions of confinement, and that the § 1983 claims against her should be dismissed. Id. at 10.

Having thus reviewed the Magistrate Judge's findings on the Plaintiff's § 1983 claims against Ferguson, as well as the Plaintiff's objection to those findings and Ferguson's response to this objection, the court will now evaluate the § 1983 claims de novo for the purpose of determining whether they are sufficient to survive the instant Motion.

For several reasons, Ferguson's arguments for dismissal of the § 1983 claims do not withstand the applicable standard of review.[6] To begin, it is true that the Plaintiff does not allege that Ferguson had independent knowledge of the alleged unconstitutional deprivations of Mitchell's civil rights that

_____

[6] See supra Part II.

occurred at the hands of HRRJ administrators, guards, and medical staff. It is also true that the Plaintiff does not allege Ferguson's knowledge of Mitchell's case in particular, or even Ferguson's direct knowledge of the alleged conduct of Ferguson's subordinate, Defendant Hart, in mishandling Mitchell's CRO when it was sent from the Portsmouth General District Court to Eastern State Hospital. Ferguson treats these omitted allegations as if they were dispositive of the Motion. See Def.'s Resp. to Pl.'s Objs. at 7. However, the Plaintiff's claims against Ferguson do not rely on any of these facts, which relate to other Defendants in this proceeding. Instead, the Plaintiff has specifically alleged that Ferguson herself "was woefully mismanaging the DBHDS's available beds," Compl. ¶ 87, and that Ferguson herself "routinely intentionally disregarded court orders regarding the restoration of competency." Id. ¶ 173. The Plaintiff specifically states that not only Mitchell's CRO, but "countless others, were regularly disregarded by DBHDS." Id. ¶ 84. The Plaintiff supports this contention by alleging that data from the DBHDS, as reported in the Richmond Times-Dispatch, and a report from Virginia's Office of the Inspector General, both show that the problem of inmates still waiting on hospital beds, despite court-ordered mental health treatment and despite a broad availability of empty beds, was not isolated with Eastern State Hospital and Defendant Hart.

See id. at ¶¶ 85-87. Indeed, the Plaintiff alleges that "[t]he failure to properly use available state mental hospital beds and the failure to properly transfer inmates under court order to such facilities for restoration was persistent and widespread." Id. ¶ 88.

In addition to these allegations, the Plaintiff further alleges that Ferguson had a statutory duty "to supervise and manage the [DBHDS] and its state facilities," id. ¶ 89 (quoting Va. Code § 37.2-304 (internal quotation marks omitted)), as well as a statutory duty to assign inmates for whom a court has entered a CRO for transfer "to an appropriate hospital to provide restorative mental health treatment." Id. (citing Va. Code § 19.2-169.2). The Plaintiff alleges that this latter statute requires the Commissioner, not a subordinate or the DBHDS itself, to designate a hospital appropriate for such treatment. See Compl. ¶ 2, 41 (citing Va. Code § 19.2-169.2).[7] Beyond the statutory basis for this duty, the Plaintiff otherwise alleges that Ferguson had a duty, upon receiving Mitchell's CRO, "to properly act on the CRO's directives to admit Mitchell to Eastern State for the restoration of competency." Id. ¶ 173.

---

[7] As explained below, the court does not agree with this interpretation. See infra note 8. However, the court notes the Plaintiff's argument here for the sake of properly characterizing the instant allegations.

With the Plaintiff's allegations against Ferguson appropriately framed, the court now considers whether the Plaintiff has plausibly stated claims against Ferguson under § 1983. As the Magistrate Judge noted, each of these claims requires some independent knowledge by Ferguson of an unconstitutional deprivation of Mitchell's rights. See R&R at 10. For Count Two, the Plaintiff was required to allege that Ferguson was deliberately indifferent to Mitchell's serious medical needs. See Estelle v. Gamble, 429 U.S. 97, 105 (1976). Accordingly, the Plaintiff's allegations must raise the reasonable inference that Ferguson acted with a "sufficiently culpable state of mind." Scinto, 841 F.3d at 225 (4th Cir. 2016) (quoting Farmer, 511 U.S. at 834 (internal quotation marks omitted)). The same standard applies to Count Five. See id. For Count Six, alleging § 1983 supervisory liability, the Plaintiff must have plausibly alleged that Ferguson was "deliberately indifferent in the face of a pervasive and unreasonable risk of harm" through inaction that "bore an affirmative causal link to the harm suffered by the plaintiff." Shaw v. Stroud, 13 F.3d 791, 802 (4th Cir. 1994). For such liability, the requisite knowledge is "actual or constructive knowledge" of a subordinate's "conduct that posed 'a pervasive and unreasonable risk' of constitutional injury to citizens like the plaintiff." Id. at 799 (quoting Slakan, 737 F.2d at 373).

28

Accepting the Plaintiff's allegations as true, and drawing all reasonable inferences in favor of the Plaintiff, the court finds that the Plaintiff has plausibly alleged Ferguson's knowledge for each of the § 1983 claims. Although the Plaintiff has not alleged facts that show Ferguson's direct knowledge of each of the Plaintiff's § 1983 claims arising from the systemic problems in the DBHDS, the Plaintiff is not required to do so. See Farmer, 511 U.S. at 842 ("Whether a prison official had the requisite knowledge of a substantial risk is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence . . . .") (emphasis added). Rather, the Plaintiff has sufficiently alleged Ferguson's knowledge in two ways. First, the Plaintiff has alleged that this problem of hospital bed mismanagement was substantial and widespread. See Compl. ¶¶ 85-88. In other words, based on the Plaintiff's allegations, the DBHDS was systematically failing to accommodate inmates who required in-patient mental health treatment to restore their mental competence. See id. Second, the Plaintiff alleges that this systematic failure was directly tied to Ferguson's duties as DBHDS Commissioner. See id. ¶ 173. Even though the court is not persuaded by part of the Plaintiff's statutory basis for this allegation,[8] the court is persuaded that

---

[8] Although the Plaintiff argues that the Virginia provision regarding CROs mandates that Ferguson alone is responsible for

29

the Plaintiff has plausibly alleged Ferguson's ultimate responsibility for hospital placement of inmates subject to CROs in Virginia. See id.

Thus, the alleged systemic problem in bed allocation would be Ferguson's own failing, in addition to any failure by her subordinates to perform duties that she may have delegated to them for this purpose. Taken together, the Plaintiff's allegations of a substantial, state-wide problem with bed allocation for inmates ordered to receive in-patient mental health treatment, falling under Ferguson's duties as DBHDS Commissioner, permit the reasonable inference of Ferguson's knowledge that the problem existed. Accordingly, the Plaintiff has plausibly alleged that Ferguson knew of the DBHDS's mismanagement of beds, but did nothing in response. See Compl. ¶¶ 85-88, 173.

Nevertheless, that does not end the inquiry. To state these § 1983 claims against Ferguson, the Plaintiff must have

---

performing this duty, see Compl. ¶¶ 2, 41, 173 (citing Va. Code § 19.2-169.2), the court does not interpret the statute in this manner. In relevant part, the statute requires that, upon a finding of a defendant's incompetency to stand trial and a finding that in-patient hospital treatment is required, "the court shall order that the defendant receive treatment to restore his competency . . . at a hospital designated by the Commissioner . . . as appropriate for treatment of persons under criminal charge." Va. Code § 19.2-169.2(A). This does not appear to place an affirmative duty on the Commissioner, but, rather, describes the kind of hospital to which such inmates must be transferred, i.e., one that the Commissioner has designated "as appropriate for treatment of persons under criminal charge." Id.

plausibly alleged not only Ferguson's knowledge of these systemic problems, but also that these systemic problems presented a substantial risk of harm to Mitchell, and that Ferguson was subjectively aware of this risk. See Scinto, 841 F.3d at 225-26. Thus, the Plaintiff's allegations must plausibly satisfy the two prongs of the Supreme Court's test in Farmer: (1) the objective prong, under which the alleged deprivation must be "objectively, 'sufficiently serious,'" and (2) the subjective prong, under which Ferguson must have acted with a "'sufficiently culpable state of mind.'" Farmer, 511 U.S. at 834 (quoting Wilson v. Seiter, 501 U.S. 294, 297-98 (1991)).

The court will address the objective prong first. As stated above, Ferguson argues that the Plaintiff has failed to satisfy this burden. Specifically, Ferguson asserts that "[t]here is nothing that is inherently medically serious about the need for competency restoration." Def.'s Resp. to Pl.'s Objs. at 6. Additionally, Ferguson asserts that because prisons are required by law to provide medical treatment to inmates, "[t]here is no reason to believe that medical care was not being provided to those who happened to be on waiting lists to be transferred to a state mental health facility." Id.

The court disagrees with these arguments. First, Ferguson's assertion that "[t]here is nothing that is inherently medically serious about the need for competency restoration" is

31

necessarily subject to factual dispute, and such a dispute would have to be resolved by the factfinder, not the court at this stage of the proceeding.[9] Second, Ferguson's assertion regarding mandatory medical care at prisons is overly broad. Although it is true that prisons are required by law to provide care for inmates facing serious medical needs, that is not the issue raised by the Plaintiff's § 1983 claims against Ferguson. Rather, the relevant question is whether serious medical needs would arise for an inmate who is deemed by the state so mentally incompetent to face adjudication that in-patient medical treatment is required to restore his competency, but who nevertheless remains in prison without the in-patient care. Stated differently, the court must determine whether the Plaintiff has plausibly alleged that a substantial risk of harm would come to such an inmate solely by virtue of the inmate's remaining in jail, without the court-ordered transfer.

Ferguson has anticipated this inquiry by arguing that "the Complaint does not allege Ferguson was aware that all prisoners such as Mitchell had a serious medical need that was not being met merely by virtue of being on a waiting list." Def.'s Resp. to Pl.'s Objs. at 6. However, the court finds this assertion to

---

[9] Although it does not resolve this factual dispute here, the court notes that the Virginia legislature found a pretrial detainee's inability to face adjudication due to mental health to be a concern that is serious enough to warrant court-ordered in-patient hospital treatment. See Va. Code § 19.2-169.2.

be overly broad, as well. Specifically, it is not true that the Plaintiff must allege that all inmates in Mitchell's category were facing a substantial risk of harm due to serious medical needs. Ferguson does not cite any law for that proposition, and it would not be prudent for the court to follow it, as it would result in a fallacy of composition.[10] Indeed, if the court were to find it wholly implausible that certain inmates in Mitchell's category faced an unconstitutionally substantial risk of harm, by virtue of their remaining on a waiting list, that finding would not mean that other inmates in this category did not face such a risk. Likewise, if the court were to find that a particular inmate in this category, perhaps Mitchell himself, plausibly faced such a risk, that finding would not mean that every inmate on a waiting list faced this risk, as well. Thus, the court will not subject the Plaintiff's allegations to a strict, universal generalization of this category of inmates, due solely to the possibility of exceptions. Instead, the court will evaluate the Plaintiff's allegations to determine whether they permit the reasonable inference that Mitchell's category

---

[10] See RUGGERO J. ALDISERT, LOGIC FOR LAWYERS: A GUIDE TO CLEAR LEGAL THINKING 215 (1989) ("'The fallacy of composition consists of reasoning improperly from a property of a member of a group to a property of the group itself.' It is to argue that something is true of a whole which can safely be said of its parts taken separately.") (quoting JOSEPH GERARD BRENNAN, A HANDBOOK OF LOGIC 190 (1957)).

included a sufficient number of inmates who faced such a substantial risk of unconstitutional harm as to make placement in that category an obvious, "specified source" of such harm. Slakan, 737 F.2d at 373.

Having reviewed the Plaintiff's allegations de novo, the court finds that they do raise such a reasonable inference. Ferguson's assertion that because prisons are required to provide medical care to inmates, "[t]here is no reason to believe that medical care was not being provided to those who happened to be on waiting lists to be transferred to a state mental health facility," Def.'s Resp. to Pl.'s Objs. at 6, is unpersuasive on its face. The inmates in question were on these waiting lists precisely because they were waiting for court-ordered medical care that the state determined the jail could not provide. Thus, there was every reason to believe that such medical care was not being provided to them. Although prisons are required to treat inmates' medical problems, they are not designed to treat all medical problems. If, for instance, an inmate requires serious surgery, that inmate will likely be transferred to a hospital for the procedure, given the limited resources of a prison. The court declines to hold that it would be otherwise for a serious issue of mental health. As the Fourth Circuit explained forty years ago, "[w]e see no underlying distinction between the right to medical care for

34

physical ills and its psychological or psychiatric counterpart." Bowring v. Godwin, 551 F.2d 44, 47 (4th Cir. 1977). Moreover, the Supreme Court has acknowledged the plain fact that, under some circumstances, a prison may not be capable of treating a mentally ill prisoner within its walls. See Vitek v. Jones, 445 U.S. 480, 495 (1980) ("The question whether an individual is mentally ill and cannot be treated in prison 'turns on the meaning of the facts which must be interpreted by expert psychiatrists and psychologists.'") (quoting Addington v. Texas, 441 U.S. 418, 429 (1979)). The Virginia legislature appears to agree with this notion, given the very procedure at issue here for transferring mentally ill inmates to hospitals for mental health treatment. See Va. Code § 19.2-169.2. Accordingly, under the facts of the Complaint, it is plausible that the inmates on these waiting lists were not being provided necessary medical care, and that their serious medical needs were not being met.

Even so, that does not answer the instant question under the objective prong, which is whether the inmates' remaining on these waiting lists gave rise to an unconstitutional risk of harm based on serious medical needs. The Plaintiff alleges that there were numerous individuals on waiting lists who had received CROs pursuant to Va. Code § 19.2-169.2, based on Ferguson's regularly disregarding those orders. See Compl. ¶¶ 85-91, 173. These orders were issued to inmates because they

35

had been deemed mentally incompetent by a court, upon review of a mental health professional's individual assessment of them. See Compl. ¶ 44 (citing Va. Code § 19.2-169.1). The Virginia Code defines incompetency as a defendant's "lack[ing] substantial capacity to understand the proceedings against him or to assist his attorney in his own defense." Va. Code § 19.2-169.1. This was the finding made for Mitchell and others for whom a CRO was issued by a court, pursuant to the procedure in that provision. See Compl. ¶¶ 62-63, 84-91.

Based on the definition of incompetency in the Virginia Code provision cited in the Complaint, a court's finding of a defendant's mental incompetency, alone, does not necessarily mean that such an individual would automatically face a substantial risk of harm solely by virtue of remaining in jail. On the other hand, it is highly likely that the class of individuals subject to CROs would include inmates so mentally ill that they would face such a risk, if left in jail without necessary in-patient mental health treatment. The allegations regarding Mitchell himself are an example of such likely harm.

Before any alleged abuse occurred at the HRRJ, and before the CRO was issued, Mitchell was evaluated by a psychologist who observed that "Mitchell's thought processes were so confused that only snippets of his sentences could be understood, the rest were mumbled statements that made no rational sense," and

36

that Mitchell was "hyperactive," to the point of banging his head against the walls, singing, and yelling for an entire half hour. Compl. ¶ 62. According to the Complaint, the psychologist also reported that Mitchell "dropped his pants and spat on the floor during the exam." Id. Any contention that such a mentally ill person would not be at risk of substantial harm to himself or others by remaining in a jail, either in isolation or among the regular jail population, would itself far exceed the realm of plausibility.

Based on the facts as stated in the Complaint, the Plaintiff has plausibly alleged that Mitchell was at a substantial risk of harm throughout his detention at the HRRJ, regardless of any alleged abuse or mistreatment he may have received at the hands of the HRRJ employees and contractors. Moreover, based on these facts, the court may draw a reasonable inference that the class of inmates to which Mitchell belonged, as the recipient of a CRO based upon a psychological evaluation reviewed by the court, included individuals who were likewise at a substantial risk of harm without court-ordered in-patient treatment. Indeed, it would be reasonable to infer that this class of inmates may have included individuals in far worse mental health than Mitchell, but who, like him, were nonetheless delayed in receiving in-patient hospital treatment due to the alleged mismanagement of beds by the DBHDS. Although the

inability to understand proceedings and assist defense counsel serves as the floor for an incompetency determination, that leaves the ceiling undefined. Given the vast array of individuals brought into jails, it would be reasonable to infer that the ceiling is the height of mental illness. For these reasons, the Plaintiff has satisfied the objective prong.

The court now turns to Farmer's second prong, which requires a determination of whether Ferguson "acted with a 'sufficiently culpable state of mind.'" Scinto, 841 F.3d at 225 (quoting Farmer, 511 U.S. at 834). Because the court has already established that the Plaintiff plausibly alleged Ferguson's knowledge of the systemic bed allocation problem for this set of inmates, the only remaining question is whether the Plaintiff has sufficiently alleged Ferguson's understanding that her inaction posed an "excessive risk" to this class of inmates. Jackson v. Lightsey, 775 F.3d 170, 178 (4th Cir. 2014).

The Complaint states that Ferguson was the Commissioner of the Virginia Department of Behavioral Health and Development Services, and is a licensed clinical psychologist. Compl. ¶ 41. Given this information, the relevant question becomes the following: Is it reasonable to infer that the licensed clinical psychologist who ran the state's behavioral health agency understood that a class of inmates could face a substantial risk of harm by remaining in jail, when a mental health professional

has recommended, and a state court has ordered, that each of these inmates be immediately transferred to a hospital for mental health treatment due to their incompetency to stand trial? The question answers itself. Thus, the Plaintiff has satisfied Farmer's subjective prong.

In conclusion, it is reasonable to infer from the Plaintiff's allegations that there was a systemic problem of inmates, such as Mitchell, not being placed in hospital beds, despite their availability. Further, because the Plaintiff has alleged that Ferguson was the individual charged with managing the court-ordered transfer of these inmates to hospitals in Virginia, it is reasonable to infer that she must have known about this systemic problem of bed assignment, since she was the person ultimately responsible for the management thereof. Additionally, it is reasonable to infer from the Plaintiff's allegations that inmates like Mitchell, who were waiting on hospital beds despite a court order for immediate in-patient mental health treatment, were at a substantial risk of harm without that treatment, and that Ferguson, as a licensed clinical psychologist charged with running the state's behavioral health agency, would have appreciated that risk. Accordingly, the Plaintiff's objection, based on the sufficiency of the § 1983 claims against Ferguson, is SUSTAINED.

### C. Qualified Immunity from the § 1983 Claims

The Plaintiff argues that the Magistrate Judge incorrectly found Ferguson entitled to qualified immunity for the claims brought against her under 42 U.S.C. § 1983. See Objs. at 11. As the Magistrate Judge noted, state actors are entitled to qualified immunity from such claims "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." R&R at 14 (quoting Harlow, 457 U.S. at 818). Nevertheless, the Magistrate Judge found that the Plaintiff's allegations against Ferguson do not fall under that exception, and that Ferguson is protected from the § 1983 claims by qualified immunity. See id. at 14-16.

In so finding, the Magistrate Judge explained: "Plaintiff seeks to hold [Ferguson] liable for 'systemic problems' in her agency caused by the failure of her subordinates to timely process transfer orders." Id. at 16. However, the Magistrate Judge stated that "absent any authority supporting the proposition that state agency heads can be personally liable for 'systemic problems' caused by the alleged misconduct of their subordinates, [Ferguson] is entitled to qualified immunity, since it was not clearly established that the agency head bore such responsibility for her subordinates." Id. "Stated another way," the Magistrate Judge explained, "it cannot be said that . . . it was clearly established that the Commissioner of a

40

state agency would violate the constitutional rights of a pretrial detainee if her employees failed to timely process inmate transfers." Id.

In objecting to this finding on qualified immunity, the Plaintiff argues that she "does not claim that Defendant Ferguson is liable simply because 'her employees failed to timely process inmate transfers,'" Objs. at 11 (quoting R&R at 16), but rather, that she claims "Defendant Ferguson was woefully mismanaging the DBHDS's available beds." Id. (quoting Compl. ¶ 87). The Plaintiff states that the allegation is "Ferguson knew or should have known that beds were needlessly going unused and that persons similarly situated to Mitchell would suffer constitutional injury because of that." Id.[11] Thus, the Plaintiff frames the qualified immunity inquiry as "whether the Commissioner of a state agency would have known that she could be held liable for personally 'woefully mismanaging [her agency's] available beds." Id. at 12. Moreover, in response to the Magistrate Judge's statement that "absent any authority

---

[11] The court bases its analysis herein on the facts as stated in the Complaint. See supra Part II. The Complaint alleges that Ferguson "intentionally disregarded court orders regarding the restoration of competency," Compl. ¶ 173, and, specifically under the allegations for Count Six, that Ferguson "had actual or constructive knowledge" of the alleged bed mismanagement. Id. ¶ 271. In other words, under Count Six, if Ferguson did not have actual knowledge of the bed mismanagement problem, she should have known about it. See id. As an aside, a supervisor cannot be "willfully blind" to a problem and then claim lack of knowledge of it.

41

supporting the proposition that state agency heads can be personally liable for 'systemic problems' caused by the alleged misconduct of their subordinates, [Ferguson] is entitled to qualified immunity," R&R at 16, the Plaintiff states that there is such authority in the Fourth Circuit case of Slakan v. Porter, 737 F.2d 368 (4th Cir. 1984), and that Slakan "disproves" the Magistrate Judge's finding. See Objs. at 13. The Plaintiff further challenges the Magistrate Judge's framing of the qualified immunity issue as whether "it was clearly established that the Commissioner of a state agency would violate the constitutional rights of a pretrial detainee if her employees failed to timely process inmate transfers," R&R at 16, arguing that the inquiry should instead be whether Ferguson's failure to address such systemic conduct by her employees would violate the constitutional rights of a pretrial detainee. See Objs. at 14-15. Overall, the Plaintiff argues that "[w]here a person knows, or should know, about a 'systemic problem' in the provision of medical care to prisoners, and fails to take reasonable steps to address the systemic problem, that person has violated 'clearly established law,'" and that Ferguson was such a person here. Id. at 15 (internal footnote omitted).

In response, Ferguson argues that, while "Plaintiff seeks to hold Ferguson liable under the Fourteenth Amendment, which adopts the Eighth Amendment's prohibition on cruel and unusual

punishment of inmates in correctional facilities," this prohibition applies to "prison officials charged with providing inmates with medical care and basic human needs." Def.'s Resp. to Pl.'s Objs. at 12 (citing Farmer, 511 U.S. at 832). Ferguson notes that she "is not a prison official and is not tasked with providing inmates with medical care and basic human needs." Id. Additionally, Ferguson states that the "Plaintiff has not pointed to one case that holds that the head of a statewide agency, outside of the chain of correctional officials, can be held liable for the alleged deprivation of an inmate's constitutional rights while that inmate is in prison," and that the "Plaintiff has not pointed to any clearly established law that could impose liability on Ferguson under the Plaintiff's allegations that Mitchell was denied medical care while incarcerated and subjected to unconstitutional conditions of confinement." Id. Ferguson states that the "Plaintiff's attempt to define Mitchell's rights at a high level of generality should not be entertained," but that the "Plaintiff must show that Ferguson violated a clearly established law particularized to the facts of this case." Id. (citing White v. Pauly, 137 S. Ct. 548, 552 (2017)). Ferguson argues that "under [the] Plaintiff's theory, Ferguson would be liable for every subordinate error, regardless of what that error was, if it falls within the assertion that DBHDS inefficiently managed the assignment of

beds." Id.[12] Ferguson also distinguishes Slakan, stating that while "the supervisory defendants in Slakan had specific knowledge that their subordinates were using water hoses to punish inmates and they took no action to enact policies to address that issue," the Plaintiff has not alleged "that Ferguson had specific knowledge of misconduct of her subordinates that she failed to address." Id. at 13 (citing Slakan, 737 F.2d at 375-76). Overall, Ferguson states that, based on the allegations in the Complaint, "it was not clearly established that Ferguson . . . violated Mitchell's constitutional rights." Id.

"The doctrine of qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" Pearson v. Callahan, 555 U.S. 223, 231 (2009) (quoting Harlow, 457 U.S. at 818). Importantly, "qualified immunity is 'an immunity from suit rather than a mere defense to liability,'" and "'it is effectively lost if a case is erroneously permitted to go to trial.'" Id. (quoting Mitchell v.

---

[12] Ferguson overstates her case and exaggerates here. The point is not responsibility for every subordinate's error, but responsibility for the oversight of the agency's mission of placing inmates subject to CROs into hospitals for immediate and necessary mental health treatment, for which she allegedly critically failed.

Forsyth, 472 U.S. 511, 526 (1985)). For this reason, courts should resolve the issue of qualified immunity "at the earliest possible stage in litigation." Id. (quoting Hunter v. Bryant, 502 U.S. 224, 227 (1991)).

"A qualified immunity defense can be presented in a Rule 12(b)(6) motion." Owens v. Baltimore City State's Attorneys Office, 767 F.3d 379, 396 (4th Cir. 2014). However, when raising the defense in a Rule 12(b)(6) motion, the defendant official "faces a formidable hurdle" and "is usually not successful." Id. (quoting Field Day, LLC v. Cnty. of Suffolk, 463 F.3d 167, 191-92 (2d Cir. 2006)). "This is so because dismissal under Rule 12(b)(6) is appropriate only if a plaintiff fails to state a claim that is plausible on its face." Id. (citing Iqbal, 556 U.S. at 678).[13]

When facing a claim under 42 U.S.C. § 1983, public officials are not protected by qualified immunity, if: "(1) the allegations underlying the claim, if true, substantiate a violation of a federal statutory or constitutional right; and (2) this violation was of a clearly established right of which a reasonable person would have known." Occupy Columbia v. Haley, 738 F.3d 107, 118 (4th Cir. 2013) (quoting Ridpath v. Bd. of Governors Marshall Univ., 447 F.3d 292, 306 (4th Cir. 2006)). Because the first prong of this test has already been satisfied,

---

[13] See supra Part II.

based on the court's ruling that the Plaintiff has plausibly alleged the § 1983 claims against Ferguson, the court need not address the first prong any further, beyond repeating that the Plaintiff has plausibly alleged Ferguson's violation of Mitchell's constitutional rights through her deliberate indifference to his serious medical needs.[14] Therefore, the court will now address the second prong, which requires determination of whether a reasonable person would have known that Ferguson's alleged conduct violated a clearly established right. See Occupy Columbia, 738 F.3d at 118.

The Fourth Circuit has stated that, in evaluating the second prong of the qualified immunity analysis, a court "[ordinarily] need not look beyond the decisions of the Supreme Court, this court of appeals, and the highest court of the state in which the case arose." Wilson v. Kittoe, 337 F.3d 392, 402-403 (4th Cir. 2003) (quoting Edwards v. City of Goldsboro, 178 F.3d 231, 251 (4th Cir. 1999)) (alteration in original). "However, 'the nonexistence of a case holding the defendant's identical conduct to be unlawful does not prevent denial of qualified immunity.'" Id. at 403 (quoting Edwards, 178 F.3d at 251). This is because "qualified immunity was never intended to relieve government officials from the responsibility of applying familiar legal principles to new situations." Id.

---

[14] See supra Part III.B.

(quoting Trulock v. Freeh, 275 F.3d 391, 405 (4th Cir. 2001) (Michael, J., concurring)). At the same time, "officials are not liable for bad guesses in gray areas; they are liable for transgressing bright lines." Id. (quoting Maciariello v. Sumner, 937 F.2d 295, 298 (4th Cir. 1992), cert. denied, 506 U.S. 1080 (1993)). Thus, "[i]n deciding whether the right alleged to have been violated was clearly established, the right must be defined 'at a high level of particularity.'" Id. (quoting Edwards, 178 F.3d at 250-51).

As established under the first prong of the qualified immunity analysis, at issue here is Mitchell's right to treatment of his serious medical needs. See Estelle, 429 U.S. at 104. Based on the Plaintiff's allegations, the court will define the violation as Ferguson's failure to correct, or address, the known systemic problem of her agency's not placing inmates in hospitals, despite court orders for their immediate, in-patient mental health treatment. See Compl. ¶¶ 2, 41, 85-91, 173. Under this definition, a reasonable person would have known that Ferguson's alleged conduct was a violation of Mitchell's clearly established right to timely in-patient mental health medical care, as her alleged conduct created and resulted in the delay and denial of treatment that another mental health professional and a state court judge had deemed medically necessary. Accordingly, at this stage of the proceeding,

47

Ferguson has not demonstrated that she is entitled to qualified immunity for the § 1983 claims.

In so finding, the court is not persuaded by Ferguson's argument that she is protected by qualified immunity because she was "outside of the chain of correctional officials." See Def.'s Resp. to Pl.'s Objs. at 12. Neither the Plaintiff's allegations, nor any law that Ferguson has cited, supports this contention. According to the Complaint, a court had ordered that Mitchell be given immediate mental health treatment in a hospital under Ferguson's purview. See Compl. ¶¶ 63-64. Moreover, the Complaint alleges that it was Ferguson's responsibility to ensure that the timely transfer of Mitchell and other inmates subject to such a court order occurred. See id. ¶¶ 2, 41, 173. Therefore, even though Ferguson was not a state official within the HRRJ itself, the Complaint alleges that Ferguson was the state official charged with ensuring that Mitchell and other inmates received the immediate medical care that a mental health professional and state court had deemed necessary. This duty placed Ferguson in a role that is indistinguishable from that of a jail administrator or a medical administrator within the correctional system charged with ensuring that necessary medical care is provided to inmates in the jails themselves. To find otherwise, based on Ferguson's location in a different building and governmental division, would ignore a plain and reasonable inference from the

Plaintiff's allegations. Moreover, it would permit the triumph of an empty formalism, without any citation by Ferguson to law that requires such a limitation. Although Ferguson argues that the "Plaintiff has not pointed to one case that holds that the head of a statewide agency, outside of the chain of correctional officials, can be held liable for the alleged deprivation of an inmate's constitutional rights while that inmate is in prison," see Def.'s Resp. to Pl.'s Objs. at 12, Ferguson has not cited a single case that holds such a government official to be immune from suit, despite bearing a direct responsibility for a pretrial detainee's in-patient mental health medical care, solely by virtue of a unique position within the state's administrative structure. The key here is that Ferguson's position broke "the chain of correctional officials," or at least inserted her into "the chain," because she was the link in charge of assigning Mitchell to an in-patient medical facility out of the jail. Once again, "the nonexistence of a case holding the defendant's identical conduct to be unlawful does not prevent denial of qualified immunity." Wilson, 337 F.3d at 403 (quoting Edwards, 178 F.3d at 251).

The court is also not persuaded by Ferguson's framing of the second prong of the qualified immunity analysis, as "whether it was clearly established that the Commissioner of a state agency would violate a pretrial detainee's constitutional rights

49

by relying on a subordinate (at one state facility out of many that the Commissioner oversaw) to process the detainee pursuant to a CRO." Mem. Supp. at 13. This characterization is a mischaracterization of the Plaintiff's allegations. The Plaintiff does not allege that Ferguson violated Mitchell's constitutional solely by "relying on a subordinate (at one state facility out of many that the Commissioner oversaw)." Mem. Supp. at 13. Although the Plaintiff did allege that one of Ferguson's subordinates at one state facility regularly disregarded CROs, even placing them in a drawer, see Compl. ¶ 2, the Complaint does not rest on that allegation alone. Rather, as stated in the second paragraph of the Complaint, the Plaintiff has alleged that "Ferguson regularly disregarded competency restoration orders issued by judges throughout the Commonwealth of Virginia," Compl. ¶ 2 (emphasis added), and that "[t]he failure to properly use available state mental hospital beds and the failure to properly transfer inmates under court order to such facilities for restoration was persistent and widespread." Id. ¶ 88. Thus, the court bases its qualified immunity determination not on Ferguson's narrow view of the Plaintiff's allegations, but on the allegations themselves.

Having applied the law of qualified immunity to the Plaintiff's facts as stated in the Complaint, the court finds that, at this stage of the proceeding, Ferguson is not entitled

to qualified immunity from the Plaintiff's § 1983 claims. Accordingly, the Plaintiff's objection based on the finding of qualified immunity for the § 1983 claims is **SUSTAINED**.

### D. Sufficiency of the Plaintiff's State Law Claims

The Plaintiff objects to the Magistrate Judge's finding that the Plaintiff failed to state claims for relief against Ferguson based on negligence, gross negligence, and willful and wanton negligence under Virginia law. See Objs. at 22-26. In the R&R, the Magistrate Judge found that the Plaintiff did not state these claims because the Plaintiff failed to assert that Ferguson owed a duty toward Mitchell. R&R at 20. Specifically, the Magistrate Judge found that "[i]t is not [Ferguson] herself who engaged in specific conduct which created a risk of harm to Mitchell; instead, it is the agency which allegedly failed to have proper procedures in place to insure that individuals in Mitchell's position were timely transferred from jails to hospitals." Id. at 21. The Magistrate Judge concluded that, "[a]bsent a duty, Plaintiff has failed to state a claim for negligence, gross negligence, or willful and wanton negligence." Id.

In support of this objection, the Plaintiff notes the Complaint's allegation that "[d]uring the relevant period, Defendant Ferguson regularly disregarded competency restoration orders issued by judges throughout the Commonwealth of

51

Virginia," Objs. at 22 (quoting Compl. ¶ 2), and argues that "[t]he foregoing words state precisely the failures of the former Commissioner of DBHDS, who was charged with the duty to transfer individuals to an appropriate hospital to provide restorative mental health treatment." Id. at 23 (citing Va. Code § 19.2-169.2). The Plaintiff argues that the Complaint does sufficiently allege a duty by Ferguson, based on her "critical position" as DBHDS Commissioner and "statutory duty to act." Id. at 25. Specifically, the Plaintiff argues that "[Ferguson] was 'in such a position with regard to' Mitchell that, if she 'did not use ordinary care and skill, she would 'cause danger of injury' to Mitchell." Id. (quoting RGR, LLC v. Settle, 288 Va. 260, 276 (2014)). The Plaintiff further argues that "Mitchell and other mentally ill persons who had been subject to restoration orders issued by Virginia judges certainly comprise individuals or a class of persons to which Defendant Ferguson owed duties—and she knew she owed duties—as head of the state agency that, among other things, runs state mental health hospitals." Id. at 26. Finally, the Plaintiff argues that she has plausibly alleged that Ferguson's conduct was the proximate cause of Mitchell's alleged mistreatment and death, and that she has also plausibly alleged gross negligence, and willful and wanton negligence, under Virginia law. See id.

In response, Ferguson argues that the "Plaintiff is unable to locate a recognized state law tort duty that Ferguson owed to Mitchell." Def.'s Resp. to Pl.'s Objs. at 15. Ferguson states that while "Plaintiff now relies on a supposed common law duty to mankind to generally avoid negligent conduct[,] [t]his common law duty was not asserted in the Complaint." Id. Ferguson states that the Virginia Supreme Court's decision in Settle has no bearing on the instant case, see id. at 16-17, and that, "[i]n reality, Plaintiff claims Ferguson had statutory duties as CEO of DBHDS and consequently owed a duty to the public at large to fulfill those statutory obligations." Id. at 17. However, Ferguson argues that "[t]he public duty doctrine . . . bars any action against Ferguson that is based on some alleged duty to the public." Id. (citing Marshall v. Winston, 239 Va. 315, 319 (1990); Rich-McGhie v. City of Portsmouth, 62 Va. Cir. 518, 525 (Va. Cir. Ct. 2002)). "More specifically," Ferguson argues, the "Plaintiff is attempting to hold Ferguson liable for anything that happened while she was the Commissioner of DBHDS," and "[t]his amounts to strict liability of a public official, and liability on that basis is expressly prohibited by the public duty doctrine." Id. at 18.[15]

In prior filings, Ferguson raised other arguments that were not fully renewed in the Response to the Plaintiff's Objections.

---

[15] See supra note 12 and accompanying text.

In the Memorandum in Support of the Motion to Dismiss, Ferguson asserted that her statutory duties did "not create a means through which an individual may sue in tort," and that the "Plaintiff is attempting to cure the lack of a common law duty by relying on generalized enabling statutes." Mem. Supp. at 16. Ferguson also provided an alternative interpretation for a statute relied upon by the Plaintiff to establish a duty by Ferguson to place inmates in hospitals after CROs are issued, see id. (citing Va. Code § 19.2-169.2), and, regarding the "generalized enabling statutes," stated that the "Plaintiff cannot rely on such statutes to establish that Ferguson owed a tort duty." Id. (citing Isbell v. Commercial Inv. Associates, Inc., 273 Va. 605 (2007)). Moreover, Ferguson argued that, "to the extent Plaintiff seeks to invoke the doctrine of negligence per se by somehow proving a violation [of these statutes], the law does not permit her to do so," because "[i]t is well-settled that 'the doctrine of negligence per se does not create a cause of action where none otherwise exists." Id. at 18 (quoting Williamson v. Old Brogue, Inc., 232 Va. 350 (1986)).

Thus, for several reasons, Ferguson argues that the "Plaintiff has no claim against Ferguson for negligence, gross negligence, willful and wanton negligence, or any other state law tort theory," and that Count One should be dismissed with prejudice as to Ferguson. Def.'s Resp. to Pl.'s Objs. at 18.

Having reviewed the findings of the Magistrate Judge on the state law claims, the Plaintiff's objection, and Ferguson's response, the court now turns to analyzing the state law claims for sufficiency under Rule 12(b)(6) review.[16]

## 1. Ordinary Negligence

Under Virginia law, "[t]o constitute actionable negligence, there must be a duty, a violation thereof, and a consequent injury." <u>Trimyer v. Norfolk Tallow Co.</u>, 192 Va. 776, 781 (1951). A duty to exercise due care to avoid injuring others "is owed to those within reach of a defendant's conduct." <u>Settle</u>, 288 Va. at 276. Such a duty arises "[w]henever one person is by circumstances placed in such a position with regard to another . . . that if he did not use ordinary care and skill in his own conduct with regard to those circumstances, he would cause danger of injury to the person or the property of the other." <u>Id.</u> (quoting <u>S. States Grain Mktg. Coop. v. Garber</u>, 205 Va. 757, 761 (1965)).

By alleging that Ferguson, as DBHDS Commissioner, was responsible for the management of inmate transfers and placements based on CROs, and that Mitchell was a part of that class of inmates to whom Ferguson owed this particular duty, <u>see</u> Compl. ¶¶ 2, 41, 173-75, 203, the Plaintiff has satisfied her burden of pleading Ferguson's duty toward Mitchell.

---

[16] <u>See</u> <u>supra</u> Part II.

Ferguson incorrectly relies on Virginia's public duty doctrine as a ground to dismiss the Plaintiff's state law claims. Under the public duty doctrine in Virginia, when a plaintiff claims negligence against a public official, "a distinction must be drawn between a public duty owed by the official to the citizenry at large and a special duty owed to a specific identifiable person or class of persons," and "[o]nly a violation of the latter duty will give rise to civil liability of the official." Marshall, 239 Va. at 319. However, the Virginia Supreme Court "has only applied the public duty doctrine in cases when a public official owed a duty to control the behavior of a third party, and the third party committed acts of assaultive criminal behavior upon another." Commonwealth v. Burns, 273 Va. 14, 17 (2007) (emphasis added). The instant allegations do not fall under this category, because they are not based on Ferguson's failure to control third parties engaging in such behavior. Rather, the Plaintiff seeks to hold Ferguson liable for her failure to place Mitchell in a hospital, pursuant to a court order for necessary mental health medical treatment. See Compl. ¶¶ 2, 41, 173. For this reason, even if the public duty doctrine were extended, it could not apply here, because Ferguson's relationship to Mitchell was not as a public official to a member of the public at large. Mitchell was "an identifiable person, or a member of an identifiable class of

56

persons, to whom the defendant[] owed a duty distinguishable from the duty . . . owed to the citizenry at large." <u>Marshall</u>, 239 Va. at 319. Indeed, the Plaintiff's allegations place Mitchell in the class of persons to whom Ferguson actually owed a particular duty to provide immediate mental health treatment upon court order. <u>See</u> Compl. ¶¶ 2, 41, 173. This circumstance is far different from the one in <u>Marshall</u>, where the plaintiff sought to hold a sheriff and jailer liable for negligently releasing an inmate prior to the expiration of his sentence, which inmate then robbed and murdered the plaintiff's decedent. <u>Marshall</u>, 239 Va. at 316-17.

Next, Ferguson argues that the Plaintiff's allegations rely upon a statutory duty, rather than a common law duty. Not so. Although the Plaintiff does cite a statutory duty for Ferguson to place Mitchell's class of inmates into hospitals for restorative treatment, <u>see</u> Compl. ¶¶ 2, 41, 173, the Complaint alleges a common law duty by Ferguson, as well. <u>See</u> <u>id.</u> ¶¶ 173-75, 203. It is for this reason that the Complaint notes that "Defendant Ferguson <u>also</u> had statutory duties to Mitchell." <u>Id.</u> ¶ 173. Thus, the Plaintiff has sought to hold Ferguson liable for negligence claims based on a statutory duty and also on a duty arising under common law, and Ferguson is incorrect to state that the Complaint relies solely on the former kind of duty. Regardless, the court has found that the Plaintiff

57

plausibly alleged that Ferguson had a common law duty of ordinary care toward Mitchell, and that is sufficient to overcome the instant stage of review.

Nevertheless, the court must also determine whether the Plaintiff has sufficiently pled that Ferguson's conduct was the proximate cause of the alleged harm in this case, whether it was foreseeable to Ferguson that her alleged conduct would cause harm, and whether there was any superseding cause of the harm that would relieve Ferguson from liability.

Under Virginia law, "[t]he proximate cause of an event is that act or omission which, in natural and continuous sequence, unbroken by an efficient intervening cause, produces the event, and without which that event would not have occurred." Jenkins v. Payne, 251 Va. 122, 128 (1996) (quoting Beale v. Jones, 210 Va. 519, 522 (1970)). Furthermore, "[t]here may be more than one proximate cause of an event." Id. (citing Panousos v. Allen, 245 Va. 60, 65 (1993)). Additionally, "[i]n order for negligence to be actionable, a defendant 'need not have anticipated or foreseen the precise injury sustained, but it is sufficient if an ordinarily careful and prudent person ought, under the same or similar circumstances, to have anticipated that an injury might probably result from the negligent acts.'" Norfolk Shipbuilding & Drydock, Co., Inc., v. Scovel, 240 Va. 472, 476 (1990) (quoting New Bay Shore Corp. v. Lewis, 193 Va. 400, 409,

69 S.E.2d 320, 326 (1952)). Finally, although "negligence intervening between the defendant's negligent act and the injury" may "relieve a defendant of liability for his negligent act," that intervening negligence "must so entirely supersede the operation of the defendant's negligence that it alone, without any contributing negligence by the defendant in the slightest degree, causes the injury." Jenkins, 251 Va. at 129 (citing Panousos, 245 Va. at 65; Coleman v. Blankenship Oil Corp., 221 Va. 124, 131 (1980); City of Richmond v. Gay, 103 Va. 320, 324 (1905)).

Having conducted a de novo review, the court finds that the Plaintiff has sufficiently alleged that Ferguson's conduct was the proximate cause of Mitchell's harm, that harm was foreseeable to Ferguson, and that no superseding negligence relieves Ferguson of liability from the claim of negligence. Specifically, although Ferguson claims that "the alleged acts or omissions of Ferguson were not a proximate cause of the alleged mistreatment and death of Mitchell," Mem. Supp. at 22 n.3, the court disagrees. The Complaint alleges that Ferguson separately caused harm to Mitchell by systematically mismanaging the intake system for inmates, like him, subject to CROs for immediate in-patient mental health treatment. See Compl. ¶¶ 2, 41, 85-91, 173-75. This mismanagement led to the failure timely to assign Mitchell to a bed at Eastern State Hospital. See id. ¶¶ 88-91,

173-75, 195. Moreover, while Ferguson claims that she "could not have foreseen the acts or omissions attributed to third parties responsible for Mitchell at HRRJ," and "could not have foreseen that Hart would not process the CRO and that such a failure would result in Mitchell's demise," Mem. Supp. at 22 n.3, these assertions of unforeseeability and superseding causes do not comport with the reasonable inferences drawn from the facts in the Complaint, as required at this stage of the proceeding.[17]

Based on the facts alleged in the Complaint, it is reasonable to infer that Ferguson could have foreseen that harm would come to inmates who were not given in-patient mental health treatment, as ordered by a court and recommended by a mental health professional, pursuant to a CRO. Moreover, the Plaintiff's allegations that the conduct of other Defendants proximately caused harm to Mitchell do not relieve Ferguson of liability, as there can be multiple proximate causes of an event. See Jenkins, 251 Va. at 128 (citing Panousos, 245 Va. at 65). Based on the Plaintiff's allegations, separate from the actions of the other Defendants, Ferguson was universally mismanaging the hospital intake of mentally ill inmates across the state, in a systematic failure of her duties to place them under proper care, and harm befell Mitchell because of this failure. See Compl. ¶¶ 2, 41, 85-91, 173-75. Accordingly, the

---

[17] See supra Part II.

60

Plaintiff has sufficiently stated a claim of negligence against Ferguson.

### 2. Gross Negligence

In Virginia, gross negligence is "a degree of negligence showing indifference to another and an utter disregard of prudence that amounts to a complete neglect of the safety of such other person." Elliott v. Carter, 292 Va. 618, 622 (2016) (quoting Cowan v. Hospice Support Care, Inc., 268 Va. 482, 487 (2004) (internal quotation marks omitted)). Gross negligence "is a heedless and palpable violation of legal duty respecting the rights of others which amounts to the absence of slight diligence, or the want of even scant care." Id. (quoting Chapman v. City of Va. Beach, 252 Va. 186, 190 (1996)). Indeed, gross negligence "requires a degree of negligence that would shock fair-minded persons, although demonstrating something less than willful recklessness." Id. (quoting Cowan, 268 Va. at 487 (internal quotation marks omitted)). "Ordinarily, the question whether gross negligence has been established is a matter of fact to be decided by a jury," but "when persons of reasonable minds could not differ upon the conclusion that such negligence has not been established, it is the court's duty to so rule." Id. (quoting Frazier v. City of Norfolk, 234 Va. 388, 393 (1987)).

Ferguson seeks dismissal of the Plaintiff's gross negligence claim. Specifically, Ferguson argues that the Plaintiff has not alleged facts against Ferguson that satisfy the above standards, because "the allegations are that a single employee——Defendant Hart——failed to process Mitchell's CRO and instead placed it in a desk drawer." Mem. Supp. at 21. Ferguson adds, "[e]xpecting that an employee of DBHDS would do their job without any reason to believe otherwise does not constitute negligence, much less gross negligence." Id.

The Plaintiff's allegations are to the contrary. See Compl. ¶¶ 2, 41, 85-91, 173-75. The Plaintiff does not merely complain of Hart's conduct. Instead, the Plaintiff alleges that Ferguson herself personally failed to address a systemic problem of not transferring inmates to hospitals for in-patient mental health care, despite court orders for such necessary medical treatment.

At this stage of the proceeding, before discovery has even begun, reasonable minds can differ over whether Ferguson's conduct amounted to an "utter disregard of prudence that amounts to a complete neglect of the safety of such other person." Elliott, 292 Va. at 622 (quoting Cowan, 268 Va. at 487). Accordingly, the Plaintiff has sufficiently pled gross negligence against Ferguson to survive the instant Motion.

### 3. Willful and Wanton Negligence

In Virginia, "[w]illful and wanton negligence is action taken in conscious disregard of another's rights, or with reckless indifference to consequences that the defendant is aware, from his knowledge of existing circumstances and conditions, would probably result from his conduct and cause injury to another." Kaltman v. All American Pest Control, Inc., 281 Va. 483, 494 (2011) (quoting Alfonso v. Robinson, 257 Va. 540, 545 (1999)).

Ferguson argues that the Plaintiff has failed to state a plausible claim of willful and wanton negligence, because "[w]ithout knowledge of Mitchell or the CRO, Ferguson could not have consciously disregarded Mitchell's rights or intended that the CRO not be implemented." Mem. Supp. at 22. Moreover, Ferguson argues that "the alleged acts or omissions of Ferguson were not a proximate cause of the alleged mistreatment and death of Mitchell," and that "Ferguson could not have foreseen the acts or omissions attributed to third parties responsible for Mitchell at HRRJ," and for the conduct of Defendant Hart. Id. at 22 n.3.

Ferguson's arguments are unpersuasive. The Plaintiff does not allege that Ferguson's failures were limited to Mitchell's case. Instead, the Plaintiff alleges that Ferguson consciously disregarded the whole class of inmates to which Mitchell

63

belonged, and that this class of inmates, due to a known systematic failure within Ferguson's agency, remained on a waiting list for hospital beds, despite court orders for immediate in-patient mental health medical treatment. See Compl. ¶¶ 2, 41, 85-91, 173-75. Moreover, the Plaintiff's allegations do not rely on the conduct of other Defendants, but on the conduct of Ferguson herself. See id. ¶ 2, 41, 173. Additionally, the court has already found that the conduct of other Defendants, as described in the Complaint, has not provided a superseding cause of harm for Ferguson.[18]

At this stage of the proceeding, before discovery has even begun, reasonable minds can differ over whether Ferguson's conduct amounted to a conscious disregard of Mitchell's rights, or reckless indifference to consequences that Ferguson was aware would probably result from her conduct. See Kaltman, 281 Va. at 494. Accordingly, the Plaintiff has sufficiently pled willful and wanton negligence against Ferguson to survive the instant Motion.

### 4. Eleventh Amendment and State Law Immunity

The Plaintiff has plausibly alleged claims of negligence, gross negligence, and willful and wanton negligence against Ferguson under Virginia law. Nevertheless, the court must next determine whether these claims are barred by a doctrine of

---

[18] See supra Parts III.B, III.D.1.

immunity. In the R&R, the Magistrate Judge found that the state law claims against Ferguson are barred by Eleventh Amendment immunity. See R&R at 16-20. As stated above, that finding relied on analysis that applies to the Plaintiff's § 1983 claims, but not to the Plaintiff's state law claims.[19] Thus, the court must address whether these state law claims are barred by Eleventh Amendment immunity on another basis. Additionally, the court must address whether the claims are otherwise barred by a doctrine of immunity, beyond the Eleventh Amendment.

The analysis in Part III.A of this Opinion does not apply to Eleventh Amendment immunity for these state law claims. See Pennhurst, 465 U.S. at 103-06. Specifically, the availability of a § 1983 claim against a state official sued in a personal capacity, based on a determination that the suit is not for damages against the state, is determined by concerns unrelated to those raised by a state law claim against a state official. See id. However, that does not mean Eleventh Amendment immunity is necessarily inapplicable. In Pennhurst, the Supreme Court barred a state law claim because of Eleventh Amendment immunity, holding that "federal courts lacked jurisdiction to enjoin petitioner state institutions and state officials on the basis of" the state law in question. Id. at 124-25. In so holding, the Supreme Court reasoned that "neither pendent jurisdiction nor

---

[19] See supra note 4.

any other basis of jurisdiction may override the Eleventh Amendment," id. at 121, and that policy concerns about litigants' necessarily bifurcating state and federal law claims in actions against state officials do not override this constitutional concern. See id. at 121-23.

Pennhurst's Eleventh Amendment concerns are inapplicable to the state law claims here. In Pennhurst, the district court had entered an injunction ordering state officials to conform their conduct to a state law for the treatment of mentally disabled individuals. See id. at 92-95. The Supreme Court reversed this judgment and remanded the case for dismissal of the state law claims, because "a federal suit against state officials on the basis of state law contravenes the Eleventh Amendment when—as here—the relief sought and ordered has an impact directly on the State itself." Id. at 117. That holding does not apply to the instant allegations. The Plaintiff alleges state law negligence claims against Ferguson in her personal capacity, not in her official capacity, and any relief granted would not "operate against the State," id. at 107, but, rather, against Ferguson herself. In other words, this case does not involve a federal court's direct intrusion, by way of injunction, into the operation of a state agency, as in Pennhurst; nor would it result in damages against the state. Instead, this case involves the pursuit of damages against a state official in her personal

capacity for negligent conduct. Contrast id. at 108 ("The named defendants had nothing to gain personally from their conduct; they were not found to have acted willfully or even negligently.") (emphasis added).

The Fifth Circuit has barred a claim of negligence against a state official based on the Eleventh Amendment immunity holding in Pennhurst. See Hughes v. Savell, 902 F.2d 376, 377-79 (5th Cir. 1990). However, Hughes is unhelpful to Ferguson. In Hughes, the Fifth Circuit applied Eleventh Amendment immunity because the "pendent negligence claim against [the state official]" was based on a Louisiana law that placed liability for the underlying negligence directly on the state. See id. at 378-79. No such statute exists here to bind the state to Ferguson's alleged misconduct.[20] Regardless, this court is not bound by the Fifth Circuit's decision in Hughes, and, absent a contrary holding by the Supreme Court or the Fourth Circuit, this court declines to hold that Eleventh Amendment immunity bars state law claims of negligence brought against a state official in her personal capacity. See Taormina v. Corr. Dep't, State of Cal., 132 F.3d 40, 1997 WL 775162, at *3 (9th Cir. 1997) (unpublished table opinion) ("Hughes is not binding on this circuit and sets forth a narrow holding that is not applicable to the case at hand.").

---

[20] See supra Part III.D.1.

Beyond Eleventh Amendment immunity, which was raised for the state law claims not by Ferguson, but by the Magistrate Judge sua sponte, see R&R at 16 n.2, Ferguson has otherwise argued, in a single sentence, that she is "entitled to sovereign immunity" for the state law claims. See Mem. Supp. at 15. While Ferguson made this conclusory statement, she did not further argue that such immunity is proper in the multiple briefings before this court or during the hearing on this matter. Under Virginia law, the party raising a plea of sovereign immunity bears the burden of "presenting distinct issues of fact which, if proved, create a bar to the plaintiff's right of recovery." Pike v. Hagaman, 292 Va. 209, 215 (2016). Here, Ferguson's conclusory statement does not meet this burden. Although Ferguson may raise a plea of sovereign immunity at a later time, she has not satisfied her burden of pleading sovereign immunity in the instant Motion. The court declines at this juncture to extend state sovereign immunity to the Plaintiff's state law claims against Ferguson. However, the court will consider an argument for sovereign immunity, if it is properly raised at a later time.

For the reasons above, the Plaintiff has plausibly stated claims of negligence, gross negligence, and willful and wanton negligence against Ferguson under Virginia law, and Ferguson is not protected from these claims by Eleventh Amendment immunity

or state sovereign immunity. The Plaintiff's objection regarding the state law claims is **SUSTAINED**.

**IV.**

At this juncture, Ferguson cannot hide behind the doctrines of sovereign and qualified immunity, and/or claims of ignorance of what was going on in the agency for which she was ultimately in charge. Accordingly, the Plaintiff's Objections are **SUSTAINED**, the Magistrate Judge's R&R is **REJECTED**, and the Motion to Dismiss, ECF No. 84, is **DENIED**.

The Clerk is **DIRECTED** to send a copy of this Opinion to counsel for all parties.

**IT IS SO ORDERED**.

REBECCA BEACH SMITH
CHIEF JUDGE

March 31, 2017